**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HAWTHORNE HYDROPONICS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| LUXX LIGHTING, INC., BRANDON | ) | |
| BURKHART, and IVAN VAN ORTWICK, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Hawthorne Hydroponics LLC ("Hawthorne") files this Complaint seeking injunctive, declaratory, and monetary relief against Defendants Luxx Lighting, Inc. ("Luxx Lighting"), Brandon Burkhart, and Ivan Van Ortwick (collectively, "Defendants"), relating to Defendants' deceptive and willful misconduct and multiple breaches of their obligations arising out of an asset purchase agreement between Hawthorne and Defendants dated December 29, 2021 (the "Agreement"), attached here as Exhibit 1.  In support, Plaintiff alleges on its own knowledge or upon information and belief as to other matters as follows:

### NATURE OF THE ACTION

1.      Hawthorne seeks injunctive, declaratory, and monetary relief arising from its purchase of certain lighting fixtures from Luxx Lighting, in light of Hawthorne's discovery that Luxx Lighting deceived Hawthorne by misrepresenting and concealing material information regarding the characteristics, quality, compliance, and condition of its products.  Hawthorne has already suffered significant damages and continues to do so and expects to incur additional significant harm—likely well in excess of $32 million, which, as set forth below, Hawthorne requests be trebled.

2.     Hawthorne is a leading provider of nutrients, lighting, and other materials used in the hydroponic growing segment.  Seeking to expand its portfolio of lighting products in this segment, Hawthorne turned to Luxx Lighting, a company that held itself out as a designer and provider of high-quality lighting fixtures used by hydroponic growers.

3.     Hawthorne entered into negotiations with Luxx Lighting, and based on information Luxx Lighting provided to Hawthorne regarding the characteristics, quality, compliance, and condition of its lighting fixtures, Hawthorne agreed to acquire certain assets of Luxx Lighting for $215 million, with Luxx Lighting expressly retaining liability for any wrongdoing arising prior to closing and other quality-related issues following the close of the Agreement and with Hawthorne expressly disclaiming such liability.

4.     Under the express terms of the Agreement, Hawthorne acquired only certain "Assumed Liabilities" and specifically disclaimed other "Excluded Liabilities."  As relevant here, Hawthorne (as Buyer) unambiguously disclaimed, and Luxx Lighting (as Seller) unambiguously retained, any and all liability "arising from facts or circumstances or underlying conditions or events or activities first occurring on or prior to the Closing."  In other words, Luxx Lighting expressly retained all liability for any issue with its lighting fixtures already manufactured, even if such issues later arose or were discovered after the close of the Agreement.

5.     Luxx Lighting further warranted under the Agreement that its products were free from faults or defects and complied with all laws and safety certification requirements.

6.     Defendants agreed to indemnify Hawthorne for any and all losses arising from or relating to the "Excluded Liabilities" or any breach of Luxx Lighting's representations or warranties made pursuant the Agreement.

7.     As to how the parties would handle indemnification of Hawthorne for liability retained by Luxx Lighting pursuant to the terms of the Agreement, the parties agreed to establish an escrow account.  The escrow account was created specifically for the purpose of addressing Excluded Liabilities for which Luxx Lighting remained liable, such as warranty claims or customer complaints regarding the lighting fixtures.

8.     Based on the information Luxx Lighting provided to Hawthorne prior to closing regarding the quality and characteristics of its products, product returns, and consumer complaints, Hawthorne agreed to an escrow amount of $28.5 million.  Based on Luxx Lighting's representations and other information provided, Hawthorne reasonably believed that amount would be sufficient to address any Excluded Liabilities.  At the time, Hawthorne did not know that the information provided by Luxx Lighting regarding its products was inaccurate, incomplete, and misleading in the manner now known.

9.     However, soon after the transaction closed, Hawthorne discovered significant quality and compliance issues in multiple models of Luxx Lighting's fixtures.  By way of example only, some of the fixtures manufactured before the closing contain markings representing that the fixtures provide a certain level of water intrusion protection, but Hawthorne discovered that Luxx Lighting did not have test reports to substantiate the claim and that the fixtures did not meet those requirements.  Other fixtures exhibited a quality issue relating to the printed circuit board delaminating (or separating) from the fixtures themselves, leading to failure of the diode, which is an electrical component of the fixture.  Yet another issue that Hawthorne discovered post-closing involved certain fixtures with an ETL listing mark that were in fact not manufactured at an ETL-approved facility, and therefore were not ETL approved.  This is significant because the ETL mark indicates that a product meets specific testing standards.

3

10.    After the sale was completed, Hawthorne also learned that the data provided by Luxx Lighting about the number of returns that Luxx Lighting received for the products at issue was inaccurate, incomplete, and misleading.  The data, on which Hawthorne relied when it agreed to the purchase price and escrow amount, materially understated the actual number of returns and therefore concealed the products' actual characteristics and true quality.

11.    Rather than properly track returns in the traditional and expected manner of using a return merchandize authorization (RMA) process, as Luxx Lighting led Hawthorne to believe it was using prior to closing, Luxx Lighting instead categorized numerous product returns as "zero cost replacements"—meaning such returns were not captured in the RMA data Luxx Lighting provided to Hawthorne.  Only after Hawthorne acquired Luxx Lighting's assets did it discover the company's zero cost replacement data, which revealed a significantly higher number of product returns.

12.    Based on Hawthorne's post-closing evaluation of the fixtures and returns to date, it currently projects that losses due to fixtures will substantially exceed $32 million—far more than the amount in escrow set aside to cover such claims.

13.    Hawthorne relied on the diligence materials Luxx Lighting provided in its negotiation of the $215 million purchase price and $25.8 million escrow amount.  Had Hawthorne been made aware of the true number of returns Luxx Lighting processed, and the underlying deficiencies that those returns revealed, Hawthorne would have sought to negotiate a different purchase price, different protections, or a greater escrow to account for the significant number of returns it now expects to receive.

14.    In March 2022 and August 2022, Hawthorne put Defendants on notice of claims relating to these issues and sought indemnification for resulting losses pursuant to Defendants'

express agreement to indemnify Hawthorne for any liabilities that existed prior to closing or for Luxx Lighting's warranty breaches.

15.     Despite their unambiguous and specific retention of liabilities for the fixtures, Defendants have refused to comply with their obligations under the Agreement to indemnify Hawthorne for its losses.

16.     Hawthorne therefore seeks injunctive, monetary, and declaratory relief from the Court arising out of the Defendants' clear and express obligations under the Agreement to indemnify Hawthorne for any losses it incurs associated with the product deficiencies as described in this Complaint.  Hawthorne further seeks damages for losses it has incurred as a result of Defendants' willful misconduct, wrongdoing, and breach of their representations and warranties under the Agreement.

## PARTIES

17.     Plaintiff Hawthorne Hydroponics LLC is a Delaware limited liability company with its principal place of business located in Marysville, Ohio, and is a wholly-owned subsidiary of Hawthorne Gardening Company, a Delaware corporation that is Plaintiff's sole member.  Hawthorne Gardening Company is a leading provider of nutrients, lighting, and other materials used in the hydroponic growing segment.  Its ultimate parent company is The Scotts Miracle-Gro Company, a publicly traded company that sells lawn and garden products in the consumer market.

18.     Defendant Luxx Lighting, Inc. (now known as Burk Ortwick Holdings, Inc.) is a California corporation.  Upon information and belief, its principal place of business is in Mira Loma, California.  Luxx Lighting is a producer and distributor of LED, high-intensity discharge (HID), and high-pressure sodium (HPS) lighting fixtures and accessories used by growers in the hydroponics industry.

5

19.     Defendant Brandon Burkhart is an individual who, upon information and belief, is a citizen of Florida.  Upon information and belief, Mr. Burkhart is the Chief Executive Officer and 50% equity owner of Luxx Lighting, and he is a signatory to the Agreement.

20.     Defendant Ivan Van Ortwick is an individual who, upon information and belief, is a citizen of California.  Upon information and belief, Mr. Ortwick is a 50% equity owner of Luxx Lighting, and he is a signatory to the Agreement.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff and Defendants. Further, Plaintiff to date has suffered substantial business losses in an amount far greater than $75,000, and those losses are increasing daily. The amount in controversy necessary for diversity jurisdiction over a declaratory judgment action is measured by the value of those business losses. *Id.* § 1332(a).

22.     This Court has personal jurisdiction over Luxx Lighting, Burkhart, and Ortwick pursuant to Section 9.9 of the Agreement pursuant to which the parties agreed that:

> EACH PARTY HEREBY IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY (AND IF JURISDICTION IN THE DELAWARE COURT OF CHANCERY SHALL BE UNAVAILABLE, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF DELAWARE) IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING IN CONNECTION WITH THIS AGREEMENT  . . . AND THEREBY, AND EACH PARTY AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING WILL BE BROUGHT ONLY IN SUCH COURT (AND WAIVES ANY OBJECTION BASED ON *FORUM NON CONVENIENS* OR ANY OTHER OBJECTION TO VENUE THEREIN)

23.     The parties further agreed to waive their right to a jury trial pursuant to Section 9.9, which further provided that each Party "EXPRESSLY WAIVES ANY RIGHT TO TRIAL

BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING

UNDER THIS AGREEMENT . . . ."

24.     The parties further agreed, pursuant to Section 9.8, that the "Agreement will be

governed by and construed in accordance with the laws of the state of Delaware, without regard

for the conflict of laws principles thereof."

## FACTUAL BACKGROUND

25.     Hawthorne entered the hydroponics retail industry in 2014 and soon became the

world's largest vertically integrated manufacturer, direct seller, and service provider dedicated to

servicing North America's licensed producers and growers in the hydroponics industry.  By

tapping into the rich horticulture growing expertise and resources of its parent company, Scotts

Miracle Gro, Hawthorne is able to provide its customers with the highest-quality lighting,

nutrients, growing media, fans, filtration, and other related products.

26.     To further grow and support its portfolio of lighting products, in 2021 Hawthorne

sought to purchase the assets of Luxx Lighting, a California-based company founded in 2018

that held itself out as a producer of high-quality cultivation lighting for cannabis growers.

**Before Closing:  Due Diligence and the Purchase Price and Escrow Amount**

27.     On December 29, 2021 Hawthorne entered into the Agreement with Luxx

Lighting, Burkhart, and Van Ortwick to purchase certain assets, properties, and rights of Luxx

Lighting for $215 million, with the intent of expanding its portfolio of lighting products in the

hydroponic growing segment.

28.     Those assets included certain lighting fixtures that were in Luxx Lighting's

inventory as well as customer orders for those fixtures.

29.     The parties closed the transaction on December 30, 2021 (the "Closing").

30.     Prior to the Closing, Defendants provided Hawthorne with data regarding the customer return rate for some of the Luxx Lighting products and concealed other material data regarding such products.

31.     Specifically, on August 9, 2021, Hawthorne requested "[c]onsumer complaint data summary analysis of any complaints or warranty claims for the past 2 years, including any related documents" as well as information regarding "[c]ompliance programs - industry standards, organic, etc. - what are they and how do you maintain and track compliance."

32.     After repeated requests for this information, Luxx Lighting finally responded on December 13, 2021 by providing certain information regarding its products' return rates, including the few returns it claimed to have through its RMA data.  Luxx Lighting did not disclose the many "zero cost replacements" it had provided to its customers.  Luxx Lighting's audited financial statements also reflected that it did not have any reserve for warranty claims because it historically had little to no RMA.

33.     Hawthorne reasonably relied on this data when negotiating the purchase price of $215 million, contract terms, and the escrow amount of $25.8 million to cover any indemnification claims after Closing.

34.     The Agreement drew a clear line between those liabilities that Hawthorne would assume and those it would not.

35.     Section 2.4 of the Agreement unambiguously provides that Hawthorne (as Buyer) disclaimed certain "Excluded Liabilities" from the asset purchase, including, among others, "any Liability arising from facts or circumstances or underlying conditions or events or activities first occurring on or prior to the Closing."  Section 2.4 provides in full:

Section 2.4. Excluded Liabilities. Notwithstanding any provision of this Agreement express or implied to the contrary (and without any implication that Buyer is

assuming any Liability of Seller or the Business or any Liability related to any of the Purchased Assets not expressly excluded), ***Buyer is not assuming or becoming obligated in any way in respect of, and will not be required to pay, perform, undertake or discharge, any Liabilities that are not specifically included in the Assumed Liabilities, including*** (a) any Indebtedness, including debt for borrowed money and all fees, accrued and unpaid interest, premiums or penalties relating to the foregoing including that certain Business Loan Agreement, dated January 28, 2021, (b) any Liabilities to the extent relating to, resulting from or arising out of any Environmental Law (including any violation of Environmental Law), Environmental Condition, or any Release of Hazardous Substance on, under, at or migrating to or from any of Seller's or any of its predecessors current or former facilities, (c) ***any Liability arising from facts or circumstances or underlying conditions or events or activities first occurring on or prior to the Closing, or relating to the conduct or operation of the Business or any other conduct of Seller and its Affiliates and their respective officers, directors, employees, consultants, agents or advisors on or prior to the Closing***, including but not limited to any Liability related to compliance with respect to Customs and Import Laws and any product misclassification or underpayments for customs duties or similar fees or charges owed by Seller (including, without limitation, any fines, assessments, penalties or late fees related thereto) to United States Customs and Border Protection or related Governmnetal [sic] Authority (the "**Excluded Liabilities**"). Seller will pay, perform or discharge when due or required to be performed or discharged, or contest in good faith, the Excluded Liabilities.

36.     In contrast, Section 2.3 of the Agreement (Assumed Liabilities) sets forth that Hawthorne assumed *only* "the liabilities of [Luxx Lighting] arising from facts or circumstances or underlying conditions or events or activities first occurring ***after*** the Closing that are either in respect of the Purchased Assets or the conduct of the Business" and any open purchase orders pursuant to Section 2.3 of the Disclosure Schedule to the Agreement.

37.     Accordingly, Hawthorne explicitly and unambiguously disclaimed any liability associated with the condition or design of the purchased products that arose prior to Closing.

38.     In connection with its sale of assets, Luxx Lighting represented to Hawthorne that its products would be free of deficiencies and would comply with all warranties.  Specifically, Luxx Lighting represented that:

(i) Seller has not manufactured, sold or distributed any products that were, at the time they were manufactured, sold or distributed, faulty or defective or did not

comply with any and all warranties or representations, including safety certification markings, expressly made or implied by or on behalf of Seller and (ii) all products manufactured, sold, distributed, provided, shipped or licensed by Seller and each service rendered by Seller has conformed with all applicable safety standards, contractual commitments, warranties and Laws, and there are no material design, manufacturing or other defects, latent or otherwise, in such products.

Ex. 1, Agreement § 3.24(b) (Product Warranties; Product Liability).

39.     Luxx Lighting further represented that "All products manufactured, sold, distributed, provided, shipped or licensed by Seller have complied with all requirements of Laws and regulation related to warning labels, packaging, containers, and all other labeling requirements," *id.* § 3.24(c) (Product Warranties; Product Liability), that Luxx Lighting "has been in compliance in all material respects with, and is not in violation, in any material respect of, all Laws applicable to the Business, the Purchased Assets or the Assumed Liabilities," and that to its knowledge it was not aware of any events that would constitute or result in a violation, *id.* § 3.11(a) (No Violation of Law; Permits).

40.     In support of these representations, Luxx Lighting, Burkhart, and Van Ortwick each agreed to severally indemnify, defend, and hold harmless Hawthorne against any losses incurred by Hawthorne to the extent such losses "are based upon, arise out of or relate to Excluded Liabilities or "a breach of any representation or warranty of [Luxx Lighting] set forth in this Agreement."  *Id.* § 8.3 (Indemnification by Seller).

41.     Section 8.3 provides in full:

Section 8.3. <u>Indemnification by Seller.</u> Subject to the provisions of this Article VIII, Seller, Burkhart and Van Ortwick will severally indemnify, defend and hold harmless Buyer and Buyer's officers, directors, managers, members, employees, agents, Affiliates and Subsidiaries, including officers and directors of any Affiliate or Subsidiary of Buyer (collectively, the "**<u>Buyer Parties</u>**" and together with the Seller Parties, the "**<u>Indemnitees</u>**"), after the Closing, from and against any and all Losses incurred by Buyer Parties to the extent such Losses are based upon, arise out of or relate to (a) a breach of any representation or warranty of Seller set forth in this Agreement or in any of the Transaction Documents, (b) any failure to

perform or comply with any of the covenants of Seller set forth in this Agreement or in any of the Transaction Documents, (c) Excluded Liabilities, (d) any and all Taxes for which Seller is responsible pursuant to this Agreement or for which Seller is otherwise responsible under any applicable Law, or (e) any matters set forth on Schedule 8.3.

42.     Schedule 8.3 further provides that Luxx Lighting agreed to specifically indemnify Hawthorne for "Any Liabilities arising out of or related to deficient and/or inaccurate safety markings or manuals with respect to products of the Business prior to the Closing."  Ex. 1, Agreement, Schedule 8.3(3).

43.     As defined in the Agreement, "Losses" includes "any and all damages, fines, fees, penalties, deficiencies, Liabilities, claims, losses (including loss of value), demands, judgments, settlements, actions, obligations and costs and expenses (including interest, court costs and fees and costs of attorneys, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment)."  *Id.* § 1.1(a).  "Liability" means "any direct or indirect, primary or secondary, liability, Indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), claim, deficiency, guaranty or endorsement of or by any Person of any type, secured or unsecured, whether accrued, fixed, absolute or contingent, direct or indirect, asserted or unasserted, due or to become due, whenever or however arising (including contract, tort, negligence or strict liability), liquidated or unliquidated, matured or unmatured, known or unknown or otherwise."  *Id.*  The parties thus agreed that Defendants would fully indemnify Hawthorne for any damages or liability arising from Excluded Liabilities.

44.     To specifically address any claims for indemnification relating to Luxx Lighting's retained liabilities after Closing, the parties entered into a separate escrow agreement, as described in Section 5.9, and Luxx Lighting was required to place $25.8 million into escrow for

a period of eighteen months following Closing.  *Id.* § 5.9 (Escrow).  If there were no unresolved claims for indemnification one year after the Closing, 50% of the remaining funds would be released to Luxx Lighting, and the full remaining amount would be released after eighteen months. To the extent any unresolved claims for indemnification were pending one year and/or eighteen months after the Closing, the amount to be released would be reduced by an amount equal to the maximum aggregate amount of all such unresolved claims.  *Id.* § 5.9(b)-(c).

45.     Under the Agreement a party may assert a claim for indemnification and recover Losses relating to those claims from the escrow amount by providing notice that describes the claims with reasonable particularity and by delivering an "Officer's Certificate" (meaning it is signed by any officer of that party) to the indemnifying party and escrow agent.  *See id.* §§ 8.3; 8.6(a).  If the indemnifying party does not object to the claim within thirty (30) days, the indemnified party may recover its Losses from the escrow account.  *Id.* § 8.6(a).

46.     While the Agreement generally provides that Hawthorne may not recover more than the escrow amount on its claims for indemnification under the Agreement, that restriction expressly does not apply to the Excluded Liabilities or any claims arising out of or related to fraud or willful misconduct by any Defendant.  *Id.*

**After Closing:  Discovery of Quality Issues and Hawthorne's Indemnification Claims for Excluded Liabilities**

47.     Soon after the sale, Hawthorne discovered material quality deficiencies, misrepresentations regarding Luxx Lighting's products, and inaccurate markings on lighting products it acquired that had been manufactured before the Closing.  Hawthorne was not made aware of such deficiencies prior to the Closing; to the contrary, Luxx Lighting had sought to mislead and conceal such deficiencies from Hawthorne, expressly representing in Section 3.2(b) that the products were not "faulty [or] defective."  *Id.* § 3.2(b).

48.     Hawthorne also discovered that Defendants had grossly understated pre-closing the true number of product returns it had actually received before the Closing.

49.     As Hawthorne learned only after the Closing, Luxx Lighting used a misleading approach to track returns and disclose those returns to Hawthorne.  Instead of using an RMA process to track product returns, Luxx Lighting instead categorized the vast majority of product returns as "zero cost replacements," meaning the product was replaced at zero cost to the customer but was not counted in Luxx Lighting's system as a return.  That concealed the true number of product returns.  Defendants misled Hawthorne by providing only the limited RMA data in response to Hawthorne's direct inquiries, which showed significantly fewer product returns than would have been revealed had Luxx Lighting also provided the zero cost replacement data.  Hawthorne discovered the zero cost replacement data only after it acquired Luxx Lighting's assets and gained access to such information through Luxx Lighting's files and records and former Luxx Lighting employees who came to work at Hawthorne after the Closing.

50.     As Hawthorne learned from one former Luxx Lighting employee, before the Closing, Luxx Lighting was aware of quality issues with its products.  Worse, Luxx Lighting intentionally chose to replace only a few lights at a time to avoid drawing attention to the returns in the diligence materials provided to Hawthorne, thus reflecting Luxx Lighting's willful misconduct.

51.     As indicated by the significantly higher number of returns Luxx Lighting actually received, Hawthorne's analysis of the products at issue demonstrates that a much higher portion of certain products will experience failure before the end of the products' five- or three-year (depending on the fixture) warranty period.

52.     Hawthorne also discovered that certain of the products failed to comply with certification markings, though Luxx Lighting had specifically warranted that the products complied with such markings.  *Id.* § 3.2(b).

53.     Hawthorne further discovered that certain of the products had been sold as having been manufactured in an ETL-authorized facility as Luxx Lighting had stated in their diligence materials for the product, though they had not been manufactured in such a location.  This too had been compliance to which Luxx Lighting had warranted in Section 3.2.

54.     On March 11, 2022 and on August 30, 2022, Hawthorne asserted claims for indemnification pursuant to Section 8.3 of the Agreement against Luxx Lighting, Burkhart, and Van Ortwick.  Hawthorne's claim notice letters complied with the procedure set forth in Section 8.4 and Section 8.6 by providing the requisite Officer's Certificate to Defendants and the escrow agent along with a detailed description of the Losses that Hawthorne reasonably expected to incur in connection with the products' quality issues, including its attorneys' fees as expressly authorized under the Agreement.

55.     The claim notice letters described the quality issues discovered with four particular products.

A.   Luxx 860W LED PRO (120-277V and 480V) (the "LED 860s"): Despite displaying markings claiming that these products are "IP-66 compliant"— meaning they offer a certain level of water intrusion protection—the LED 860s are in fact not IP-66 certified.  IP-66 refers to the "Ingress Protection" rating system used in the industry to classify the different levels of sealing effectiveness provided by an electrical enclosure against foreign bodies such as objects, water, or dirt, and "IP-66" is the particular rating for withstanding water and dust

ingress.  Hawthorne only discovered after the Closing that Luxx Lighting did not

have testing reports to substantiate its claim of IP-66 compliance (and that they

were not, in fact, IP-66 certified).  The LED 860s have also been found to

experience delamination (splitting or separation between coating layers) between

the printed circuit board (PCB) and the fixture itself, leading to diode failure, and

indicating that the products will fail well before the end of the product's warranty

period.

B. <u>Luxx 645W LED PRO (the "LED 645s")</u>: The LED 645s display markings that

indicate they are IP-66 compliant, but they are not actually IP-66 certified, similar

to the LED 860s.  The products' conformal coating has also exhibited a quality

issue causing corrosion and flaking, which causes early failure.  Finally, certain of

these units were found to have been manufactured in Malaysia, which is not an

ETL-authorized manufacturing location and was not included in the requisite

listing report for this fixture.  An "ETL-authorized location" refers to a particular

manufacturing facility through which products may receive certification of

compliance with the testing requirements from Electrical Testing Laboratories

(ETL), which is a nationally-recognized testing lab.  Certain growers specifically

purchase products manufactured in ETL-authorized locations, because they offer

certification of compliance with important North American standards.  Units that

were manufactured in Malaysia were improperly marked by Luxx Lighting as

manufactured in an ETL-authorized location and sold to growers, when in fact

they were not.

C.  <u>Luxx 200W LED Bar (the "LED 200s"):</u> The product labels for the LED 200s do not include other required markings and instructions.  Hawthorne expended substantial amounts to bring these products into compliance.

D.  <u>Luxx DE 1000W HPS (high-pressure sodium) (the "HPS 1000s"):</u> Since the Closing, Hawthorne has received numerous customer complaints regarding intermittent ignition issues that prevents the HPS 1000s from turning on and/or causes them to intermittently turn off.

56.    The product issues described above were misrepresented to Hawthorne, were wrongly concealed from Hawthorne, and evidence clear breaches of Luxx Lighting's representations regarding product warranties and liabilities under the Agreement, including that its products complied with all laws (§ 3.11), "safety certification markings" (§ 3.24(b)), and laboratory testing labeling requirements (§ 3.24(c)).

**Defendants' Refusal to Comply with the Agreement**

57.    As set forth above, certain of the fixtures fail to comply with basic applicable regulations, due to their mislabeling as being manufactured in ETL-authorized locations.  Certain other fixtures failed to comply with certification markings.

58.    In addition, while Hawthorne's investigation into these product deficiencies is ongoing, its analysis performed to date demonstrates that a significant portion of the fixtures it purchased pursuant to the Agreement will be returned due to product failure within the stated warranty period as a result of the design and manufacturing issues.  Indeed, Hawthorne has already begun receiving an unexpectedly high number of returns and complaints from customers about potentially defective products relating to these quality issues.  Hawthorne reasonably expects to continue to receive an increasing number of customer returns and/or warranty claims in the near future.

59.     Based on the failure rate of the products analyzed to date, Hawthorne projects that it will incur losses relating to the discovered quality issues in excess of $32 million and has incurred already well more than the $1,075,000 necessary to assert a claim for indemnification pursuant to Section 8.7 of the Agreement.  Hawthorne disclosed these estimated losses in its March 11 and August 30 claim letters to Defendants.  These losses do not reflect the full extent of the harm incurred or to be incurred by Hawthorne, as they do not include additional other losses attributable to the mislabeling of the products or other losses related to, for example, allegations of property and/or crop damage.

60.     On September 7, 2022, Defendants objected to Hawthorne's claim letters, refusing to indemnify Hawthorne for its Losses and thereby wrongfully preventing the release of escrow funds to Hawthorne for its Losses related to the Excluded Liabilities, as the parties had agreed under the terms of the Agreement.

61.     Because Hawthorne's estimated losses substantially exceed the escrow amount, and its claims for indemnification remain unresolved, Hawthorne has exercised its rights under the Agreement to withhold instruction to the escrow agent to release any of the escrow amount to Luxx Lighting.

62.     Defendants refuse to accept responsibility for the liabilities associated with the deficiencies in Luxx Lighting's previously-manufactured products that were discovered by Hawthorne following the Closing, despite the unambiguous language of the Agreement's "Excluded Liabilities" in Section 2.4, which makes clear that Hawthorne explicitly disclaimed such liabilities, and Section 8.3, which makes clear that Defendants explicitly agreed to indemnify Hawthorne for all such liabilities.

63.     The parties' dispute remains unresolved.  Hawthorne therefore seeks an order declaring that Section 2.4 of the Agreement unambiguously requires Defendants to indemnify Hawthorne for any losses incurred that are associated with the product deficiencies discovered in Luxx Lighting's previously-manufactured products that were discovered by Hawthorne following the Closing.  Hawthorne also seeks injunctive relief and compensatory damages for the losses it has incurred relating to the discovered quality issues and the damages it expects to incur as a result of the Defendants' wrongdoing.

## CLAIMS FOR RELIEF

### COUNT I

### Declaratory Relief

64.     Hawthorne, repeats, realleges, and incorporates by reference the above allegations as if fully set forth herein.

65.     Section 2.4 of the Agreement expressly and unambiguously provides that losses attributable to the manufacture, sale or distribution of products by Luxx Lighting are "Excluded Liabilities."

66.     Section 8.3 of the Agreement expressly and unambiguously provides that Luxx Lighting, Burkhart, and Van Ortwick shall indemnify Hawthorne for Excluded Liabilities and for any breach of any representation or warranty by Luxx Lighting.

67.     Hawthorne made claims for indemnification for losses relating to Excluded Liabilities, but Luxx Lighting, Burkhart, and Van Ortwick have refused to indemnify Hawthorne.

68.     Defendants' actions have harmed Hawthorne by causing Hawthorne to incur damages associated with the product issues and by interfering with its rights under the Agreement to seek and receive indemnification for such liabilities that were explicitly excluded.

69.     Hawthorne does not have an adequate remedy at law.

70.     Accordingly, Hawthorne seeks a declaration that the Excluded Liabilities provision in Section 2.4 of the Agreement requires Defendants to retain liability for all Losses incurred by Hawthorne associated with any product defects that arose prior to the Agreement's Closing; and further, that Section 8.3 requires Defendants to indemnify Hawthorne for all Losses associated with Excluded Liabilities.

## COUNT II

**Breach of Contract for Injunctive Relief – Failure to Release Escrow Funds**

71.     Hawthorne, repeats, realleges, and incorporates by reference the above allegations as if fully set forth herein.

72.     The Agreement is a valid and enforceable contract between Hawthorne and Luxx Lighting, Burkhart, and Van Ortwick.

73.     Under the Agreement, Hawthorne expressly disclaimed all Excluded Liabilities as set forth in Section 2.3.  Under that provision, Luxx Lighting unambiguously retained any and all liability "arising from facts or circumstances or underlying conditions or events or activities first occurring on or prior to the Closing."

74.     On March 11, 2022 and August 30, 2022 Hawthorne sought indemnification from Defendants for Losses it reasonably expected to incur relating to the quality issues discovered with the lighting fixtures manufactured prior to Closing—underlying conditions that fall squarely within the Excluded Liabilities.

75.     Defendants objected to Hawthorne's claims for indemnification and refused to comply with its obligations under the Agreement to indemnify Hawthorne for all such Losses associated with the Excluded Liabilities.

76.     As a result of Defendants' baseless objection to Hawthorne's claims for indemnification, Hawthorne is unable to seek recovery from the escrow account for its Losses associated with the Excluded Liabilities to which it is entitled.

77.     Accordingly, Hawthorne seeks an injunction directing Defendants to withdraw their baseless objection to the indemnification claims and cease withholding their consent to the escrow agent to release funds to Hawthorne for its claimed Losses.

## COUNT III

### Breach of Contract – Representations and Warranties

78.     Hawthorne, repeats, realleges, and incorporates by reference the above allegations as if fully set forth herein.

79.     The Agreement is a valid and enforceable contract between Hawthorne and Luxx Lighting, Burkhart, and Van Ortwick.

80.     Under the Agreement, Luxx Lighting expressly represented and warranted that its products would be free of faults or defects and would comply with all warranties, including that it "has not manufactured, sold or distributed any products that were, at the time they were manufactured, sold or distributed, faulty or defective or did not comply with any and all warranties or representations, including safety certification markings, expressly made or implied by or on behalf of [Luxx Lighting]"; that such products "conformed with all applicable safety standards, contractual commitments, warranties and Laws"; and that "there are no material design, manufacturing or other defects, latent or otherwise, in such products."  Ex. 1, Agreement § 3.24(b).

81.     Luxx Lighting further represented that "All products manufactured, sold, distributed, provided, shipped or licensed by Seller have complied with all requirements of Laws and regulation related to warning labels, packaging, containers, and all other labeling

requirements," *id.* § 3.24(c), that Luxx Lighting "has been in compliance in all material respects with, and is not in violation, in any material respect of, all Laws applicable to the Business, the Purchased Assets or the Assumed Liabilities," and that to its knowledge it was not aware of any events that would constitute or result in a violation, *id.* § 3.11(a).

82.    Defendants have repeatedly breached the Agreement through their misrepresentations regarding the products' condition, quality, and compliance with all laws and regulations.

83.    This Complaint is filed less than twelve months prior to Closing, well within the Agreement's prescribed period for survival of Luxx Lighting's representations and warranties of eighteen months following Closing.  *Id.* § 8.1.

84.    These breaches have caused and will continue to cause substantial additional damages to Hawthorne and also have materially and adversely affected Hawthorne's negotiation of and agreement to the escrow amount, which was influenced in part by the return information Defendants provided to Hawthorne prior to Closing.

85.    As a result of Defendants' multiple breaches, Hawthorne has incurred and expects to incur substantial additional damages, and the value of additional returns and warranty claims Hawthorne reasonably expects to receive now far exceeds the escrow amount the parties negotiated to cover such claims.

86.    Hawthorne seeks all damages incurred, expected to be incurred, or recoverable under applicable law in connection with Defendants' breaches.

## COUNT IV

### Fraud and/or Willful Misconduct

87.    Hawthorne, repeats, realleges, and incorporates by reference the above allegations as if fully set forth herein.

88.    Defendants made multiple misrepresentations regarding the quality and characteristics of its products and knowingly and willfully failed to provide accurate and complete information regarding product returns in response to direct requests by Hawthorne for that information.  Defendants also knowingly and willfully misrepresented the products' condition, quality, and compliance with all laws and regulations.

89.    In connection with the transaction Hawthorne requested specific information regarding Luxx Lighting's products return rates, and in response, Luxx Lighting provided information that was incomplete, inaccurate, and misleading, and vastly understated the real number of returns it received.

90.    On information and belief, Luxx Lighting fraudulently and willfully miscategorized numerous product returns to avoid accounting for the returns in its diligence materials provided to Hawthorne.

91.    Hawthorne relied on these materials in its negotiation of the purchase price, contract terms, and escrow amount.  Had Hawthorne been made aware of the true number of returns Luxx Lighting processed, actual product conditions, and the underlying deficiencies that those returns revealed, Hawthorne would have sought to negotiate a different purchase price, protections, or escrow amount to account for the significant number of returns it expects to receive.

92.    As a result of Defendants' fraudulent and willful misconduct, Hawthorne has incurred and expects to incur substantial additional damages and reasonably expects to receive returns and warranty claims that will far exceed the escrow amount the parties negotiated to cover such claims.

93.     Hawthorne seeks all damages to the fullest extent permitted by law, including those incurred or expected to be incurred as a result of Defendants' fraudulent and willful misconduct.

## COUNT V

### Delaware Deceptive Trade Practices Act

94.     Hawthorne, repeats, realleges, and incorporates by reference the above allegations as if fully set forth herein.

95.     The Delaware Deceptive Trade Practices Act prohibits unlawful and deceptive trade practices, including where a person "[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services"; falsely represents "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; or "[e]ngages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding. *6 Del. C.* § 2532(a)(2), (7), and (12).

96.     Defendants willfully engaged in deceptive trade practices by providing inaccurate, incomplete, and misleading information in its pre-Closing diligence materials that concealed the condition and characteristics of its products, the true number of product returns, and the underlying quality issues with the Luxx Lighting products sold to Hawthorne.

97.     Defendants intended that Hawthorne rely upon these misrepresentations, concealments, and omissions, and Hawthorne did reasonably rely.

98.     As a result of Defendants' willful deceptive practices, Hawthorne suffered harm in the form of damages and Losses associated with the products at issue.

99.     Hawthorne seeks to recover all damages incurred or expected to be incurred and treble damages associated with Defendants' willful misconduct in violation of the Delaware Deceptive Trade Practices Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor and against Defendants as follows:

1.      Declare that, pursuant to Section 2.4 of the Agreement, Hawthorne has not assumed or become obligated in any way for any actual, anticipated, or potential damages relating to the assets it purchased under the Agreement;

2.      Declare that Defendants must indemnify Hawthorne for Losses (including attorneys' fees) arising from the Excluded Liabilities and for any breach of any representation or warranty by Luxx Lighting;

3.      Order Defendants to withdraw their objection to the indemnification claims and cease withholding their consent to the escrow agent to release funds to Hawthorne for its claim Losses;

4.      Award damages to Hawthorne resulting from Defendants' breach of their representations and warranties;

5.      Award damages to Hawthorne resulting from Defendants' fraud or willful misconduct to the fullest extent permitted by law;

6.      Award treble damages to Hawthorne resulting from Defendants' fraud or willful misconduct in violation of the Delaware Deceptive Trade Practices Act; and

7.      Award Hawthorne the cost of this action, reasonable attorneys' fees, and such further relief that the Court deems just, proper, and equitable.

OF COUNSEL:

Marjorie P. Duffy
Alexandra Schill
Jones Day
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215
(614) 469-3939


Jeffrey J. Jones
Jones Day
150 West Jefferson Avenue, Suite 2100
Detroit, MI 48226
(313) 230-7950

Dated:  December 23, 2022

/s/ Kelly E. Farnan
Blake Rohrbacher (#4750)
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
rohrbacher@rlf.com
farnan@rlf.com
metzler@rlf.com

*Attorneys for Plaintiff*