# EXHIBIT 1

*EXECUTION VERSION*

---

**PURCHASE AGREEMENT**

**by and among**

**LUXX LIGHTING, INC.,**

**BRANDON BURKHART,**

**IVAN VAN ORTWICK**

**and**

**HAWTHORNE HYDROPONICS LLC**


**Dated as of December 29, 2021**

---

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION ........................................... 1

Section 1.1.    Definitions.............................................................................................. 1

Section 1.2.    Definitions defined in Agreement...................................................... 12

Section 1.3.    Grammatical Constructions ................................................................ 13

ARTICLE II PURCHASE AND SALE OF ASSETS AND CLOSING................................. 15

Section 2.1.    Purchase and Sale ............................................................................... 15

Section 2.2.    Excluded Assets .................................................................................. 16

Section 2.3.    Assumed Liabilities. ............................................................................ 18

Section 2.4.    Excluded Liabilities ............................................................................ 18

Section 2.5.    Purchase Price ..................................................................................... 19

Section 2.6.    Closing ................................................................................................. 19

Section 2.7.    Closing Deliveries by Seller .............................................................. 19

Section 2.8.    Closing Deliveries by Buyer.............................................................. 20

Section 2.9.    Pre-Closing Delivery by Seller; Adjustment .................................... 21

Section 2.10.   Closing Date Balance Sheet............................................................... 21

Section 2.11.   Withholding ........................................................................................ 24

Section 2.12.   Parent Stock Consideration................................................................ 24

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ............................ 24

Section 3.1.    Organization and Qualification.......................................................... 24

Section 3.2.    Authority; Non-Contravention; Approvals. ...................................... 25

Section 3.3.    Financial Statements; Inventory ........................................................ 26

Section 3.4.    Absence of Undisclosed Liabilities ................................................... 27

Section 3.5.    Absence of Certain Changes or Events.............................................. 27

Section 3.6.    Tax Matters. ........................................................................................ 27

Section 3.7.    ERISA and Employee Benefits........................................................... 29

Section 3.8.    Employment Matters........................................................................... 31

Section 3.9.    Labor Relations ................................................................................... 31

Section 3.10.   Litigation............................................................................................. 32

Section 3.11.   No Violation of Law; Permits............................................................ 32

Section 3.12.   Title to Purchased Assets; Encumbrances ........................................ 33

# TABLE OF CONTENTS
(continued)

**Page**

Section 3.13.   Entire Business; Sufficiency ............................................................ 33

Section 3.14.   Solvency.................................................................................... 33

Section 3.15.   Insurance .................................................................................. 33

Section 3.16.   Material Contracts....................................................................... 34

Section 3.17.   Tangible Personal Property........................................................... 36

Section 3.18.   Receivables; Disputed Accounts Payable ........................................ 36

Section 3.19.   Intellectual Property; Privacy and Information Technology. ............... 36

Section 3.20.   Real Property. ........................................................................... 40

Section 3.21.   Environmental Matters................................................................. 41

Section 3.22.   International Trade Laws .............................................................. 42

Section 3.23.   Casualties ................................................................................. 43

Section 3.24.   Product Warranties; Product Liability ............................................ 43

Section 3.25.   Product Registrations; Universal Product Codes............................... 43

Section 3.26.   Promotions and Allowances ......................................................... 44

Section 3.27.   Bank and Brokerage Accounts; Investment Purchased Assets............. 44

Section 3.28.   Absence of Certain Business Practices ............................................ 45

Section 3.29.   Propriety of Past Payments .......................................................... 45

Section 3.30.   Customers and Suppliers.............................................................. 45

Section 3.31.   Brokers.................................................................................... 45

Section 3.32.   Affiliate Transactions.................................................................. 46

Section 3.33.   Restrictions on Business Activities................................................. 46

Section 3.34.   Full Disclosure .......................................................................... 46

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 46

Section 4.1.   Organization and Qualification........................................................ 46

Section 4.2.   Authority; Non-Contravention; Approvals. ....................................... 46

Section 4.3.   Brokers .................................................................................... 47

Section 4.4.   Sufficient Funds ......................................................................... 47

Section 4.5.   Legal Proceedings ....................................................................... 47

ARTICLE V COVENANTS........................................................................................ 47

Section 5.1.   Conduct of the Business................................................................ 47

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 5.2. | Use of Name | 50 |
| Section 5.3. | Tax Matters. | 50 |
| Section 5.4. | Non-Competition; Non-Solicitation. | 51 |
| Section 5.5. | Non-Assignable Assets. | 53 |
| Section 5.6. | Employee Matters. | 54 |
| Section 5.7. | Parties' Obligations | 56 |
| Section 5.8. | Bulk Sale Filings | 58 |
| Section 5.9. | Escrow | 58 |
| Section 5.10. | Further Assurances; Post-Closing Cooperation. | 59 |
| Section 5.11. | Access to Information | 60 |
| Section 5.12. | Publicity | 61 |
| Section 5.13. | Exclusivity | 61 |
| Section 5.14. | Receivables | 61 |
| Section 5.15. | Notification of Certain Matters | 61 |
| ARTICLE VI CONDITIONS TO CLOSING | | 62 |
| Section 6.1. | Conditions to Each Party's Obligations | 62 |
| Section 6.2. | Conditions to Buyer's Obligations | 62 |
| Section 6.3. | Conditions to Seller's Obligations | 63 |
| ARTICLE VII TERMINATION | | 64 |
| Section 7.1. | Termination | 64 |
| Section 7.2. | Effect of Termination | 65 |
| ARTICLE VIII SURVIVAL; INDEMNIFICATION | | 65 |
| Section 8.1. | Survival of Representations, Warranties, Covenants and Agreements | 65 |
| Section 8.2. | Indemnification by Buyer | 66 |
| Section 8.3. | Indemnification by Seller | 66 |
| Section 8.4. | Assertion of Claims | 66 |
| Section 8.5. | Notice of and Right to Defend Third Party Claims | 67 |
| Section 8.6. | Indemnification Procedures. | 68 |
| Section 8.7. | Limitations. | 68 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 8.8. | Payment of Claims | 69 |
| Section 8.9. | Character of Indemnity Payments | 69 |
| Section 8.10. | Exclusive Remedy | 69 |
| ARTICLE IX MISCELLANEOUS | | 70 |
| Section 9.1. | Notices | 70 |
| Section 9.2. | Entire Agreement | 71 |
| Section 9.3. | Expenses | 71 |
| Section 9.4. | Waiver | 71 |
| Section 9.5. | Amendment | 71 |
| Section 9.6. | No Third-Party Beneficiary | 71 |
| Section 9.7. | Assignment; Binding Effect | 71 |
| Section 9.8. | Governing Law | 72 |
| Section 9.9. | Consent to Jurisdiction; Service of Process; Waiver of Jury Trial | 72 |
| Section 9.10. | Invalid Provisions | 73 |
| Section 9.11. | Counterparts | 73 |
| Section 9.12. | Interpretation | 73 |

**EXHIBITS**

Form of Burkhart Marketing Agreement ................................................. A
Form of Intellectual Property Assignment Agreement ......................... B
Form of Jungle Boys Marketing Agreement ........................................ C
Marketing Content Plan ...................................................................... D
Calculation of Net Working Capital .................................................... E
Form of Transition Services Agreement ............................................. F
Form of Assignment and Assumption Agreement and Bill of Sale ...... G
Form of Escrow Agreement ............................................................... H

**SCHEDULES**

Disclosure Schedule ............................................................................. 1

Specific Indemnities ........................................................................... 8.3

# PURCHASE AGREEMENT

This Purchase Agreement, dated as of December 29, 2021 (this "**Agreement**"), is by and among Luxx Lighting, Inc., a California corporation (the "**Seller**"), Brandon Burkhart ("**Burkhart**"), Ivan Van Ortwick ("**Van Ortwick**") and Hawthorne Hydroponics LLC, a Delaware limited liability company ("**Buyer**" and together with Seller, Burkhart and Van Ortwick, the "**Parties**").

## RECITALS

**WHEREAS**, Seller is engaged in the business of developing, manufacturing, marketing and distributing lighting products for horticultural uses (the "**Business**");

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase or cause one or more of its Affiliates to purchase, as applicable, from Seller, substantially all of the assets and specified liabilities of the Business, subject to the terms and conditions set forth herein; and

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1.    Definitions.

(a)    Whenever used in this Agreement, the following words and phrases will, when capitalized, have the respective meanings ascribed to them as follows:

"**Action**" means any demand, dispute, charge, claim, action, suit, countersuit, arbitration, mediation, hearing, inquiry, proceeding, audit, review, complaint, litigation or investigation, sanction, summons, subpoena, examination, citation, audit, review or proceeding of any Governmental Authority.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified.  The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies and affairs of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Assumed Current Assets**" means all Purchased Assets that are Current Assets.

"**Assumed Current Liabilities**" means all Assumed Liabilities that are Current Liabilities.

"**Burkhart Marketing Agreement**" means the agreement, substantially in the form attached as **Exhibit A** hereto.

"**Business Day**" means any day, other than Saturday and Sunday, on which federally-insured commercial banks in New York, New York are open for business (and not required or authorized to be closed) and capable of sending and receiving wire transfers.

"**Business Intellectual Property**" means all of Seller's right, title and interests in Intellectual Property that is now, and/or at the time of the Closing will be, owned, used or held for use in or otherwise necessary for the conduct of, the Business, including all the Intellectual Property listed in Section 3.19 of the Disclosure Schedule.

"**Business Material Adverse Effect**" means any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts that, individually or in the aggregate, has a material adverse effect on the business, operations or financial condition of the Business taken as a whole; *provided*, that none of the following events, changes, developments, effects, conditions, circumstances, matters, occurrences or states of facts shall be taken into account in determining whether there has been or may be a Business Material Adverse Effect: (a) any change or development in United States financial or securities markets, general economic or business conditions or political or regulatory conditions in the United States, (b) any act of war, armed hostilities or terrorism, (c) any change or development in the industry in which the Business operates, (d) any change in Law or the enforcement thereof or in GAAP or the interpretation thereof, (e) the public announcement or pendency of the transactions contemplated by this Agreement or the Transaction Documents, or (f) any change resulting from any action taken or omitted to be taken by or at the written request or consent of Buyer, except in the case of clauses (a), (b), (c) or (d) to the extent such events, changes, developments, effects, conditions, circumstances, matters, occurrences or states of facts have a disproportionate effect on the Business relative to other Persons engaged in the industry in which the Business operates.

"**Business Product Registrations**" means all Product Registrations used or held for use or contemplated to be used or held for use in connection with the marketing and sale of the Business Products to the end-user.

"**Business Products**" means all of the products of the Business that have been or are currently sold, licensed, distributed or otherwise made available to customers, as applicable, including the Registered Products and any products currently under development or scheduled for commercial release within 90 days of the date of this Agreement or otherwise scheduled to be provided to customers.

"**Buyer Material Adverse Effect**" means a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby and fulfill its obligations under this Agreement.

"**Cannabis**" means (i) all living or dead material, plants, seeds, plant parts or plant cells from any cannabis species or subspecies other than hemp, including wet and dry material, trichomes, oil and extracts from cannabis other than hemp (including cannabinoid or terpene extracts from any cannabis plant other than hemp), and (ii) biologically or synthetically

2

synthesized analogs of cannabinoids extracted, using micro-organisms, from any cannabis plant other than hemp.

"**Closing Date Customer Deposits**" means Customer Deposits as of the end of the Business Day immediately preceding the Closing Date.

"**Closing Date Net Working Capital**" means the Net Working Capital of Seller calculated as of the end of the Business Day immediately preceding the Closing Date.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Code**" means the Internal Revenue Code of 1986.

"**Confidential Data**" means information, including Personal Data, in whatever form that Seller is obligated, by Law or Contract, to protect from unauthorized access, use, disclosure, modification or destruction together with any data owned or licensed by Seller that is not intentionally shared with the general public or that is classified by Seller with a designation that precludes sharing with the general public.

"**Confidential Data Processor**" means any Person other than an employee of Seller (or the applicable Data Subject) that Processes or has access to any Data Processed by or on behalf of Seller.

"**Confidential Information**" has the meaning set forth in the Confidentiality Agreement.

"**Confidentiality Agreement**" means the Mutual Confidentiality Agreement between Hawthorne Hydroponics LLC and Seller, effective as of February 1, 2021.

"**Contract**" means any agreement, contract, plan, undertaking, instrument, note, bond, mortgage, indenture, deed of trust, loan, credit agreement, franchise concession, Permit, license, lease, purchase order, sales order or other similar commitment, obligation, arrangement or understanding, whether written or oral.

"**Current Assets**" means, as of a particular date and without duplication, amounts which would, in conformity with GAAP, be included under and classified as current assets on a consolidated balance sheet of Seller, *provided*, *however*, that (a) the amount of Receivables from Seller's consolidated balance sheet will be reduced to an amount equal to Eligible Receivables, (b) the amount of Inventory from Seller's consolidated balance sheet will be reduced to an amount equal to Eligible Inventory, and (c) Current Assets will exclude cash and any assets associated with federal, state, local or foreign income based Taxes.  Current Assets will be calculated in accordance with **Exhibit E**.

"**Current Liabilities**" means, as of a particular date and without duplication, amounts which would, in conformity with GAAP, be included under and classified as current liabilities on a consolidated balance sheet of Seller, including (a) all of Seller's obligations with respect to accounts payable associated with the corresponding Business obligations of Seller and

3

(b) all accrued, but unpaid, expenses; *provided*, *however*, that Current Liabilities will exclude liabilities associated with federal, state, local or foreign income based Taxes.  Current Liabilities will be calculated in accordance with **Exhibit E**.

"**Customer Deposits**" has the meaning set forth on **Exhibit E**.

"**Customer Orders**" means all bona fide purchase orders that have been received by Seller for the shipment of goods or services prior to and as of the Closing Date.

"**Customs and Import Laws**" means the Laws pertaining to imports and customs, including, but not limited to, those administered by the U.S. Bureau of Customs and Border Protection, U.S. Department of Homeland Security (and any successor thereof) ("**CBP**") or similar Governmental Authorities of other countries in which the Seller has conducted and/or currently conducts business, or from which the Seller imports any goods, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws.

"**Data**" means Confidential Data or Personal Data.

"**Data Subject**" means any "person," "individual," or "data subject" as defined by the applicable Information Privacy Laws.

"**Disclosure Schedule**" means that schedule of disclosures made by Seller and annexed hereto as **Schedule 1**.

"**Eligible Inventory**" has the meaning set forth on **Exhibit E**.

"**Eligible Receivables**" has the meaning set forth on **Exhibit E**.

"**Employees**" means (a) each person who as of immediately prior to the Closing is an active employee of Seller and (b) each employee of Seller who is on short-term disability, long-term disability or approved leave of absence as of immediately prior to the Closing and who returns to work within three months after the Closing Date.

"**Encumbrances**" means any and all liens, charges, security interests, mortgages, pledges, options, preemptive rights, rights of first refusal or first offer, proxies, levies, voting trusts or agreements, or other adverse claims or restrictions on, or imperfections of, title or transfer of any nature whatsoever (including any Encumbrances arising from any Liability for Taxes).

"**Environment**" means soil, surface waters, groundwater, drinking water, natural resources, land, stream sediments, surface or subsurface strata, ambient air, indoor air, any material or substance used in the physical structure of any building or improvement and any environmental medium.

"**Environmental Condition**" means any condition of the Environment with respect to (a) the Real Property arising, existing or occurring on or prior to the Closing, (b) any real property previously owned, leased or operated by Seller or any of its Affiliates in connection with the Business to the extent such condition of the Environment existed or occurred at the time of such ownership, lease or operation, or (c) any other real property at which any Hazardous

4

Substance generated by the operation of the Business prior to the Closing has been treated, stored, recycled, disposed of, or has otherwise come to be located, that violates any Environmental Law or that results in any Release, threat of Release, Loss or Liability.

"**Environmental Law**" means any Law relating to (a) human health or safety (including public or workplace health and safety), (b) protection of the Environment, (c) Releases of Hazardous Substances, (d) injury, harm or adverse health effects to Persons relating to exposure to Hazardous Substances, or (e) the treatment, storage, recycling, handling, use, generation, manufacture, sale, distribution, importation, exportation, labeling or reporting relating to Hazardous Substances.

"**Environmental Loss**" means any Loss arising out of or relating to Environmental Laws, an Environmental Condition or Release of Hazardous Substance.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means a Person required at any particular time to be aggregated with any of Seller under Sections 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**Excluded Inventory**" means products comprising metal halide and ceramic metal halide bulbs.

"**FCPA**" means the Foreign Corrupt Practices Act of 1977.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**Governmental Authority**" means any international, supranational, national, provincial, regional, federal, state, municipal or local government, any instrumentality, subdivision, court, tribunal, judicial or arbitral body, administrative or regulatory agency or commission or other authority thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"**Hazardous Substance**" means any pollutant, toxic substance, asbestos and asbestos-containing materials, hazardous waste, hazardous material, hazardous substance, contaminant, petroleum and petroleum-containing materials, radiation and radioactive materials, leaded paints, toxic mold, polychlorinated biphenyls and other substances or materials as defined in, the subject of, or which could give rise to Liability under, any Environmental Law.

"**Indebtedness**" means, with respect to any Person, (a) all obligations of such Person for borrowed money (including reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured), (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable and accrued commercial or trade Liabilities arising in the ordinary course of business, (d) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (e) all indebtedness created or arising under any conditional sale or

5

other title retention agreement with respect to property acquired by such Person, (f) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, (g) all indebtedness secured by any lien on any property or asset owned or held by such Person regardless of whether the indebtedness secured thereby will have been assumed by such Person or is non-recourse to the credit of such Person, (h) all guarantees by such Person of the indebtedness of any other Person, (i) income Tax Liabilities and (j) all other obligations that would be required to be reflected as debt in accordance with GAAP.

"**Information Privacy Laws**" means any Laws pertaining to privacy, data protection or data transfer, including all privacy and security breach disclosure Laws, implementing laws, ordinances, permit, regulation, rule, code, governmental order, constitution, treaty, common law, judgment, ruling, decree, other requirement or rule of law, in each case, of any Governmental Authority, including, as applicable, the General Data Protection Regulation (GDPR), the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and the Children's Online Privacy Protection Act (COPPA) of 1998, as amended, the Telephone Consumer Protection Act of 1991, as amended, the Do-Not-Call Implementation Act of 2003, as amended, Section 5 of the Federal Trade Commission Act of 1914, as amended (as the same has been interpreted to apply to privacy, data protection, breach disclosure or data transfer issues).

"**Intellectual Property**" means all intellectual property, in any jurisdiction worldwide, whether registered or unregistered, including (a) all trademarks, service marks, trade names, logos, artwork, designs, slogans and symbols, corporate names, certification marks, collective marks, d/b/a's, internet domain names and websites, user names on social media websites, business symbols, brand names and other indicia of origin, all applications and registration for the foregoing and all goodwill associated therewith and symbolized thereby, including all renewals of same, (b) all patents, patent applications and inventions, if any, including any provisional, utility, continuation, continuation-in-part or divisional applications filed in the United States or any other jurisdiction and all reissues thereof and all reexamination certificates issuing therefrom, (c) all published and unpublished works of authorship, if any, whether copyrightable or not (including data bases and other compilations of information), copyrights therein and thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof, (d) all confidential or proprietary information, trade secrets and know-how, if any, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer and supplier lists, advertising materials and other industry information, (e) the rights of privacy and publicity and to sue for and recover damages, assert, settle and/or release any claims or demands and obtain all other remedies and relief at Law or equity for any past, present or future infringement or misappropriation of any of the Intellectual Property, (f) all licenses, options to license and other contractual rights to use the Intellectual Property, (g) all UPC Codes, and (h) all computer and electronic data processing programs and Software and related documentation, existing research projects, Software presently under development, and all Software concepts owned and all proprietary information, processes, formulae and algorithms, used in the ownership, marketing, development, maintenance, support and delivery of such Software, subject to all applicable licenses and rights to use such Software.

"**Intellectual Property Assignment Agreement**" means the Intellectual Property Assignment Agreement in the forms attached hereto as **Exhibit B**.

6

"**International Trade Laws**" means any applicable (i) Sanctions; (ii) U.S. export control Laws (including, without limitation, the International Traffic in Arms Regulations (22 CFR §§ 120-130, as amended), the Export Administration Regulations (15 CFR §§ 730-774, as amended) and any regulation, order, or directive promulgated, issued or enforced pursuant to such laws; (iii) Customs and Import Laws; (iv) the anti-boycott laws administered by the U.S. Department of Commerce and the U.S. Department of the Treasury; and (v) export Laws of other countries in which the Seller has conducted and/or currently conduct business.

"**Inventory**" means all inventory, including finished goods, work-in-process, packaging, parts, supplies and raw materials, other than Excluded Inventory.

"**IRS**" means the United States Internal Revenue Service, or any successor Governmental Authority.

"**Jungle Boys Marketing Agreement**" means the agreement, substantially in the form attached as **Exhibit C** hereto.

"**Law**" means any federal, provincial, state, local, municipal, foreign, national, supranational, international, multinational or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, treaty, rule, code or other requirement imposed by a Governmental Authority.

"**Liability**" means any direct or indirect, primary or secondary, liability, Indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), claim, deficiency, guaranty or endorsement of or by any Person of any type, secured or unsecured, whether accrued, fixed, absolute or contingent, direct or indirect, asserted or unasserted, due or to become due, whenever or however arising (including contract, tort, negligence or strict liability), liquidated or unliquidated, matured or unmatured, known or unknown or otherwise.

"**Losses**" means any and all damages, fines, fees, penalties, deficiencies, Liabilities, claims, losses (including loss of value), demands, judgments, settlements, actions, obligations and costs and expenses (including interest, court costs and fees and costs of attorneys, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment).

"**Marketing Content Plan**" means the agreement, substantially in the form attached as **Exhibit D** hereto.

"**Net Working Capital**" means, as of a specified date, and calculated in accordance with **Exhibit E**, (a) the sum of Assumed Current Assets _less_ (b) Assumed Current Liabilities; _provided_, that such calculation will exclude (i) any income Tax Liabilities or income Tax assets, (ii) any property or item of value received in connection with any transfer of any Excluded Assets (other than any Assumed Current Assets or cash so received, which will be included in the calculations), and (iii) any gain or loss relating to or resulting from any hedging agreement.

"**Nicholls**" means Brent Nicholls.

"**Open Source Materials**" refers to any Software or other material that is distributed as "free software," "open source software" or under similar licensing or distribution terms (including the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), Berkeley Source Distribution (BSD) licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL), the Sun Industry Standards License (SISL), the Apache License, and any license identified as an open source license by the Open Source Initiative (www.opensource.org)).

"**Parent Stock**" means shares of Common Stock of The Scotts Miracle-Gro Company (NYSE: SMG), par value $0.0001 per share.

"**Parent Stock Consideration**" means a number of shares of Parent Stock equal to the Parent Stock Consideration Amount, divided by the Parent Stock Price, rounded down to the nearest whole share.

"**Parent Stock Consideration Amount**" means an amount equal to 10% of the Purchase Price.

"**Parent Stock Price**" means the product of (a) the volume weighted average price of the Parent Stock over the ten (10) day trading period ending three (3) trading days prior to Closing and (b) 105%.

"**Pattison**" means Morgan Pattison.

"**Pattison Consulting Agreement**" means the agreement providing for consulting services of Pattison to Buyer, in a form satisfactory to Buyer.

"**Permit**" means any permit, license, franchise, approval, consent, registration, clearance, variance, exemption, order, certificate or authorization by, of or to any Governmental Authority.

"**Permitted Encumbrances**" means (a) liens for Taxes not yet due and payable, (b) such non-monetary imperfections of title, if any, which do not materially detract from the value or materially interfere with the present use of the property subject thereto or affected thereby, (c) statutory liens to secure obligations to landlords, lessors or renters under leases or rental agreements, (d) statutory liens in favor of carriers, warehousemen, mechanics and materialmen, to secure claims for labor, materials or supplies and other like liens arising or incurred in the ordinary course of business for amounts which are not delinquent and which are not, individually or in the aggregate, material and for which adequate reserves have been established, and (e) zoning, entitlement, building and other land use regulations imposed by a Governmental Authority having jurisdiction over the Real Property which are not violated by the current use and operation thereof.

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited or unlimited liability company, proprietorship, joint venture, other business organization, trust, union, association or Governmental Authority.

"**Personal Data**" means any data or information relating to an identified or identifiable natural person; an "identifiable person" is one who can be identified, directly or

indirectly, including by reference to an identification number or to one or more factors specific to his physical, physiological, mental, economic, cultural or social identity, including unique device or browser identifiers, names, ages, addresses, telephone numbers, email addresses, social security numbers, passport numbers, alien registration numbers, medical history, employment history, and/or account information; and shall also mean "personal information", "personal health information" and "personal financial information" each as defined by applicable Laws relating to the collection, use, sharing, storage, and/or disclosure of information about an identifiable individual.

"**Personal Data Processor**" means any person other than an employee of Seller (or the applicable Data Subject) that Processes or has access to any Personal Data Processed by or on behalf of Seller.

"**Personal Data Supplier**" means any person (other than a Data Subject) that provides Personal Data to Seller.

"**Prepaid Expenses**" means all prepaid expenses, deferred charges, advance payments, Security Deposits paid by or on behalf of Seller, reserves in connection with any Permitted Encumbrances and similar items, excluding any such items arising from, related to, or in connection with, any Excluded Assets.  The Prepaid Expense categories and amounts as of the Closing are set forth in Section 1.1.1 of the Disclosure Schedule.

"**Privacy Policy**" means a policy of Seller (or a policy of a Personal Data Supplier where Seller is obligated by Law or Contract to apply the terms of such policy of a Personal Data Supplier) made available in connection with the collection of information provided by or on behalf of individuals that is labelled as a "Privacy Policy," is reached on a web site by a link that includes the label "Privacy" or that is a written policy or disclosure that describes how information provided by or on behalf of individuals will be held, used, processed or disclosed.

"**Process**" means to acquire, use, transmit, record, organize, adapt, alter, transfer, retrieve, consult, disclose, disseminate, combine or store Data.

"**Product Registrations**" means any and all pending applications or filings and all current registrations issued under any federal or state statute or other Law, letters of authorization, and any and all labels, data, including but not limited to toxicology, chemistry and efficacy data, studies, protocols, final reports and raw data, and other documentation and information used and/or reasonably necessary to support such registrations and/or to support label or advertising claims. Product Registrations also include applications and/or filings with any National Recognized Testing Lab or otherwise to support product markings such as "UL" or "ETL."

"**Real Property**" means any and all real property and interests in real property of Seller (together with all buildings, structures, fixtures and improvements thereon), including the Leased Real Property, any real property leaseholds and subleaseholds, purchase options, easements, licenses, rights to access and rights of way and any other real property otherwise owned, occupied or used by Seller in connection with the Business

"**Receivables**" means all of Seller's accounts (including all health-care insurance receivables), Contract rights, instruments (including promissory notes and other instruments

9

evidencing Indebtedness owed to Seller by any Person other than any of their respective Affiliates), chattel paper (whether tangible or electronic), general intangible assets relating to accounts, drafts and acceptances, and all other forms of obligation owing to Seller arising out of, or in connection with, the sale, lease or other disposition of Inventory or the rendition of services, all guarantees and other security therefor, whether secured or unsecured.

"**Registered Products**" means each of the end-user products sold by Seller set forth on <u>Section 1.1.2 of the Disclosure Schedule</u>, which products are sold, as of the Closing, pursuant to Product Registrations.

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, or dumping of a Hazardous Substance into the Environment (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Substance).

"**Representatives**" with respect to any Person, means, collectively, such Person's directors, officers, managers, trustees, shareholders, members, partners, employees, agents, counsel, accountants, financial advisors, consultants and other representatives.

"**Sanctions**" means economic or financial sanctions, requirements or trade embargoes imposed, administered or enforced from time to time by Governmental Authorities of the United States (including, but not limited to, the Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State and the U.S. Department of Commerce), the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority.

"**Sanctions Target**" means any Person: (a) that is the subject or target of any Sanctions; (b) named in any Sanctions-related list maintained by the U.S. Department of State; the U.S. Department of Commerce, including the Bureau of Industry and Security's Entity List and Denied Persons List; or the U.S. Department of the Treasury, including the OFAC Specially Designated Nationals and Blocked Persons List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List; or any similar list maintained by the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority; (c) located, organized or resident in a country, territory or geographical region which is itself the subject or target of any territory-wide Sanctions (a "**Sanctioned Jurisdiction**") (including, without limitation, the Crimea region of Ukraine, Cuba, Iran, North Korea, Syria and, prior to January 17, 2017, Sudan); or (d) owned or controlled by any such Person or Persons described in the foregoing clauses (a)-(c).

"**Security Deposit**" means any security deposits, whether deposited with or paid by Seller or its Affiliates (including any tenant security or other similar deposit held by or on behalf of a landlord in connection with any Leased Real Property and any tenant security or other similar deposit held by or on behalf of Seller in connection with any sub-lease thereof).

"**Seller Material Adverse Effect**" means a material adverse effect on the ability of Seller to consummate the transactions contemplated hereby and fulfill their obligations under this Agreement.

"**Seller's Knowledge**" means, with respect to Seller, the facts and circumstances that are known, after reasonably inquiry, or reasonably should have been known, had such reasonable inquiry been undertaken, by Brandon Burkhart, Nicholls, Ivan Van Ortwick and Amberlee Rails, pursuant to the discharge of their duties in the ordinary course.

"**Software**" means all computer software and code, including assemblers, applets, compilers, source code, object code, development tools, design tools, user interfaces, databases and data, in any form or format, however fixed, including any related documentation.

"**Subsidiary**" means, with respect to any Person, any other Person (a) of which the first Person owns directly or indirectly 50% or more of the equity interest in the other Person, (b) of which the first Person or any other Subsidiary of the first Person is a general partner or managing member, (c) of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions with respect to the other Person are at the time owned by the first Person and/or one or more of the first Person's Subsidiaries, or (d) whose financial results are required by GAAP to be consolidated with the financial results of the first Person.

"**Tangible Property**" means all machinery, tools, equipment, computers, computer equipment, servers, computer disks and peripheral devices, appliances, fixtures, motor vehicles, trucks, forklifts and other rolling stock, spare parts and other tangible personal property (other than Inventory, except for purposes of Section 3.17) including any assignable warranties related thereto, in each case whether owned or leased by Seller or any of its Affiliates, that in the past 12 months has been, is now, or at the time of the Closing will be, used or held for use in or otherwise necessary for the conduct of, the Business.

"**Target Net Working Capital**" means $20,100,000.

"**Tax**" and "**Taxes**" means all federal, state or local and all foreign taxes, including income, gross receipts, windfall profits, value added, severance, property (including tangible, intangible and real property), production, sales, use, duty, license, excise, goods and services, commodity, capital gains, transfer, ad valorem, franchise, employment, withholding or similar taxes, together with any interest, additions or penalties with respect thereto and any interest with respect to such additions or penalties, and including any liability under state or local abandonment or unclaimed property, escheat or similar Law.

"**Tax Return**" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxing Authority**" means any Governmental Authority or any subdivision, agency, commission or authority thereof having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"**Transaction Documents**" means this Agreement and each other agreement, document, instrument or certificate contemplated hereby or thereby or to be executed by Seller or Buyer in connection with the consummation of the transactions contemplated by this Agreement.

11

"**Transition Services Agreement**" means the agreement, substantially in the form attached as **Exhibit F** hereto.

"**UPC Code**" means any Universal Product Code, including any International Article Numbers.

Section 1.2.   Definitions defined in Agreement.

"**Agreement**" .......................................................... Preamble
"**Asset Allocation Statement**" ..................................... 5.3(c)
"**Assumed Liabilities**" ................................................ 2.3(a)
"**Basket Amount**" ...................................................... 8.7(a)
"**Benefit Plans**" ......................................................... 3.7(a)(i)
"**Bill of Sale**" ........................................................... 2.7(a)
"**Burkhart**" ............................................................... Preamble
"**Business**" ................................................................ Recitals
"**Business Permits**" .................................................... 3.11(d)
"**Buyer**" .................................................................... Preamble
"**Buyer Fundamental Representations**" ......................... 8.1
"**Buyer Parties**" ......................................................... 8.3
"**Buyer Plans**" ........................................................... 5.6(b)(i)
"**Buyer's Closing Date Net Working Capital**" ............... 2.10(c)
"**Buyer's Closing Date Customer Deposits**" .................. 2.10(c)
"**Cardholder Data**" ..................................................... 3.19(i)
"**Claim**" .................................................................... 8.4
"**Classification**" ......................................................... 2.5(b)
"**Closing**" .................................................................. 2.6
"**Closing Amount**" ...................................................... 2.8(a)
"**Closing Date**" .......................................................... 2.6
"**Closing Date Balance Sheet**" ..................................... 2.10(a)
"**Consent**" .................................................................. 3.2(b)
"**Continuation Period**" ................................................ 5.6(b)(i)
"**Dispute Notice**" ....................................................... 2.10(b)
"**Earn-Out Payment**" .................................................. 2.5(b)
"**Employee Handbook**" ............................................... 3.19(c)
"**Employment Commencement Date**" ........................... 5.6(a)
"**Escrow Accounts**" ..................................................... 5.9
"**Escrow Agent**" ......................................................... 5.9
"**Escrow Agreement**" .................................................. 5.9
"**Escrow Amount**" ...................................................... 2.8(c)
"**Excluded Assets**" ..................................................... 2.2(j)
"**Excluded Inventory**" ................................................. 2.1(b)
"**Excluded Liabilities**" ................................................ 2.4
"**Export Approvals**" .................................................... 3.22(a)
"**FF&E**" .................................................................... 2.1(b)
"**Final Closing Date Customer Deposits**" ..................... 2.10(d)
"**Final Closing Date Net Working Capital**" ................... 2.10(d)

"**Financial Statements**" ............................................... 3.3(a)

"**First Escrow Release Amount**" ............................. 5.9(b)

"**Fundamental Representations**" .................................8.1

"**Governmental Antitrust Entity**" ............................. 5.7(c)

"**HSR Act**" ...................................................................... 3.2(c)

"**Indemnitees**" ................................................................8.3

"**Indemnitor**" ..................................................................8.4

"**Interests**" ................................................................... 3.1(b)

"**Interim Balance Sheet**" ........................................... 3.3(a)

"**Leased Real Property**" ...........................................3.20(b)

"**Lower Net Working Capital Limit**" ..........................2.9

"**Material Contract**" ..................................... 3.16(a)(xxv)

"**Maximum Indemnity Amount**" .............................. 8.7(a)

"**Officer's Certificate**" ............................................ 8.6(a)

"**Orders**" ..........................................................................3.10

"**Parties**" .............................................................. Preamble

"**Projected Closing Date Balance Sheet**" .....................2.9

"**Projected Closing Date Net Working Capital**" ..........2.9

"**Projected Customer Deposits**" ...................................2.9

"**Purchase Price**" ............................................................2.5

"**Purchased Assets**" .......................................................2.1

"**Purchased Contracts**" .............................................2.1(h)

"**Real Property Leases**" ................................... 3.16(a)(xx)

"**Reviewing Accountant**" ........................................ 2.10(c)

"**Security Incident**" ..................................................3.19(m)

 "**Seller Fundamental Representations**" .......................8.1

"**Seller Parties**" .............................................................8.2

"**Seller**" ................................................................ Preamble

"**Seller's Closing Date Net Working Capital**" ....... 2.10(c)

"**Seller's Closing Customer Deposits**" ................... 2.10(c)

"**Straddle Period**" ..................................................... 5.3(a)

"**Straddle Period Return**" ........................................ 5.3(a)

"**Tax Clearance Certificate**" ....................................5.3(d)

"**Terminating Breach**" ............................................. 7.1(b)

"**Termination Date**" ...........................................7.1(d)(iii)

"**Third-Party Claim**" ................................................ 8.5(a)

"**Transfer Taxes**" ...................................................... 5.3(b)

"**Transferring Employee**" ........................................ 5.6(a)

"**Upper Net Working Capital Limit**" ............................2.9

"**Valuation Expert**" .................................................. 5.3(c)

"**Van Ortwick**" .................................................... Preamble

"**WARN Act**" ...................................................................3.9

Section 1.3.    <u>Grammatical Constructions</u>.  As used in this Agreement, except to the extent that the context otherwise requires:

(a)     when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated, and any Schedule or Exhibit referred to herein will be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim;

(b)     the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)     whenever the words "include," "includes" or "including" (or similar terms) are used in this Agreement, irrespective of whether used in connection with the words "without limitation," they are deemed in all cases to be followed by the words "without limitation";

(d)     the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)     all terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)     the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)     if any action is to be taken by any Party hereto pursuant to this Agreement on a day that is not a Business Day, such action will be taken on the next Business Day following such day;

(h)     references to a Person are also to its permitted successors and assigns;

(i)     the use of "or" is not intended to be exclusive unless expressly indicated otherwise;

(j)     "ordinary course of business" (or similar terms) will be deemed followed by "consistent with past practice";

(k)     "assets" will include "rights," including rights under Contracts;

(l)     "reasonable efforts" or similar terms will not require the waiver of any rights under this Agreement;

(m)     any reference to any Law will be deemed also to refer to all rules and regulations promulgated thereunder and to include all statutory and regulatory provisions consolidating, amending or replacing the Law, unless the context requires otherwise;

(n)     any reference to a Contract or other document means such Contract or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and

14

(o)      all accounting terms used herein and not expressly defined herein will have the meanings given to them under GAAP, and any references to "dollars," "$" or other dollar amounts in this Agreement will mean the lawful currency of the United States.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS AND CLOSING

Section 2.1.   Purchase and Sale.   At the Closing, upon the terms and subject to the conditions of this Agreement, Seller will sell, transfer, assign, convey and deliver or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer will purchase from Seller and acquire good, valid and marketable title to, free and clear of all Encumbrances, other than Permitted Encumbrances, all of the assets, properties and rights of Seller that are now, in the past 12 months have been, or at the time of the Closing will be, used or held for use in or otherwise necessary for the conduct of, the Business, including all assets reflected on the most recent balance sheet included in the Financial Statements and not subsequently disposed of in the ordinary course of business without breach of any provision of this Agreement, in each case other than the Excluded Assets described in Section 2.2 (collectively, the "**Purchased Assets**").  The Purchased Assets will include:

(a)      all Tangible Property (including all rights of Seller in any leases of Tangible Property), including all of the furniture, fixtures and equipment ("**FF&E**") and including the items listed on Section 2.1(a) of the Disclosure Schedule;

(b)      all Inventory;

(c)      all Customer Orders;

(d)      all Receivables and rights of Seller or any of its Affiliates to receive payments arising out of, sales occurring in the conduct of the Business and the security agreements related thereto, including all rights of Seller or any of its Affiliates with respect to any third-party collection proceedings or any other actions or proceedings that have been commenced in connection therewith;

(e)      Seller's UPC Codes used or held for use in or otherwise necessary for the conduct of the Business, including the items set forth in Section 2.1(e) of the Disclosure Schedule;

(f)      all Business Intellectual Property and all rights to sue and recover damages for past, present and future infringement, dilution, misappropriation, violation, unlawful imitation or breach thereof;

(g)      all interests, rights, claims and benefits of Seller under all Contracts that are now, or at the time of the Closing will be, used or useful in, or necessary for the conduct of, the Business or relating to or arising out of the conduct of the Business, including all Contracts under which Seller has the right to protect the confidentiality of information relating to the Business or to prevent third parties from competing with the Business or soliciting Employees, all customer and distributor agreements, all of which Contracts are listed either in Section 2.1(g), 3.16 or 3.20(b) of the Disclosure Schedule (collectively, the "**Purchased Contracts**");

15

(h)     all Permits that are now, or at the time of the Closing will be, used or held for use in or otherwise necessary for the conduct of, the Business, including the Business Permits listed in Section 3.11(d) of the Disclosure Schedule;

(i)     all files, documents, instruments, papers, books and records (whether in paper, digital or other tangible or intangible form) that are now, or at the time of the Closing will be, used or held for use in or otherwise necessary for the conduct of, the Business, the Purchased Assets or the Assumed Liabilities, including copies of financial records, copies of Tax records (other than income Tax records), all technical information, operating and production records, quality control records, blueprints, research and development notebooks and files, customer credit data, manuals, engineering and scientific data, marketing, sales and promotional literature and other materials, drawings, technical plans, business plans, budgets, price lists, lists of customers and suppliers and human resources data;

(j)     all rights, claims and causes of Action that are now, or at the time of the Closing will be, used or held for use in or otherwise necessary for the conduct of, the Business or any of the Assumed Liabilities or the Purchased Assets;

(k)     all Prepaid Expenses that are now, or at the time of the Closing will be, used or held for use in or otherwise necessary for the conduct of the Business;

(l)     all rights of Seller under or pursuant to all warranties, representations, indemnities and guarantees made either verbally or in writing by suppliers, manufacturers, intermediaries, distributors or contractors in connection with products sold or services provided to Seller for, or in connection with, the Business, or in respect of any Purchased Asset, but excluding any such rights with respect to Excluded Assets

(m)     all insurance benefits to the extent relating to claims arising out of events that occurred prior to the Closing (if any) and associated with the Purchased Assets, including such rights and proceeds receivable or hereafter received under any insurance policy written prior to Closing;

(n)     all telephone numbers, websites and domain names and user names on social media websites that are now, or at the time of the Closing will be, used or held for use in or otherwise necessary for the conduct of, the Business;

(o)     all goodwill associated with the Business and the Purchased Assets, together with the right to represent to third parties that Buyer is the successor to the Business;

(p)     all motor vehicles other than those described in Section 2.2(n); and

(q)     all assets described in Section 2.1(q) of the Disclosure Schedule, whether or not now, or at the time of the Closing, used or held for use in or otherwise necessary for the conduct of, the Business.

Section 2.2.    Excluded Assets.  Notwithstanding any provision of this Agreement express or implied to the contrary, Buyer will not acquire and the Purchased Assets will not include the following assets, properties and rights:

16

(a)      Cash in Seller accounts;

(b)      the lease for the Real Property located at 1930 Catepillar Court, Riverside, CA 92509;

(c)      the lease for the Real Property ocated at 3811 Wacker Dr., Jurupa Valley, CA 91752;

(d)      the capital stock of, or any membership interest, partnership interest or any similar equity interest in, any Person;

(e)      any Benefit Plan and all Contracts and refunds related thereto (including refunds of workers' compensation expenses, Contract premiums or payments);

(f)      insurance policies and all prepaid expenses or premiums, proceeds, rights and claims thereunder;

(g)      all rights to any refunds of Taxes imposed on or with respect to the Business and paid by Seller prior to the Closing;

(h)      the minute books, charter documents, and transfer records of Seller and such other books and records as pertain to the organization, existence or capitalization of Seller, any other books or records not related to the Business or the Purchased Assets and financial records pertinent to Seller's operation of the Business (copies of which will be provided to Buyer);

(i)      Seller's rights under this Agreement and the Transaction Documents to which it is a party;

(j)      all assets owned or held in trust or otherwise associated with or used in connection with any Benefit Plan;

(k)      all of Seller's rights, claims, causes of Action, rights of recovery and rights of set-off of any kind against third parties which (i) may arise in connection with the discharge by Seller of the Excluded Liabilities or (ii) are not related to the Purchased Assets;

(l)      any prepaid expenses made by or on behalf of Seller other than Prepaid Expenses; and

(m)      any payments received from United States Customs and Border Protection or related Governmental Authority for Seller's overpayment of customs duties or similar fees or charges made by Seller prior to the Closing;

(n)      all motor vehicles and equipment leases described in Section 2.2(n) of the Disclosure Schedule;

(o)      all Excluded Inventory;

LEGAL_US_E # 158737765.16

(p)      each of the assets set forth in Section 2.2(p) of the Disclosure Schedule (the assets, properties and rights in this Section 2.2 collectively, the "**Excluded Assets**").

Section 2.3.      Assumed Liabilities.

(a)      Buyer agrees that, on the Closing Date, Buyer will assume and thereafter pay, perform or discharge, as the case may be only (i) the Liabilities of Seller arising from facts or circumstances or underlying conditions or events or activities first occurring after the Closing that are either in respect of the Purchased Assets or the conduct of the Business and (ii) the Liabilities reflected in the calculation of the Final Closing Date Net Working Capital, in each case, set forth on Section 2.3 of the Disclosure Schedule (collectively, the "**Assumed Liabilities**").

(b)      In the event of any claim against Buyer with respect to any of the Assumed Liabilities, Buyer will have, and Seller hereby assigns to Buyer, all defenses, counterclaims and rights of setoff that would have been available to Seller or the Business if such claim had been asserted against Seller or the Business.  The assumption by Buyer of the Assumed Liabilities and the transfer of the Assumed Liabilities by Seller will in no way expand the rights or remedies of any Person against Buyer, Seller, their respective Affiliates or any of their respective Representatives as compared to the rights and remedies that such Person would have had against Buyer, Seller, their respective Affiliates or any of their respective Representatives had Buyer not assumed the Assumed Liabilities.

Section 2.4.      Excluded Liabilities.  Notwithstanding any provision of this Agreement express or implied to the contrary (and without any implication that Buyer is assuming any Liability of Seller or the Business or any Liability related to any of the Purchased Assets not expressly excluded), Buyer is not assuming or becoming obligated in any way in respect of, and will not be required to pay, perform, undertake or discharge, any Liabilities that are not specifically included in the Assumed Liabilities, including (a) any Indebtedness, including debt for borrowed money and all fees, accrued and unpaid interest, premiums or penalties relating to the foregoing including that certain Business Loan Agreement, dated January 28, 2021, (b) any Liabilities to the extent relating to, resulting from or arising out of any Environmental Law (including any violation of Environmental Law), Environmental Condition, or any Release of Hazardous Substance on, under, at or migrating to or from any of Seller's or any of its predecessors current or former facilities, (c) any Liability arising from facts or circumstances or underlying conditions or events or activities first occurring on or prior to the Closing, or relating to the conduct or operation of the Business or any other conduct of Seller and its Affiliates and their respective officers, directors, employees, consultants, agents or advisors on or prior to the Closing, including but not limited to any Liability related to compliance with respect to Customs and Import Laws and any product misclassification or underpayments for customs duties or similar fees or charges owed by Seller (including, without limitation, any fines, assessments, penalties or late fees related thereto) to United States Customs and Border Protection or related Governmnetal Authority (the "**Excluded Liabilities**"). Seller will pay, perform or discharge when due or required to be performed or discharged, or contest in good faith, the Excluded Liabilities.

Section 2.5.   Purchase Price.

(a)   At Closing. Subject to any adjustments required pursuant to Sections 2.5(b), 2.9, and 2.10, the aggregate purchase price for the Purchased Assets is Two Hundred Fifteen Million dollars ($215,000,000) (the "**Purchase Price")** which shall be paid 90% in cash and 10% in shares of Parent Stock**.**

(b)   Earn-Out. As soon as practicable after the Closing, Seller shall submit to CBP a request for a binding tariff classification ruling letter in accordance with 19 C.F.R. Part 177 in respect of Seller's import classification whereby complete lighting fixtures previously classified by Seller under Section 9405 of the US Harmonized Tariff Schedule were amended by Seller to be classified as various types of lamps under Section 8539 of the US Harmonized Tariff Schedule (the "**Classification**"). Seller shall bear all costs and expenses related thereto, and shall keep Buyer reasonably apprised of any material communications with CBP, including any requests for additional information, any decisions rendered regarding the Classification, and any communications with CBP regarding Seller's previously submitted Prior Disclosure.  In the event CBP issues a binding tariff classification ruling indicating that the Seller's Classification was correct, then within ten (10) Business Days of Seller's receipt of such ruling from CBP, Buyer shall pay to Seller, as an increase in the Purchase Price, an amount equal to Thirty-Five Million dollars ($35,000,000) (the "**Earn-Out Payment**").  In the event CBP issues a ruling that does not adopt Seller's Classification, Buyer shall have no obligation to pay the Earn-Out Payment.  Seller shall indemnify Buyer pursuant to Article VIII hereof in respect of any Losses incurred by Buyer due to the inaccuracy or invalidity of the Classification, and Seller shall remain liable for all conduct of Seller in respect of Customs and Import Laws, including any activity undertaken by Seller after Closing to import Inventory that was ordered prior to Closing.  Notwithstanding Seller's submission of a customs ruling request pursuant to this Section 2.5(b), and regardless of whether CBP's review of such ruling is pending, Buyer shall be entitled, immediately upon the Closing, and at its complete discretion, to either continue to apply the Classification or apply a different classification to any Business Products included in the Purchased Assets.

Section 2.6.   Closing.  Unless the Agreement is earlier terminated, the closing of the transactions contemplated hereby (the "**Closing**") will take place in virtual electronic form via exchange of PDF, facsimile or other electronic transmission of documents on the third Business Day following the satisfaction or waiver of all conditions set forth in Article VI (other than conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) or at such other time or place as Buyer and Seller mutually agree. The date on which the Closing actually occurs is referred to herein as the "**Closing Date**."

Section 2.7.   Closing Deliveries by Seller.  At the Closing, Seller will deliver or cause to be delivered to Buyer:

(a)   a duly executed original copy of the Assignment and Assumption Agreement and Bill of Sale (the "**Bill of Sale**") in substantially the form of **Exhibit G**, duly executed by Seller;

(b)   the Intellectual Property Assignment Agreement, duly executed by Seller;

(c)     the Escrow Agreement, duly executed by Seller;

(d)     the Jungle Boys Marketing Agreement, duly executed by JB IP, LLC;

(e)     the Burkhart Marketing Agreement, duly executed by Burkhart;

(f)     the Marketing Content Plan, in a form reasonably acceptable to Buyer;

(g)     the Transition Services Agreement, duly executed by Seller;

(h)     all Tax Clearance Certificates as provided under Section 5.3;

(i)     a certificate described in Treasury Regulations Section 1.1445-2(b)(2) from each Seller, in a form reasonably acceptable to Buyer and duly executed by each Seller, and an IRS Form W-9 form each Seller, properly completed and duly executed by each Seller;

(j)     all sales and use Tax exemption certificates issued to each Seller; and

(k)     such further instruments and documents as may be required to be delivered by Seller pursuant to the terms of this Agreement or as may be reasonably requested by Buyer in connection with the Closing of the transactions contemplated by this Agreement and the Transaction Documents to complete the transfer of the Purchased Assets and the Business to Buyer, including good and sufficient instruments of assignment with respect to the Intellectual Property being transferred by Seller to Buyer in recordable form, endorsements, consents, assignments and other good and sufficient instruments of conveyance and assignment necessary or appropriate to vest in Buyer all right, title and interest in, to and under the Purchased Assets.

Section 2.8.   <u>Closing Deliveries by Buyer</u>. At the Closing, Buyer will deliver or cause to be delivered:

(a)     to Seller, an amount in cash equal to the Purchase Price, less the Parent Stock Consideration Amount, less the Escrow Amount (the "**Closing Amount**") by wire transfer of immediately-available funds to such account as Seller may direct by written notice to Buyer;

(b)     to Seller, the Parent Stock Consideration, to be delivered via the transfer agent of The Scotts Miracle-Gro Company;

(c)     to the Escrow Agent, an amount equal to $25,800,000 (the "**Escrow Amount**"), by wire transfer of immediately-available funds to the Escrow Agent in accordance with the Escrow Agreement;

(d)     to Seller, the Bill of Sale, duly executed by Buyer;

(e)     to Seller, the Escrow Agreement, duly executed by Buyer;

(f)     to Seller, the Intellectual Property Assignment Agreement, duly executed by HGCI, Inc.;

(g)     the Jungle Boys Marketing Agreement, duly executed by Buyer;

(h)     the Transition Services Agreement, duly executed by Buyer; and

(i)     such further instruments and documents as may be required to be delivered by Buyer pursuant to the terms of this Agreement or as may be reasonably requested by Buyer in connection with the Closing of the transactions contemplated by this Agreement and the Transaction Documents.

Section 2.9.   Pre-Closing Delivery by Seller; Adjustment.   At least five calendar days prior to the Closing Date, Seller will deliver to Buyer the projected, unaudited consolidated balance sheet of Seller as of the end of the Business Day immediately preceding the Closing Date (the "**Projected Closing Date Balance Sheet"**), together with a statement based on the Projected Closing Date Balance Sheet setting forth Seller's calculation of (i) projected Net Working Capital as of the end of the Business Day immediately preceding the Closing Date (the "**Projected Closing Date Net Working Capital**") and (ii) projected Customer Deposits (the "**Projected Customer Deposits**").  The Projected Closing Date Balance Sheet, the Projected Closing Date Net Working Capital and the Projected Customer Deposits will be prepared in accordance with **Exhibit E**, and, to the extent not foreseen on **Exhibit E**, GAAP. Buyer will as promptly as practicable review the Projected Closing Date Balance Sheet and such statement of Projected Closing Date Net Working Capital and Projected Customer Deposits, and the Parties will promptly discuss in good faith all comments and questions Buyer may have with respect to the Projected Closing Date Balance Sheet and such statement of Projected Closing Date Net Working Capital and Projected Customer Deposits.  Following such discussions, (a) if the Projected Closing Date Net Working Capital is an amount greater than the Target Net Working Capital plus ten percent (10%) (the "**Upper Net Working Capital Limit**"), the Purchase Price and the Closing Payment will be increased by the amount of the excess of Projected Closing Date Net Working Capital above the Upper Net Working Capital Limit, (b) if the Target Net Working Capital is an amount less then the Projected Closing Date Net Working Capital minus ten percent (10%) (the "**Lower Net Working Capital Limit**"), the Purchase Price and the Closing Payment will be decreased by the amount of the excess of the Lower Net Working Capital Limit above the Projected Closing Date Net Working Capital and (c) the Purchase Price and the Closing Payment will be decreased by the amount of the Projected Customer Deposits.

Section 2.10.   Closing Date Balance Sheet.

(a)     Promptly following the Closing Date, but in no event more than sixty (60) days following the Closing Date, Buyer will prepare and deliver to Seller (i) a pro forma balance sheet as of the end of the Business Day immediately preceding the Closing Date (the "**Closing Date Balance Sheet**"), and (ii) a statement based on the Closing Date Balance Sheet setting forth Buyer's calculation of the Closing Date Net Working Capital and Closing Date Customer Deposits, each of (i) and (ii) to be prepared in accordance with **Exhibit E**, and, to the extent not foreseen on **Exhibit E**, GAAP.  Buyer will permit Seller to review and to have reasonable access to the financial records of the Business and the Purchased Assets for purposes of reviewing the Closing Date Balance Sheet, the Closing Date Net Working Capital and Closing Date Customer Deposits determination during the 30-calendar day period set forth in Section 2.10(b).

(b)     Unless, within thirty (30) calendar days after delivery of the Closing Date Balance Sheet, Seller delivers to Buyer a notice setting forth, in reasonable detail, any good faith

objection as to the Closing Date Net Working Capital or the Closing Date Customer Deposits and the basis and calculations for such objection (a "**Dispute Notice**"), Buyer's calculation of the Closing Date Net Working Capital and Closing Date Customer Deposits will be deemed accepted by Seller and will be final and binding.

(c)     For thirty (30) days after Buyer's receipt of any Dispute Notice, Seller and Buyer will endeavor in good faith to resolve by mutual agreement all matters in the Dispute Notice to reach definitive agreement on the disputed items or amounts in order to determine, as may be required, the amount of Closing Date Net Working Capital, which amount will not be more than the amount thereof shown in Seller's calculations delivered pursuant to Section 2.10(b) ("**Seller's Closing Date Net Working Capital**") nor less than the amount thereof shown in Buyer's calculation delivered pursuant to Section 2.10(a) ("**Buyer's Closing Date New Working Capital**"), and Closing Date Customer Deposits, which amount will not be less than the amounts thereof shown in Seller's calculations delivered pursuant to Section 2.10(b) ("**Seller's Closing Date Customer Deposits**") nor more than the amounts thereof shown in Buyer's calculation delivered pursuant to Section 2.10(a) ("**Buyer's Closing Date Customer Deposits**").  If the Parties are unable to resolve any matter in the Dispute Notice within such thirty (30) calendar day period, Buyer and Seller will engage KPMG LLP or another nationally recognized, independent accounting firm to be mutually agreed upon (the "**Reviewing Accountant**").  The fees and expenses of the Reviewing Accountant will be allocated and borne by Buyer, on the one hand, and Seller, on the other hand, based on the inverse of the percentage that the Reviewing Accountant's determination (before such allocation) bears to the total amount of the total items in dispute as originally submitted to the Reviewing Accountant.

(d)     Buyer and Seller will instruct the Reviewing Accountant to resolve the disputed matters as promptly as practicable.  The Reviewing Accountant will act as an expert, and not an arbitrator, and will resolve the amounts disputed in the Dispute Notice only, based solely on written submissions by Buyer and Seller and not by independent review or audit, and applying only the principles set forth in this Agreement.  The Parties will cooperate with each other and the Reviewing Accountant in connection with the matters set forth in this Section 2.10, including by furnishing such information as may be reasonably requested.  Each Party will afford the other Party the reasonable and unrestricted opportunity to participate in all communications with the Reviewing Accountant.  The Reviewing Accountant will give to Buyer and Seller its written determination of its calculation of the Closing Date Net Working Capital (the "**Final Closing Date Net Working Capital**") and/or Closing Date Customer Deposits (the "**Final Closing Date Customer Deposits**"), which determinations will be made, to the extent practicable, within 30 days of the Reviewing Accountant's engagement; *provided*, that, in no event will the Final Closing Date Net Working Capital be greater than the amount of Seller's Closing Date Net Working Capital or less than the amount of Buyer's Closing Date Net Working Capital, nor will the Final Customer Deposits be greater than the amount of Buyer's Closing Date Customer Deposits or less than the amount of Seller's Closing Date Customer Deposits.  The Reviewing Accountant's determination will be final and binding and no Party will seek recourse to any Governmental Authority, arbitral body or otherwise, other than to collect any amounts due under this Section 2.10.  Judgment may be entered to enforce the Reviewing Accountant's determination in any court having jurisdiction over the Party against which such determination is to be enforced.

(e)     (i)     If the Final Closing Date Net Working Capital is greater than the Upper Net Working Capital Limit, Buyer will pay to Seller, as an adjustment to the Purchase Price, an amount by which the Final Closing Date Net Working Capital exceeds the Upper Net Working Capital Limit (less the amount of any increase to the Purchase Price pursuant to the final sentence of Section 2.9 or, if applicable, plus the amount of any decrease to the Purchase Price pursuant to the final sentence of Section 2.9) within five (5) Business Days after the Final Closing Date Net Working Capital has been determined in accordance with this Section 2.10, ninety percent (90%) of such amount to be paid in cash by wire transfer of immediately-available funds and ten percent (10%) of such amount to be paid in Parent Stock, to be delivered via the transfer agent of The Scotts Miracle-Gro Company.

(ii)     If the Final Closing Date Net Working Capital is less than the Lower Net Working Capital Limit, Seller will pay to Buyer, as an adjustment to the Purchase Price, an amount by which the Lower Net Working Capital Limit exceeds the Final Closing Date Net Working Capital (less the amount of any decrease to the Purchase Price pursuant to the final sentence of Section 2.9 or, if applicable, plus the amount of any increase to the Purchase Price pursuant to the final sentence of Section 2.9) within five (5) Business Days after the Final Closing Date Net Working Capital has been determined in accordance with this Section 2.10, such payment to be made in cash by wire transfer of immediately-available funds; *provided*, that Buyer may elect to withdraw such amount from the Escrow Account, in which case Buyer and Seller will instruct the Escrow Agent to pay to Buyer such amount pursuant to the terms of, and subject to, the Escrow Agreement;

(iii)     If the Final Closing Date Customer Deposits is an amount less than Projected Customer Deposits, Buyer will pay to Seller, as an adjustment to the Purchase Price, an amount by which the Projected Customer Deposits exceeds the Final Closing Date Customer Deposits, within five (5) Business Days after the Final Closing Date Customer Deposits has been determined in accordance with this Section 2.10, ninety percent (90%) of such amount to be paid in cash by wire transfer of immediately-available funds and ten percent (10%) of such amount to be paid in Parent Stock, to be delivered via the transfer agent of The Scotts Miracle-Gro Company;

(iv)     If the Final Closing Date Customer Deposits is an amount greater than the Projected Customer Deposits, Seller will pay to Buyer, as an adjustment to the Purchase Price, an amount by which the Final Closing Date Customer Deposits exceeds the Projected Closing Date Customer Deposits within five Business Days after the Final Closing Date Customer Deposits has been determined in accordance with this Section 2.10, such payment to be made in cash by wire transfer of immediately-available funds; *provided*, that Buyer may elect to withdraw such amount from the Escrow Account, in which case Buyer and Seller will instruct the Escrow Agent to pay to Buyer such amount pursuant to the terms of, and subject to, the Escrow Agreement; and

(v)     If the Final Closing Date Net Working Capital equals the Projected Closing Date Net Working Capital and the Final Closing Date Customer Deposits equals the Projected Customer Deposits, then no adjustment will be made to the Purchase Price.

(vi)     If the Final Closing Date Net Working Capital is greater than the Lower Net Working Capital Limit and less than the Upper Net Working Capital Limit, then, as

applicable, (A) the amount of any decrease to the Purchase Price pursuant to the final sentence of Section 2.9 shall be paid by Buyer to Seller, as an adjustment to the Purchase Price, within five (5) Business Days after the Final Closing Date Net Working Capital has been determined in accordance with this Section 2.10, ninety percent (90%) of such amount to be paid in cash by wire transfer of immediately-available funds and ten percent (10%) of such amount to be paid in Parent Stock, to be delivered via the transfer agent of The Scotts Miracle-Gro Company or (B) the amount of any increase to the Purchase Price pursuant to the final sentence of Section 2.9 shall be paid by Seller to Buyer, as an adjustment to the Purchase Price, within five (5) Business Days after the Final Closing Date Net Working Capital has been determined in accordance with this Section 2.10, such payment to be made in cash by wire transfer of immediately-available funds; *provided*, that Buyer may elect to withdraw such amount from the Escrow Account, in which case Buyer and Seller will instruct the Escrow Agent to pay to Buyer such amount pursuant to the terms of, and subject to, the Escrow Agreement.

Section 2.11.   <u>Withholding</u>.  Buyer, each Seller and their respective Affiliates and agents shall be entitled to deduct and withhold from any amount payable pursuant to this Agreement (including payment of the Purchase Price and releases of the Escrow Amount) such amounts as Buyer, Seller or any of their respective Affiliates or agents (as applicable) shall determine in good faith they are required to deduct and withhold with respect to the making of such payment under the Code or any other provision of applicable Law.  To the extent that amounts are so deducted and withheld, such amounts shall in each case be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

Section 2.12.   <u>Parent Stock Consideration</u>.  All Parent Stock received by Seller pursuant to this Article II is deliverable to Seller subject to Seller's execution and delivery of a letter of transmittal to the transfer agent of The Scotts Miracle-Gro Company in a form reasonably acceptable to The Scotts Miracle-Gro Company. No Parent Stock received by Seller pursuant to this Article II may be transferred to another Person until the date that is one Business Day following the one year anniversary of the Closing Date; *provided*, that Seller may transfer Parent Stock to Van Ortwick or Burkhart, or to any trust or other estate planning vehicle of Van Ortwick or Burkhart, as applicable, so long as Van Ortwick or Burkhart, as applicable, are the trustee or beneficiary of such trust or other estate planning vehicle, and provided that each such transferee agrees in writing to be subject to the restrictions in this Section 2.12.  Dividends, distributions, splits and other benefits of the Parent Stock shall inure to the benefit of Seller.

**ARTICLE III**

**<u>REPRESENTATIONS AND WARRANTIES</u>**
**<u>OF SELLER</u>**

Seller represents and warrants to Buyer as to itself and as to the Purchased Assets as to which Seller has any right, title and interest, as of the date hereof and as of the Closing Date as set forth in this Article III.

Section 3.1.   <u>Organization and Qualification; Capitalization</u>.

(a)    Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of California.  Seller has all requisite power and authority to own, license, use, lease and operate its assets and properties (including any Purchased Assets owned by Seller) and to carry on its business as it is now being conducted.  Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the assets and properties owned or leased by it or the operation of its business as currently conducted (including any Purchased Assets and the Business) makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, be material to the Business.

(b)    Burkhart and Van Ortwick each respectively hold 50% of the authorized equity capital of Seller, the number of shares of which is set forth opposite each of Burkhart's and Van Ortwick's names on Section 3.1(b)(i) of the Disclosure Schedule (the "**Interests**").  The Interests constitute all the issued and outstanding equity interests of Seller, all of which are duly authorized, validly issued and outstanding, fully paid up and nonassessable, free of any Encumbrances and any agreement, obligation or commitment to create, grant, give or permit to subsist any Encumbrances whatsoever and are held of record by each of Burkhart and Van Ortwick, respectively.  There is no security, option, warrant, right, call, subscription, agreement, commitment or understanding of any nature whatsoever, fixed or contingent, that directly or indirectly (i) calls for, prior to the Closing, the issuance, sale, pledge or other disposition by Seller of any of its equity interests or any securities convertible into, or other rights to acquire, any such equity interests, (ii) relates to the voting or control of such equity interests or rights, or (iii) obligates Seller to grant, offer or enter into any of the foregoing.  Seller has not created any "phantom equity," equity appreciation rights, profit participation rights or other similar rights with respect to Seller.  Seller has not granted to any Person the right to demand or request that Seller effect a registration under the Securities Act of 1933, of any securities held by such Person or to include any securities of such Person in any such registration by Seller.  Other than the Interests, no other Person owns any equity interest in Seller and no right of any kind to have any such equity interest issued.  Seller does not own and has not owned, of record or beneficially, or control and has not controlled any direct or indirect equity or other interest, or any right (contingent or otherwise) to acquire the same, in any corporation, partnership, limited liability company, joint venture, association or other entity.  Seller is not a party to or bound by any Contract to acquire any direct or indirect equity or ownership interest in any other Person or business.  Seller is not obligated to provide funds or make any investment (whether in the form of a loan, capital contribution or otherwise) in any other Person.

Section 3.2.    <u>Authority; Non-Contravention; Approvals</u>.

(a)    Seller has all requisite power and authority to execute and deliver this Agreement and the Transaction Documents to which it is a party and to perform the transactions contemplated by this Agreement and the Transaction Documents.  The execution and delivery by Seller of this Agreement and the Transaction Documents and the performance by Seller of the transactions contemplated by this Agreement and the Transaction Documents to which it is a party have been duly authorized and approved by Seller's Boards of Directors and its requisite shareholders.  Except as set forth on <u>Section 3.2(a) of the Disclosure Schedule</u>, no corporate or other action or proceeding on the part of Seller or any other Person is necessary to authorize the execution and delivery of this Agreement and the Transaction Documents by Seller or the performance and consummation by Seller of the transactions contemplated by this Agreement and

25

the Transaction Documents.  This Agreement has been, and upon their execution the Transaction Documents will be, duly executed and delivered by Seller and, assuming the due authorization, execution and delivery of this Agreement and the Transaction Documents by Buyer and, with respect to the Escrow Agreement, the Escrow Agent, constitutes, and upon their execution the Transaction Documents will constitute, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

(b)     The execution and delivery by Seller of this Agreement and the Transaction Documents that Seller is a party to and the performance of the transactions contemplated by this Agreement and such Transaction Documents do not and will not (i) conflict with or result in a breach of any provision of the organizational documents of Seller, (ii) except as set forth in Section 3.2(b)(ii) of the Disclosure Schedule, constitute a default or an event of default under (with or without due notice, lapse of time or both) or give rise to any obligation or any third party right to cancel, terminate or accelerate any obligation under, any material Contract to which any of Burkhart, Van Ortwick or Seller is a party, by which any of the foregoing may be bound or to which the Purchased Assets are subject, (iii) result in the creation of any Encumbrance on the Purchased Assets or any other right or asset of any of Burkhart, Van Ortwick or Seller, (iv) violate any Law applicable to Seller, the Business, the Purchased Assets or the Assumed Liabilities, or (v) require any authorization, consent, approval, waiver, exemption or other action by, or notice to, any party (other than Seller) to any Purchased Contract (each, a "**Consent**"), except as disclosed in Section 3.2(b)(v) of the Disclosure Schedule.

(c)     Except for the filings by Seller required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "**HSR Act**") and as disclosed in Section 3.2(c) of the Disclosure Schedule, and subject to the provisions of Section 2.5 and Section 5.8, no declaration, filing or registration with, or notice to, or authorization, consent, order or approval of, any Governmental Authority is required to be obtained or made in connection with or as a result of the execution and delivery of this Agreement and the Transaction Documents by Seller or the performance by Seller of the transactions contemplated by this Agreement and the Transaction Documents, except as could not reasonably be expected to have a Seller Material Adverse Effect or otherwise be material to the Business.

Section 3.3.     Financial Statements; Inventory.

(a)     Section 3.3 of the Disclosure Schedule sets forth the audited balance sheet of the Business for each of the two fiscal years ended December 31, 2019 and December 31, 2020 and the related audited consolidated statements of income and cash flows for such periods, and the unaudited balance sheet (the "**Interim Balance Sheet**") and the related unaudited consolidated statements of income, and cash flows for the 9-month period ended September 30, 2021 (collectively, the "**Financial Statements**").  The Financial Statements were derived from the books and records of Seller and prepared in accordance with GAAP and fairly present the financial position and results of operations of the Business as of their respective dates and for the respective periods presented (subject to the absence of notes, recordation of Taxes and certain footnote disclosures otherwise required by GAAP, which are not material in nature or amount, individually or in the aggregate, to the Business).  The books of account and other financial records of the Business have been kept accurately in the ordinary course of business consistent with all applicable legal requirements.  Seller maintains a system of internal controls over financial reporting

26

sufficient to provide reasonable assurances regarding the reliability of financial reporting, including that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of the financial statements in accordance with GAAP and to maintain accountability for its assets, and (iii) access to assets is permitted only in accordance with management's general or specific authorization.

(b)     All Eligible Inventory, net of reserves, (i) currently consists of a quality and quantity that is marketable, good, useable (as to raw materials or work in process) and saleable (as to finished goods) in the ordinary course of business, (ii) has been created or acquired in the ordinary course of business, and (iii) is fit for the purpose for which it was procured or manufactured.  The value of all such Inventories that are obsolete, slow moving, excess or of below-standard quality has been written down to net realizable value or adequate reserves have been provided therefor.  None of the Inventory is held on consignment, or similar arrangement, by third parties.  The amount and mix of items in the Inventories of supplies, in process and finished products are consistent with past business practice of Seller with respect to the Business, and, to Seller's Knowledge, the year-to-date Inventory shrink related to the Business is consistent with historical shrink incurred in the ordinary course of business.

Section 3.4.     <u>Absence of Undisclosed Liabilities</u>.  Except as set forth in <u>Section 3.4 of the Disclosure Schedule</u>, there are no material Liabilities relating to the Business of any nature, whether accrued, contingent or otherwise, and there is no existing condition, situation or set of facts or circumstances that reasonably could be expected to result in such a Liability, except for Liabilities (a) reflected on the Interim Balance Sheet, but only to the extent reflected therein, (b) that were incurred in the ordinary course of business since the date of the Interim Balance Sheet and that could not reasonably be expected to be material to the Business, or (c) transaction expenses relating to the transactions contemplated by this Agreement or the Transaction Documents, all of which are the responsibility of Seller.

Section 3.5.     <u>Absence of Certain Changes or Events</u>.  Since the date of the Interim Balance Sheet (a) there has not been any event, circumstance, change or effect that has had or could reasonably be expected to have a Business Material Adverse Effect or a Seller Materially Adverse Effect, (b) except as disclosed in <u>Section 3.5 of the Disclosure Schedule</u>, the Business has been conducted only in the ordinary course of business, and (c) none of Burkhart, Van Ortwick or Seller has taken any action which, if taken after the date of this Agreement without Buyer's consent, would be prohibited under Section 5.1(a)-(r).

Section 3.6.     <u>Tax Matters</u>.

(a)     All Tax Returns required to have been filed with respect to the Business or the Purchased Assets have been timely filed and are true, correct and complete in all material respects.  None of the Tax Returns with respect to the Purchased Assets or the Business is currently subject to a grant of any extension of time within which to file such Tax Return.

(b)     All Taxes (including but not limited to all state employment Taxes and related withholdings) that are due and payable with respect to the Business or the Purchased Assets (whether or not shown on any Tax Return) have been timely and fully paid and there are no

27

reasonable grounds for the assertion or assessment of additional Taxes against the Purchased Assets.

(c)     All Taxes required to be withheld by Seller with respect to the Purchased Assets or the Business in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been timely withheld and all such withheld Taxes have been timely paid over and report to the proper Governmental Authority in accordance with applicable Law.

(d)     No deficiencies for Taxes have been claimed, threatened, proposed or assessed or, to Seller's Knowledge, are expected to be claimed, threatened, proposed or assessed, in each case, with respect to the Purchased Assets or the Business.  Section 3.6(d)(i) of the Disclosure Schedule contains a complete list of all Tax audits, examinations and investigations with respect to the Business or the Purchased Assets that have been completed or are currently pending and a description in reasonable detail of any deficiencies that have been paid or are currently being contested.  Except as described in Section 3.6(d)(ii) of the Disclosure Schedule, no Seller has given or been requested to give any waiver or extension (or is or would be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the assessment or payment of Taxes with respect to the Business or the Purchased Assets.

(e)     There are no Encumbrances for Taxes on any of the Purchased Assets (other than for Taxes not yet due and payable or not yet delinquent), and to Seller's Knowledge there is no basis for the assertion of any claims for Taxes which could result in any such Encumbrance.

(f)     No claim has been made by a Governmental Authority that Seller has nexus or is required to file Tax Returns or pay Taxes (in each case, with respect to the Purchased Assets or the Business) in a jurisdiction where it does not file such Tax Returns or pay such Taxes.  Seller has filed income Tax Returns in all jurisdictions where Seller holds Tangible Property or makes payments through payroll.

(g)     Seller has no deferred income pursuant to IRS Revenue Procedure 2004-34, Treasury Regulation Section 1.451-5, Section 455 of the Code, or Section 456 of the Code (or any corresponding or similar provision of Law), in each case related to the Business or the Purchased Assets.

(h)     None of the Purchased Assets is (i) property required to be treated as being owned by another Person pursuant to the safe harbor lease provision of former Section 168(f)(8) of the Code, (ii) "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code, (iii) "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code, or (iv) subject to any similar provision of Law.

(i)     None of the Purchased Assets is an interest (other than indebtedness within the meaning of Section 163 of the Code) in an entity treated for U.S. federal (and applicable U.S. state and local) income Tax purposes as a corporation, partnership, trust or real estate mortgage investment conduit.

(j)     There is no Liability under any Contract that is a Purchased Asset to pay, share or indemnify for the Taxes of any other Person (other than Liabilities under such Contracts entered into in the ordinary course of business that do not relate primarily to Taxes).

(k)     Seller not has engaged in a "reportable transaction" involving the Purchased Assets or the Business, as defined in Section 6707A(c)(1) of the Code or Treasury Regulations Section 1.6011-4(b), or any transaction requiring disclosure under a comparable or similar provision of applicable Law.

(l)     Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

(m)     Seller has complied with all applicable Laws relating to escheat, property, sales, use, goods and services or other commodity Taxes with respect to the Purchased Assets and the Business.

(n)     Since its date of incorporation, Seller has timely filed IRS Form 8300 with respect to any and all payments in cash received by Seller for which filing IRS Form 8300 is required.

(o)     To the extent applicable, Seller has complied with Section 280E of the Code and has not taken a deduction credit for any expenditures to the extent prohibited by Section 280E of the Code. To the extent applicable, Seller has complied with IRS Chief Counsel Advice 201504011.

Section 3.7.     ERISA and Employee Benefits.

(a)     Section 3.7 of the Disclosure Schedule sets forth a complete and accurate list of (i) all employee benefit plans, programs and arrangements, including all profit-sharing, bonus, commission, stock option, pension, retirement, deferred compensation, post-retirement medical or life insurance, severance, welfare, incentive, equity incentive, phantom equity, change in control, sick leave or other leave of absence, short- or long-term disability, retention and salary continuation, plans, programs and arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective of terminated), in any case, established, maintained, sponsored or contributed to in connection with the Business for the benefit of any present or former Employees, directors, officers, shareholders, consultants, or independent contractors of the Business, with respect to which Seller has made or is required to make payments, transfers, or contributions or for which Seller has any potential Liability (the "**Benefit Plans**"), and (ii) each employment or severance agreement addressed to or covering any Employees, directors, officers, consultants, or independent contractors of the Business pursuant to which Seller has any actual or contingent Liability or obligation.  Seller has no Liability with respect to any plan, agreement, program or arrangement of the type described in the preceding sentence other than the Benefit Plans.

(b)     With respect to each Benefit Plan, Seller has made available to Buyer true and complete copies of each Benefit Plan (or, if not written, a written summary of its material terms), along with, to the extent applicable, copies of all amendments, trust agreements, insurance contracts or other funding vehicles, summary plan descriptions and summaries of material

modifications, the three most recently filed annual reports (Form 5500 series), COBRA communications, actuarial valuations, nondiscrimination test results, and the most recent determination or opinion letter issued by the IRS, and any documents, forms or other instruments relating to any Benefit Plan reasonably requested by Buyer.

(c)     Each Benefit Plan has been maintained and operated in accordance with its terms and in accordance with applicable Law, including ERISA and the Code.  As of the date hereof, there are no Actions pending, or threatened, with respect to any Benefit Plan (other than routine claims for benefits in the ordinary course of business), nor is there any basis for one.  With respect to the Benefit Plans, no breaches of fiduciary duty and no non-exempt prohibited transactions (within the meaning of Section 406 of ERISA or Section 4975 of the Code) have occurred that could reasonably be expected to give rise to any Liability on the part of Seller or any ERISA Affiliates.  No "reportable event," as defined in Section 4043 of ERISA, with respect to which the reporting requirement has not been waived, has occurred with respect to any such plan.

(d)     Neither Seller nor any ERISA Affiliate sponsors, maintains or contributes to (i) any "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Title IV of ERISA, (ii) any pension plan subject to the funding standards of Section 302 of ERISA or Section 412 of the Code, (iii) any "multiemployer plan" (within the meaning of Section 3(37) of ERISA), (iv) any "multiple employer plan" within the meaning of Section 210(a) of ERISA, or (v) a multiple employer welfare arrangement within the meaning of Section 3(40) of ERISA.

(e)     Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code is the subject of a favorable determination letter from the IRS, or with respect to a prototype plan, Seller, as applicable, can rely on an opinion letter from the IRS to the prototype plan sponsor, to the effect that such Benefit Plan is so qualified and that the trust related thereto is exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and, to Seller's Knowledge, there are no facts or circumstances that would reasonably be expected to result in the loss of the qualification of such Benefit Plan.

(f)     With respect to each Benefit Plan that is a "welfare benefit plan" (as defined in Section 3(1) of ERISA), no such plan provides medical or death benefits with respect to any Person beyond their termination of employment (other than to the extent required by Law, including group health plan continuation coverage required under Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code or similar state Law).

(g)     No Benefit Plan is or at any time was funded through a "welfare benefit fund" as defined in Section 419(e) of the Code, and no benefits under any Benefit Plan are or at any time have been provided through a voluntary employees' beneficiary association (within the meaning of subsection 501(c)(9) of the Code) or a supplemental unemployment benefit plan (within the meaning of Section 501(c)(17) of the Code).

(h)     All contributions, reserves or premium payments (including all employer contributions and employee salary reduction contributions) that are due as of the date hereof have been made to each Benefit Plan and have been or are fully deductible under the Code.

30

(i)	With respect to any insurance policy providing funding for benefits under any Benefit Plan, there is no Liability of Seller in the nature of a retroactive rate adjustment, loss sharing agreement or other actual or contingency Liability.

(j)	Neither the execution and delivery of this Agreement (alone or together with any other event which, standing alone, would not by itself trigger such result) nor the consummation of the transactions contemplated hereby shall result in, cause the accelerated vesting, funding or delivery of, or increase the amount or value of, any payment or benefit due under any Benefit Plan.

(k)	Seller is not party to any agreement that creates an obligation to make any payments that reimburse or otherwise gross up any Person for any Taxes imposed under Sections 409A or 4999 of the Code.

(l)	No amount that could be received (whether in cash or property or the vesting of property) as a result of any of the transactions contemplated by this Agreement by any employee, officer or director of Seller who is a "disqualified individual" (as such term is defined in the Treasury Regulation Section 1.280G-1) under any employment, severance or termination agreement, other compensation arrangement or Benefit Plan currently in effect would be characterized as an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code).

(m)	No Benefit Plan provides benefits to any individual who is not a current or former employee of Seller, or the dependents or other beneficiaries of any such current or former employee.

Section 3.8.	<u>Employment Matters</u>.

(a)	<u>Section 3.8 of the Disclosure Schedule</u> contains a list of all Employees, contractors, whether engaged individually or through a staffing service or other provider, and other service providers of Seller as of the date hereof and sets forth for each such individual the following as of the date hereof: (i) title or position (including whether full or part time); (ii) hire date; (iii) annual base compensation or hourly rate; (iv) commission, bonus or other incentive-based compensation; (v) work location; (vi) leave status; (vii) exempt/non-exempt classification, (viii) accrued vacation, and (ix) a description of any material fringe benefits provided to each such individual.  Such information shall be updated upon reasonable request by Buyer and five days prior to the Closing Date.

(b)	Seller is not a party to or bound by any collective bargaining, works council or other agreement with a labor organization or representative covering the Employees, and there are no ongoing or threatened, and have not been in the past three years, any union organizing activities, strikes, lockouts, slowdowns or work stoppages involving the Employees.

Section 3.9.	<u>Labor Relations</u>.  Except as set forth in <u>Section 3.9 of the Disclosure Schedule</u>, (a) Seller is, and has been for the past three years, in compliance with all applicable Laws, Contracts, agreements, and policies relating to employment and terms and conditions of employment, including Laws regarding wages and hours (including those regulating the timing of payments, wage notices, classification of employees as exempt or non-exempt, payment of

31

overtime and minimum wages, hours of work, and provision of mandated meal and rest breaks), termination of employment (including any obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (or similar laws) (the "**WARN Act**"), occupational safety and health, classification of service providers as independent contractors, consultants or employees, immigration, background checks, employment record retention, and paid and unpaid leave, (b) there are no, and for the past three years have not been any, unfair labor practice charge or complaints against Seller and to Seller's Knowledge, no such charges or complaints are threatened, and (c) there is no Action pending, and have been no Actions in the past three years, against Seller alleging violations of any employment Laws, or brought by or on behalf of any current or former Employee or other service provider.

Section 3.10.   <u>Litigation</u>.  Except as set forth in <u>Section 3.10 of the Disclosure Schedule</u>, there is no Action pending or, to Seller's Knowledge, threatened against or affecting any of Burkhart, Van Ortwick or Seller relating to or affecting the Purchased Assets, the Business or the Assumed Liabilities.  There are no outstanding orders, writs, judgments, decrees, injunctions or settlements (collectively, "**Orders**") rendered against Burkhart, Van Ortwick or Seller that restrict the Business, the Purchased Assets or the Assumed Liabilities or to which any of the foregoing is subject.

Section 3.11.   <u>No Violation of Law; Permits</u>.

(a)     Seller is and has been in compliance in all material respects with, and is not in violation, in any material respect, of, all Laws applicable to the Business, the Purchased Assets or the Assumed Liabilities and Seller has not received written notice of any noncompliance with, or violation of, any such Laws, including, for purposes of specificity and not by way of limitation, compliance with all applicable product safety, energy efficiency and conservation standards.  To Seller's Knowledge, no event has occurred that shall (with or without notice or lapse of time) constitute or result in a violation, in any material respect, by Seller of, or a failure on the part of Seller to comply with, any Law that is applicable to the Business, any of the Purchased Assets or the Assumed Liabilities.  Seller has not received any written notice (or, to Seller's Knowledge, other communication) from any Person regarding any actual or possible violation of, or failure to comply with, any Law that is applicable to the Business, any of the Purchased Assets or the Assumed Liabilities.

(b)     All material reports, statements, documents, registrations, filings or submissions required to be filed with any Governmental Authority or any Nationally Recognized Testing Lab (NRTL), e.g., UL or ETL, to the extent they relate to the Business have been filed. All such reports and filings were in compliance with applicable Laws when filed or as amended or supplemented, and no deficiencies have been asserted by any such Governmental Authority or NRTL with respect to such reports and filings.  Any and all certifications or listing reports required by law and/or to support product markings are up to date, relevant to the products as they are currently sold, and apply the correct standards for those products.

(c)     Seller has not applied for or received, is and will be entitled to, or is and will be the beneficiary of any grant, subsidy or financial assistance from any Governmental Authority in connection with the Business.

32

(d)     The Purchased Assets include all Permits that are now, or at the time of the Closing will be, used or held for use in or otherwise related to or necessary for the conduct of the Business as currently conducted and the Purchased Assets, and all such Permits are listed in Section 3.11(d) of the Disclosure Schedule (collectively, the "**Business Permits**").  All Business Permits have been legally obtained and maintained and are in full force and effect.  None of Seller, the Business or any of the Purchased Assets is in violation of, in any material respect, or is being operated in violation of, in any material respect, the terms of any Business Permit.

Section 3.12.   <u>Title to Purchased Assets; Encumbrances</u>.  Seller has good, valid and marketable title to, or good, valid and subsisting leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances, other than Permitted Encumbrances, and, at the Closing, will convey to Buyer good, valid and marketable title to, or good, valid and subsisting leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances, other than Permitted Encumbrances.

Section 3.13.   <u>Entire Business; Sufficiency</u>.  The Purchased Assets constitute all of the assets, properties and rights used in or necessary for the conduct of the Business as heretofore conducted by Seller (except for the Excluded Assets) and are adequate to conduct the Business as presently conducted.   Other than the items set forth in the Transition Services Agreement, immediately following the Closing, neither Seller nor any of its Affiliates will own or lease any assets, properties or rights that are necessary for the conduct of the Business.  Other than the items set forth in the Transition Services Agreement, there are no facilities, services, assets or personal properties that are used by Seller in the conduct or operation of the Business and that are not required to be transferred to Buyer pursuant to the provisions of this Agreement or the Transaction Documents other than the Excluded Assets.  Upon consummation of the transactions contemplated by this Agreement, Buyer will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances.

Section 3.14.   <u>Solvency</u>.  Seller is not, and immediately prior to and following the transfer of the Purchased Assets to Buyer will not be, insolvent, as determined under any applicable bankruptcy, insolvency, fraudulent conveyance of similar Laws of any applicable jurisdiction.

Section 3.15.   <u>Insurance</u>.  <u>Section 3.15 of the Disclosure Schedule</u> sets forth a complete and correct list of all insurance policies (other than insurance policies that provide benefits under any Benefit Plan) held by or on behalf of Seller relating to the Business, including the policy number and period of coverage.  Seller has delivered to Buyer a complete and correct copy of all such policies together with all riders and amendments thereto.  The insurance policies listed on <u>Section 3.15 of the Disclosure Schedule</u> include all policies of insurance that are required by the Purchased Contracts in the amounts required under such Purchased Contracts.  All the insurance policies listed on <u>Section 3.15 of the Disclosure Schedule</u> are in full force and effect, all premiums due and payable thereon covering all periods up to and including the Closing Date have been paid and no notice of cancellation or termination has been received or, to Seller's Knowledge, threatened with respect to any such policy. To Seller's Knowledge, no insurer is in breach of its obligations under any such policy nor has any such insurer made a general assignment for the benefit of its creditors, filed a petition in bankruptcy or liquidation or commenced any proceeding for a reorganization or arrangement of debts.  The Purchased Assets and the properties and risks

33

of the Business are covered by valid and currently effective insurance policies issued specifically for the benefit of the Business, in each case with reputable insurance companies.

Section 3.16.   <u>Material Contracts</u>.

(a)      <u>Section 3.16 of the Disclosure Schedule</u> sets forth, by reference to the applicable subsection of this Section 3.16, each Contract (and in the case of an oral Contract, the material terms of such Contract) relating to the Business to which Seller is a party or to which any of the assets of the Business are bound, including any Contract:

(i)      relating to the Indebtedness of the Business, the guarantee of the repayment of Indebtedness of the Business or the grant of any Encumbrance on any property or asset of the Business, including the Purchased Assets;

(ii)      providing for the employment of any Person, including Persons employed as temporary employees or as consultants;

(iii)      containing covenants limiting the freedom of Seller to compete in any line of business or with any Person or in any geographic area or market or containing any such covenants that would bind Buyer or any part the Business following the Closing;

(iv)      concerning any Business Intellectual Property, including the development, acquisition or licensing thereof;

(v)      with any current or former manager, director, officer, employee, member or shareholder of Seller or its Affiliates;

(vi)      providing for the future or ongoing purchase, maintenance or acquisition, or the sale or furnishing, of materials, components, supplies, software, services, merchandise or equipment in excess of $100,000;

(vii)      granting to any Person a right of first refusal, first offer or similar preferential right to purchase or acquire any right, asset, property or service of Seller;

(viii)      pertaining to the lease of equipment or other personal property involving payments in excess of $100,000;

(ix)      providing for any offset, countertrade or barter arrangement;

(x)      containing a "most favored nation," "most favored customer," "most favored licensee," exclusivity or similar provision;

(xi)      involving a distributor, sales representative, agent, broker or advertising arrangement that (A) involves payments of more than $100,000 during any 12-month period, (B) is located outside of the United States or Canada or (C) regardless of the amounts payable thereunder, by its express terms is not terminable by Seller at will or by giving notice of thirty (30) days or less, without Liability;

34

(xii)       with any customer that involves payments of more than $100,000 during any 12-month period;

(xiii)      involving Tax sharing, a joint venture or partnership or the sharing of profits, Losses, costs or Liability by Seller with any other Person;

(xiv)      involving management services, consulting services, support services or any other similar services;

(xv)      involving the acquisition or disposition of any business enterprise whether via stock or asset purchase or otherwise;

(xvi)      granting a power of attorney to any Person;

(xvii)      providing for a business alliance or commission payments to any third party;

(xviii)     involving any Governmental Authority;

(xix)      involving the export of any goods from the United States or Canada to outside of those countries (including to the other) or the import of any goods from outside of the United States or Canada including from United States to Canada or vice versa;

(xx)      providing for a lease, sublease, license or occupancy agreement, together with all amendments or supplements thereto, with respect to Leased Real Property (collectively, "**Real Property Leases**") or involving the lease of personal property and involving annual payments in excess of $100,000 relating to personal property used in operation of the Business;

(xxi)      involving a material settlement or compromise of any Action relating to the Business;

(xxii)     that provides for future payments or a purchase from the Business that is conditioned, in whole or in part, on a change of control of the Business;

(xxiii)     that was not made in the ordinary course of business, consistent with past practice;

(xxiv)     that provides for the warranty of goods or services purchased by Seller in relation to the Business; and

(xxv)     that is otherwise material to the Business or the Purchased Assets (the contracts described in clauses (i)-(xxv) are each, a "**Material Contract**" and collectively, the "**Material Contracts**").

(b)      Seller has provided to Buyer true and complete copies of each Material Contract, as amended through the Closing Date. Each Material Contract is a valid, binding and enforceable obligation of Seller and, to Seller's Knowledge, the other parties thereto, enforceable

in accordance with its terms.  With respect to the Material Contracts listed on <u>Section 3.16 of the Disclosure Schedule</u> (or required to be listed on <u>Section 3.16 of the Disclosure Schedule</u>), (i) Seller is not in default under or in violation of any Material Contract, (ii) no event has occurred that, with notice or lapse of time or both, would constitute such a default or violation, (iii) Seller has not waived or released any of its rights under any Material Contract, and (iv) no party to a Material Contract has repudiated any of the terms thereof or threatened to terminate, cancel, not renew or otherwise materially amend, any Material Contract, and Seller has no reason to believe that any party presently intends to do so.

Section 3.17.  <u>Tangible Personal Property</u>.  The Tangible Property is in good operating condition and is adequate and suitable to conduct the Business as currently conducted, subject to continued repair and replacement in accordance with past practice, and Seller has not received notice that any of the Tangible Property is in violation, in any material respect, of any existing Law or Order of any Governmental Authority.  During the past three years there has not been any interruption of the operations of the Business due to inadequate maintenance or repair of the Tangible Property.  No approval or consent of any Person is needed so that the interest of Seller in the Tangible Property will continue to be in full force and effect and enforceable by Buyer following the Closing.

Section 3.18.  <u>Receivables; Disputed Accounts Payable</u>.  All Receivables reflected on the Financial Statements are, and all Receivables arising from or otherwise relating to the Business will, at the Closing Date, be valid and genuine arising in the ordinary course of business from *bona fide* sales of products and services in the aggregate amount thereof subject to normal and customary trade discounts, customer allowances for discounts, returns, markdowns, co-op advertising and operational chargebacks, less any *bona fide* reserves for doubtful accounts in amounts consistent with those recorded on most recent balance sheet included in the Financial Statements.

Section 3.19.  <u>Intellectual Property; Privacy and Information Technology</u>.

(a)  <u>Section 3.19(a) of the Disclosure Schedule</u> sets forth, with owner, countries, registration and application numbers and dates indicated, as applicable, and in the case of unregistered trademarks, country of use and date of first use, a complete and correct list of all of the following Business Intellectual Property: (i) patents and applications therefor; (ii) registered copyrights and applications therefor; (iii) registered trademarks, material unregistered trademarks, and applications for the registration of trademarks; (iv) Software; (v) social media account addresses/handles, domain name registrations and applications therefor, including the registrant name and applicable registration expiration date; and (vi) all licenses or similar agreements related to Intellectual Property to which Seller is a party (including agreements or consents that restrict the territory or field of use with respect to any of the Intellectual Property included in the Purchased Assets, but excluding licenses for commercially available off-the-shelf Software).  All fees associated with any Business Intellectual Property required to have been set forth on <u>Section 3.19(a) of the Disclosure Schedule</u> have been paid in full in a timely manner to the proper Governmental Authority and, except as set forth on <u>Section 3.19(a) of the Disclosure Schedule</u>, no such fees are due within the three-month period after the Closing Date.  Except as set forth on <u>Section 3.19(a) of the Disclosure Schedule</u>, all of the Business Intellectual Property required to be listed thereon has been duly registered with, filed in or issued by, as the case may be, the United States Patent and Trademark Office, the United States Copyright Office or other applicable filing

office(s), domestic or foreign, to the extent necessary or desirable to ensure full protection under any applicable Intellectual Property law, and such registrations, filings, issuances and other actions remain in full force and effect.

(b)     Except as otherwise set forth on <u>Section 3.19(b)(i) of the Disclosure Schedule</u>, all of the Intellectual Property used in the conduct of the Business is owned solely by Seller and Seller has the exclusive right to use and possess such Intellectual Property for the life thereof for any purpose, free from (i) any Encumbrances (except for Permitted Encumbrances) and (ii) any requirement of any past, present or future royalty payments, license fees, charges or other payments or conditions or restrictions whatsoever.  Except as set forth on Section 3.19(b)(ii) of the Disclosure Schedule, Seller has not licensed or otherwise granted any right to any Person under any Business Intellectual Property and has not otherwise agreed not to assert any Business Intellectual Property against any Person.

(c)     Except as set forth on <u>Section 3.19(c) of the Disclosure Schedule</u>, all Employees have received a copy, and acknowledged their agreement in writing regarding the substance, of Seller's Employee Handbook, a true and correct copy of which has been provided to Buyer (the "**Employee Handbook**"), which Employee Handbook provides, among other things, that all Employees are deemed to be performing "work for hire" for Seller.  No manager, director, officer, member, shareholder, employee, consultant, contractor, agent or other Representative of Seller owns or claims any rights in (nor has any of them made application for) any Business Intellectual Property and all such individuals have executed written agreements pursuant to which Business Intellectual Property has been assigned to Seller.

(d)     The Business as historically and currently conducted, including the possession, use, disclosure, copying or distribution of any information, data, products or other Tangible Property or intangible property, including the Business Intellectual Property, has not infringed, misappropriated, diluted, violated or otherwise conflicted with, does not and will not infringe, misappropriate, dilute, violate or otherwise conflict with any Intellectual Property right of any other Person nor does or will the operation of the Business, as currently conducted, constitute unfair competition or deceptive or unfair trade practice.  To Seller's Knowledge, The Business Intellectual Property is not being infringed or otherwise used or available for use by any Person other than Seller and customers or end users in the ordinary course of business.  To Seller's Knowledge, the Business Intellectual Property is not being infringed or otherwise used or available for use by any Person other than Seller and customers or end users in the ordinary course of business.  Further, to Seller's Knowledge, no other party is using, owns, or could claim to own, rights in Intellectual Property which presents a significant threat (even if as of yet unasserted) to Seller's conduct of the Business.

(e)     Seller has taken all steps reasonable under the circumstances to enforce, protect and maintain the Business Intellectual Property, including protecting the confidentiality of trade secrets and other proprietary information. All of the Business Intellectual Property is subsisting, valid and enforceable. No loss or expiration of any of the Business Intellectual Property is threatened, pending or, to the Knowledge of Seller, reasonably foreseeable (other than patents expiring at the end of their respective statutory terms).

(f)        Except as set forth on <u>Section 3.19(f) of the Disclosure Schedule</u>, no Action is pending or threatened that (i) challenges the rights of Seller in respect of any Intellectual Property utilized in the Business, (ii) asserts that the operation or conduct of the Business is, was or will be infringing or otherwise in violation of any Intellectual Property, or is required to pay any royalty, license fee, charge or other amount with regard to any Intellectual Property, or (iii) claims that any default exists under any Material Contract set forth or required to be set forth on <u>Section 3.16(a)(iv) of the Disclosure Schedule</u>.  Except as set forth on <u>Section 3.19(f) of the Disclosure Schedule</u>, none of the Business Intellectual Property is or has been subject to any Action or other order, injunction, judgment or ruling issued by a court of competent jurisdiction restricting the use or enjoyment of such Business Intellectual Property by Seller, and Seller has not been subject to any Action or other order, injunction, judgment or ruling issued by a court of competent jurisdiction relating to the Business in respect of any other Person's Intellectual Property.

(g)        Seller has materially complied at all times with all relevant requirements of any applicable data protection and privacy related Laws, order or industry standard setting organizations, including compliance with Seller's own data protection principles, requests from data subjects for access to data held by Seller and any Law, order or industry standard requirements relating to the registration of data users insofar as the same pertain to any aspect of the Business. Seller has not received any order or other notification from a Governmental Authority regarding non-compliance or violation of any data protection principles or Law.  No Person has claimed any compensation from Seller for the loss of or unauthorized disclosure or transfer of personal data, and no facts or circumstances exist that might give rise to such a claim insofar as the same relate to the Business.

(h)        The products and services of the Business have not and do not use Open Source Materials in such a way that grants, or purports to grant, to any third party any rights or immunities under any Business Intellectual Property (including using any Open Source Materials that require, as a condition of use, modification and/or distribution of such Open Source Materials that other Software incorporated into, derived from or distributed with such Open Source Materials be (i) disclosed or distributed in source code or other human readable form, (ii) licensed for the purpose of making derivative works, or (iii) redistributable at no charge).

(i)        In the collection and processing by Seller of any Personal Data, Seller, and, to Seller's Knowledge, its Confidential Data Processors and its Personal Data Suppliers have complied in all material respects with all applicable Information Privacy Laws, the Privacy Policies of Seller and, to the extent obligated by Contract to do so, the Privacy Policies of Personal Data Suppliers. Seller has taken commercially reasonable measures to prevent unauthorized use, access or alteration of Confidential Data in its possession or control, which measures are in material compliance with applicable Privacy Policies and Laws concerning privacy, data security, or data breach notifications. Without limiting the foregoing, (i) Seller, and, to Seller's Knowledge, its Personal Data Suppliers have acquired all necessary consents from Data Subjects for the use of all Personal Data Processed by Seller and otherwise have all requisite legal authority to Process Personal Data in the manner it is now Processed by Seller or any Personal Data Processor on behalf of Seller and (ii) with respect to all Personal Data in the databases of notification contacts owned or licensed by Seller, and, to Seller's Knowledge, their Personal Data Suppliers have acquired requisite consents from Data Subjects to Process such Personal Data in the manner it is now Processed by Seller or any Personal Data Processor on behalf of Seller

(j)      Except as set forth on Section 3.19(i) of the Disclosure Schedules, to the extent that Seller Processes any financial account numbers (such as credit cards, bank accounts, PayPal accounts or debit cards), passwords, CCV data or other related data ("**Cardholder Data**"), Seller has implemented commercially reasonable information security procedures, processes and systems that have at all times met or exceeded all applicable Laws related to the Processing of Cardholder Data, including those established by applicable Governmental Authorities, and the Payment Card Industry Standards Council (including the Payment Card Industry Data Security Standard).

(k)      Seller has at all times presented a Privacy Policy which complies with applicable Information Privacy Laws to consumers prior to the collection of any Data online. Such Privacy Policies, and any other representations, marketing materials and advertisements that address privacy issues and the treatment of Data, accurately and completely describe Seller's information collection and use practices, including reasonable safeguards in place designed to protect the privacy, security, and integrity of all Data, and no such notices or disclosures have been inaccurate, misleading or deceptive.

(l)      Seller does not sell, rent or otherwise make available to any person any Personal Data, except in a manner that complies in all material respects with the applicable Privacy Policies and in material compliance with Information Privacy Laws. The execution, delivery and performance of this Agreement and the transactions contemplated herein, including any transfer of Personal Data resulting from the execution, deliver and performance of this Agreement, complies, and will comply with, all Information Privacy Laws, the Privacy Policies of Seller, and, to the extent obligated by contract to do so, the Privacy Policies of Personal Data Suppliers. Except as set forth in Section 3.19(k)(i) of the Disclosure Schedules, the transfer of Personal Data in connection with the transactions contemplated pursuant to this Agreement do not, and will not, require the consent of a Data Subject, notice to a Data Subject or other action by any Person with regard to a Data Subject under the Privacy Policies of the Seller or the applicable Information Privacy Laws governing the collection, use, sale, and transfer of Personal Data. Except as set forth in Section 3.19(k)(ii) of the Disclosure Schedules, no Data Subject has submitted, without regard to form or Seller's validation, under the Information Privacy Laws of the jurisdiction governing the collection, use, sale, and transfer of the Personal Data in connection with the transactions contemplated pursuant to this Agreement, (i) an opt out request that would prohibit the lawful transfer of the relevant Personal Data, (ii) a deletion request that would require the destruction of the relevant Personal Data, (iii) a correction request that would require the amendment of the relevant Personal Data, or (iv) a request to produce the relevant Personal Data to the requesting Data Subject.

(m)      Seller has not received any notice that they are or have been in material breach of any contractual obligation to limit its use of, secure or otherwise safeguard Confidential Data, and, to Seller's Knowledge, no such breach or violation has occurred within the applicable statute of limitation for a claim arising out of such a breach or violation. Seller has in place and follow commercially reasonable procedures designed to ensure that all written contracts with Confidential Data Processors require that such Confidential Data Processor Process Data in compliance with the Information Privacy Laws, Seller's Privacy Policies and Seller's obligations under any contract that governs the Processing of any Confidential Data.

(n)     Except as set forth on Section 3.19(m) of the Disclosure Schedules, to Seller's Knowledge, (i) Seller has not experienced any unauthorized access to, disclosure, deletion or other misuse of, any Personal Data in its possession or control (a "**Security Incident**") or made or been required to make any disclosure, notification or take any other action under any applicable Information Privacy Laws in connection with any Security Incident, (ii) no Confidential Data Processor has experienced any Security Incident or made or been required to make any disclosure, notification or take any other action under any applicable Information Privacy Laws in connection with any Security Incident with respect to any Confidential Data Processed by it for Seller, (iii) no Personal Data Supplier has experienced any Security Incident or made or has been required to make any disclosure, notification or take any other action under any applicable Information Privacy Laws in connection with any Security Incident with respect to any Personal Data provided by it to Seller. Seller has made all notifications to customers or individuals required to be made by Seller under any applicable Information Privacy Laws arising out of or relating to any event of unauthorized access to or disclosure or acquisition of any Personal Data by any person of which Seller have Knowledge.

(o)     No Action before any court, administrative body or Governmental Authority has been filed or commenced against Seller nor, to Seller's Knowledge, threatened against Seller, alleging any failure to comply with any Information Privacy Laws, and Seller has not incurred any material Liabilities under any Information Privacy Laws. To Seller's Knowledge, no Action has been filed, commenced or threatened against any Personal Data Supplier or Confidential Data Processor with respect to any Personal Data supplied to or Confidential Data Processed for the Business.

Section 3.20.   Real Property.

(a)     Seller does not own any real property.

(b)     Section 3.20(b) of the Disclosure Schedule sets forth a correct and complete list of all real property that is currently leased, licensed, subleased or otherwise used by Seller (the "**Leased Real Property**").  All of the Leased Real Property is used or occupied by Seller pursuant to a Real Property Lease.

(c)     Other than as set forth on Section 3.20(c) of the Disclosure Schedule, no other real property is leased, licensed, subleased or otherwise used in connection with the Business.

(d)     The occupancy, use and operation of the Real Property complies in all material respects with all applicable Law and Permits.  The condition and use of the Real Property in all material respects conforms to each applicable certificate of occupancy and all other permits required to be issued in connection with the Real Property.  The Real Property and the appurtenant easements include all of the land, buildings, offices, structures, appurtenant easements and other improvements used or held for use in connection with or otherwise required to carry on the Business.

(e)     Seller enjoys peaceful and undisturbed possession of the Real Property.  To Seller's Knowledge, all of the buildings, fixtures and structures located on the Real Property and

40

used or occupied by Seller are in good condition and repair (subject to ordinary wear and tear) and operating condition for the conduct of the Business as currently conducted.

(f)     Except as set forth on Section 3.20(g) of the Disclosure Schedule, the Real Property is not subject to any subleases, licenses, or sub-tenancies of any kind, and no Person (other than Seller) is in possession of any of the Real Property.

Section 3.21.   Environmental Matters.

(a)     (i) Seller possesses all Permits required by applicable Laws relating to Environmental Laws, (ii) Seller and operations of the Business are and have been since January 1, 2016 in full compliance with all terms and conditions of such Permits and all Environmental Laws, and (iii) there are no current circumstances which could reasonably be expected to give rise to any material Liability, obligation or duty in relation to any non-compliance with Environmental Laws.

(b)     Seller has not received any written request for information, notice, demand letter, notice of investigation, administrative inquiry or complaint or claim relating to any Environmental Condition or Liability under any Environmental Law.

(c)     Except as has been fully resolved with no further Liability, there are no threatened orders, writs, judgments, awards, injunctions or decrees of any Governmental Authority or Actions with respect to any non-compliance with, or any Liability under Environmental Laws or under Contracts concerning Environmental matters relating to current or past circumstances against Seller or the Business.

(d)     To the extent that that any of the Real Property or any building, plant, machinery, equipment or other assets employed in the conduct of the Business contains any asbestos or asbestos containing material which is regulated by Environmental Law, such asbestos or asbestos containing material is currently being managed in compliance with Environmental Law.

(e)     There has been no Release of any Hazardous Substance at, on, under, or migrating from any properties currently or formerly owned, leased or operated by Seller or the Business that requires or shall require reporting, investigation, assessment, clean-up, remediation or any other response action pursuant to any Environmental Law or any Contract.

(f)     None of Seller or the Business has assumed, undertaken, agreed to indemnify, or otherwise become subject to any Liability of any other Person relating to or arising from any Environmental Law or Environmental Matter.

(g)     To Seller's Knowledge, no Real Property will require a material capital expenditure or material annual operating expense increase during the two years following the Closing to comply with any Environmental Law.

(h)     Seller has made available to Buyer true and complete copies of any and all material documents, correspondence, pleadings, reports, assessments, analytical results, Permits relating to Environmental Laws, or other documents concerning Environmental Laws or the presence of Hazardous Substances as contamination in the air, soil and, surface water, groundwater

41

and subsurface or subsurface strata of any Real Property, which could reasonably be expected to give rise to Environmental Loss.

(i)     Seller warrants that none of the Products contains any per- and polyfluoroalkyl substances (PFAS), as defined in 40 CFR §705.3 of the U.S. Environmental Protection Agency's (EPA) proposed rule requiring PFAS reporting and recordkeeping under TSCA Section 8(a)(7), 86 Fed. Reg. 33926, 33936-37 (Jun. 28, 2021); and that neither Seller nor any Subsidiary of Seller has manufactured, imported, marketed, sold, distributed, installed, or exported any products, mixtures, or items containing PFAS.

(j)     Except as set forth in Section 3.21(j) of the Disclosure Schedule, there are no past or present (or to the best of Seller's knowledge, future) events, conditions, circumstances, activities, practices, incidents, actions, or plans that (i) may interfere with or prevent compliance or continued compliance with the Environmental Laws as may apply to PFAS or any regulation, code, plan, order, decree, judgment, injunction, notice, or demand letter issued thereunder, or (ii) may give rise to any common law or other legal liability, or any claim or action, based on, arising from, or relating to activities involving PFAS, including but not limited to their manufacture, processing, import, use, distribution, sale, release into the environment, discharge, or disposal.

Section 3.22.   International Trade Laws.   The Seller has, at all times as to which the applicable statute of limitations has not yet expired, conducted their transactions in accordance with all applicable International Trade Laws.  Without limiting the foregoing:

(a)     the Seller has obtained, and is in compliance with, all export licenses, license exceptions and other consents, notices, waivers, approvals, orders, authorizations, registrations, declarations, classifications and filings with any Governmental Authority required for (i) the export and re-export of products, services, Software and technologies and (ii) releases of technologies and Software to foreign nationals located in the United States and abroad ("**Export Approvals**");

(b)     there are no pending or, to the Seller's Knowledge, threatened claims against the Seller with respect to such Export Approvals;

(c)     to the Seller's Knowledge, there are no actions, conditions or circumstances pertaining to the Seller's import or export transactions that may give rise to any future claims;

(d)     to the Seller's Knowledge, no Export Approvals with respect to the transactions contemplated hereby are required;

(e)     neither the Seller, its Affiliates, their respective directors or officers, nor, to Seller's Knowledge, any employees or agents of the foregoing, is a Sanctions Target;

(f)     the Seller has timely paid all customs duties under all applicable Customs and Import Laws;

(g)     the Seller has properly classified its imported goods as required under Customs and Import Laws;

LEGAL_US_E # 158737765.16

(h)      since the date that is five (5) years prior to the date hereof, the Seller has not received written notice to the effect that a Governmental Authority claimed or alleged that the Seller was not in compliance with International Trade Laws; and

(i)      neither the Seller nor any of its Affiliates has made any voluntary disclosures to, or has been subject to any fines, penalties or sanctions from, any Governmental Authority regarding any past violations of International Trade Laws.

Section 3.23.   Casualties.  Except as set forth on Section 3.23 of the Disclosure Schedule, since December 31, 2020, neither the Business nor any Purchased Asset has been affected in any way by or as a result of any flood, fire, mudslide, landslide, explosion or other casualty (whether or not covered by insurance).

Section 3.24.   Product Warranties; Product Liability.

(a)      Seller has provided to Buyer true and accurate copies of the standard terms and conditions of the sale of products by Seller (containing applicable guaranty, warranty and indemnity provisions).

(b)      (i) Seller has not manufactured, sold or distributed any products that were, at the time they were manufactured, sold or distributed, faulty or defective or did not comply with any and all warranties or representations, including safety certification markings, expressly made or implied by or on behalf of Seller and (ii) all products manufactured, sold, distributed, provided, shipped or licensed by Seller and each service rendered by Seller has conformed with all applicable safety standards, contractual commitments, warranties and Laws, and there are no material design, manufacturing or other defects, latent or otherwise, in such products.

(c)      All products manufactured, sold, distributed, provided, shipped or licensed by Seller have complied with all requirements of Laws and regulation related to warning labels, packaging, containers, and all other labeling requirements, including for clarification and not by way of limitation, all labeling related to NRTLs and labeling as to efficiency, conservation or other standards.

(d)      Except as set forth in Section 3.24(d) of the Disclosure Schedule, in the five-year period prior to the Closing Date, there has been no voluntary or mandatory product recall by Seller or written notice of any Action for Liability or other claim made by any third party against Seller (whether based on Contract or tort and whether relating to personal injury, including death, property damage or economic Loss.

Section 3.25.   Product Registrations; Universal Product Codes.

(a)      All information pertaining to, used in, or comprising the information and documentation necessary for the Business Product Registrations is true and correct in all respects, and complies with all applicable Laws and regulations.

(b)      All applications, filings and records submitted to any Governmental Authority to obtain the grant of the Business Product Registrations at all times have been truthful

in all respects, not misleading or fraudulent and in compliance with all applicable Laws and regulations.

(c)      Seller has paid and is in good standing regarding all fees, mill assessments, penalties, Taxes or other monetary obligations of any kind owed to any Governmental Authority for the Business Product Registrations.

(d)       There is no pending or, to Seller's Knowledge, threatened Action by any Governmental Authority or third party to cancel, suspend, revoke, terminate or challenge any of the Business Product Registrations.

(e)      No Person has been granted a right of first refusal or option to purchase from Seller any of the Business Product Registrations.

(f)      The UPC Codes are all of the universal product codes of Seller related to the Business.  Seller is not using the UPC Codes other than related to the Business. Seller has provided a complete listing of all UPC Codes that it uses on its products.  Seller warrants that it has the rights to use all UPC Codes that it uses to identify its products and will execute all documentation needed to transfer the right to those UPC Codes to Buyer on or before the Closing.

(g)      Seller represents and warrants that all products of the Business that either (x) are electrical products, (y) contain electrical components, or (z) are pieces of electrical equipment, are each approved by an accredited certification or evaluation agency for safety.  Seller has also responsibly obtained any such approvals that are required by applicable Laws, rules or regulations.  Section 3.25(g) of the Disclosure Schedule sets forth a list of all such approvals. Seller warrants that all products of the Business match the corresponding safety and/or sanitation listing report. Seller agrees that Buyer has the right but not responsibility to independently verify the validity and accuracy of Seller's third party certification file for supplier products.

(h)      Section 3.25(h) of the Disclosure Schedule sets forth a complete and accurate list of all safety data sheets with respect to all products of the Business containing hazardous chemicals prior to shipment.

(i)      Seller warrants that all products of the Business are accompanied by comprehensive, conspicuous warnings that satisfy all applicable legal or regulatory requirements and instructions for proper use that are written in plain and understandable language. Such warnings are in all languages required by the countries in which such products are sold.

(j)      Seller confirms that all products of the Business conform to all requirements of the Federal Communications Commission of the United States.

Section 3.26.   Promotions and Allowances.  Section 3.26 of the Disclosure Schedule sets forth the material terms in effect as of the date hereof of all return, markdown, promotion, co-op advertising and other similar programs or allowances offered generally by Seller to any customer with respect to the Business.

Section 3.27.   Bank and Brokerage Accounts; Investment Purchased Assets.  Section 3.27 of the Disclosure Schedule sets forth a true and complete list of (a) the names and locations of all

44

banks, trust companies, securities brokers and other financial institutions at which Seller has an account or safe deposit box or maintains a banking, custodial, trading or other similar relationship with respect to any of the Purchased Assets (as well as a list of such accounts and safety deposit boxes), (b) the names of all persons authorized to draw on or have access to such accounts and safe deposit boxes, and (c) all outstanding powers of attorney or similar authorizations granted by Seller.

Section 3.28.  Absence of Certain Business Practices.  Neither Seller nor any of its Representatives has, directly or indirectly, given or agreed to give any gift or similar benefit to any customer, supplier, employee of any Governmental Authority or any other Person that could reasonably be expected to subject the Business, Purchased Assets or Assumed Liabilities to any material penalty in any civil, criminal or governmental litigation or proceeding.

Section 3.29.  Propriety of Past Payments.  In connection with the Business, (a) no unrecorded fund or asset of Seller has been established for any purpose, (b) no material accumulation or material use of corporate funds of Seller has been made without being properly accounted for in the books and records of the Business, (c) no payment has been made by or on behalf of Seller with the understanding that any part of such payment is to be used for any purpose other than that described in the documents supporting such payment, and (d) none of Seller, any of its Representatives or any other Person associated with or acting for or on behalf of Seller has, directly or indirectly, made any illegal contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, private or public, regardless of form, whether in money, property or services, (i) to obtain favorable treatment for Seller in securing business, (ii) to pay for favorable treatment for business secured for Seller, (iii) to obtain special concessions, or for special concessions already obtained, for or in respect of Seller, or (iv) otherwise for the benefit of Seller in violation of any Law, including the FCPA and other foreign anti-bribery and anti-corruption laws.  Neither Seller nor any current director, officer, agent, employee or other Person acting on behalf of Seller, has accepted or received any unlawful contribution, payment, gift, kickback, expenditure or other item of value in violation of any Law.

Section 3.30.  Customers and Suppliers.  Section 3.30 of the Disclosure Schedule lists the 20 largest customers of the Business during the 12 months prior to the date hereof (measured in terms of revenues during such period) and the 20 largest suppliers of the Business during the 12 months prior to the date hereof (measured in terms of total spend during such period). Seller has not received within the 12 months prior to the date hereof any written or oral notice that (a) any of the 20 largest customers of the Business or any of the 20 largest suppliers of the Business will cease dealing with the Business or (b) that any of such 20 largest customers may otherwise reduce or become unable for any reason to maintain the volume of business transacted by such customer with the Business. Seller has not received within the 12 months prior to the date hereof any written notice of a dispute, claim or other Action between the Business or Seller, on the one hand, and any supplier or customer thereof, on the other hand, other than those occurring in the ordinary course of business that are not material to the Business.

Section 3.31.  Brokers.  Neither Seller nor any of its Affiliates, officers, directors, managers or Employees has employed, retained or engaged any broker or finder or incurred any Liability for any brokerage, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement and the Transaction Documents.

45

Section 3.32.   Affiliate Transactions.  Except as set forth on Section 3.32 of the Disclosure Schedule, there are no agreements, Contracts or other arrangement by and between Seller and any current or former manager, director, officer, employee, member or shareholder of Seller or its Affiliates.

Section 3.33.   Restrictions on Business Activities.   There is no Contract (including covenants not to compete) or Order relating to the Business that has or would reasonably be expected to have, whether before or after consummation of the transactions contemplated by this Agreement and the Transaction Documents, the effect of prohibiting or impairing the conduct of the Business as currently conducted.

Section 3.34.   Full Disclosure.  No representation or warranty about the Business made in this Agreement by Seller and no statement contained in the Disclosure Schedule or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material act necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as of the date hereof and as of the Closing Date, as set forth in this Article IV:

Section 4.1.   Organization and Qualification.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own, license, use or lease and operate its assets and properties and to carry on its business as it is now conducted.

Section 4.2.   Authority; Non-Contravention; Approvals.

(a)    Buyer has all requisite power and authority to execute and deliver this Agreement and the Transaction Documents and to perform the transactions contemplated by this Agreement and the Transaction Documents.   The execution and delivery by Buyer of this Agreement and the Transaction Documents and the performance by Buyer of the transactions contemplated by this Agreement and the Transaction Documents have been duly authorized and approved by the Board of Directors and the requisite shareholders, of Buyer and no other corporate or other actions or proceedings on the part of Buyer or any other Person are necessary to authorize the execution and delivery of this Agreement or the Transaction Documents or the performance and consummation by Buyer of the transactions contemplated by this Agreement and the Transaction Documents.   This Agreement has been, and upon their execution the Transaction Documents will be, duly executed and delivered by Buyer and, assuming the due authorization, execution and delivery of this Agreement and the Transaction Documents by Seller and, with respect to the Escrow Agreement, the Escrow Agent, constitutes and upon their execution the Transaction Documents will constitute, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

(b)      The execution and delivery by Buyer of this Agreement and the Transaction Documents and the performance of the transactions contemplated by this Agreement and the Transaction Documents do not and will not (i) conflict with or result in a breach of any provisions of the certificate of incorporation or bylaws of Buyer, (ii) result in a violation or breach of or constitute a default (or an event which, with or without notice or lapse of time or both, would constitute a default) under, or result in the termination of, or the loss of a benefit under or accelerate the performance required by, or give rise to any obligation or result in a right to cancel, terminate or accelerate any obligation under, the terms, conditions or provisions of any Contract of any kind to which Buyer or any of its Subsidiaries or Affiliates is now a party or by which Buyer or any of its Subsidiaries or any of their respective properties or assets may be bound or affected, or (iii) violate any order, writ, injunction, decree, statute, treaty, rule or regulation applicable to Buyer or any of its Subsidiaries, other than in the case of clauses (ii) and (iii) above as would not reasonably be expected to result in a Buyer Material Adverse Effect.

(c)      Except for the filings by Buyer required by the HSR Act, no declaration, filing or registration with, or notice to, or authorization, consent, order or approval of, any Governmental Authority is required to be obtained or made in connection with or as a result of the execution and delivery of this Agreement and the Transaction Documents by Buyer or the performance by Buyer of the transactions contemplated by this Agreement and the Transaction Documents, other than such declarations, filings, registrations, notices, authorizations, consents or approvals which, if not made or obtained, as the case may be, could not reasonably be expected to result in a Buyer Material Adverse Effect.

Section 4.3.     Brokers.   Neither Buyer nor any of their Affiliates, officers, directors, managers or Employees has employed, retained or engaged any broker or finder or incurred any Liability for any brokerage, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement and the Transaction Documents.

Section 4.4.     Sufficient Funds.  Buyer possesses sufficient funds (through existing credit facilities and cash on hand) to pay, and, with respect to the Purchase Price, will in the future possess sufficient funds to pay, the Purchase Price and affirms that it is not a condition to Closing or any of its other obligations under this Agreement that Buyer obtain financing for or related to payment thereof.

Section 4.5.     Legal Proceedings.   There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that (i) challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement; or (ii) arise out of the purchase of any company, division or entity including by way of asset purchase, stock purchase, merger or business combination.

## ARTICLE V

## COVENANTS

Section 5.1.     Conduct of the Business.  Since September 30, 2021, except as otherwise expressly provided in this Agreement, Seller has operated the Business only in the ordinary course of business consistent with past practice.  During the period from the date of this Agreement to the

Closing, except as otherwise expressly provided in this Agreement, Seller will operate the Business only in the ordinary course of business. Seller will use commercially reasonable efforts to (a) preserve intact the present organization of the Business, (b) keep available the services of the present officers of the Business and Employees, and (c) preserve relationships with customers, suppliers, licensors, licensees, contractors, distributors and others having business dealings with the Business. Without limiting the generality of the foregoing, from the date of this Agreement to the Closing, except as set forth in <u>Section 5.1 of the Disclosure Schedule</u> and other than with the prior written approval of Buyer, Seller will not, to the extent related to the Business or any of the Purchased Assets:

        (a)     sell, pledge, lease, encumber, assign, transfer or dispose of, or authorize the sale, pledge, lease, encumbrance, assignment, transfer or disposition of, any assets or rights or acquire (including by merger, consolidation or acquisition of stock or assets) any assets or rights that, in either case, are or would otherwise be Purchased Assets, other than sales of Inventory in the ordinary course of business;

        (b)     abandon or allow to lapse any of the Business Intellectual Property, fail to prosecute any pending applications for registration of any of the Business Intellectual Property or fail to defend any third party claims of infringement related to any of the Business Intellectual Property;

        (c)     disclose any Confidential Information of Seller relating to the Business or the Purchased Assets to any Person outside of the ordinary course of busness;

        (d)     (i) make any material change to any pricing, marketing, sales, billing, Receivables collection or payment practice of the Business, (ii) waive any rights in respect of or write off any Receivables, or (iii) fail to timely pay any account payable of the Business, in each case, except in the ordinary course of business;

        (e)     engage in any promotional sale, discount, pricing reduction or other activity that would reasonably be expected to have the effect of accelerating sales of the Business for the period of time prior to the Closing that otherwise would have occurred post-Closing;

        (f)     enter into any material commitment or transaction, including any commitment to make any loan, advance or capital contribution to, or investment in, any other Person with respect to the Business, in each case that would not be fulfilled in full prior to the Closing;

        (g)     incur, create or assume any Indebtedness for borrowed money in excess of $100,000 (other than letters of credit entered into or issued in the ordinary course of business) or take or omit to take any action that results in an Encumbrance, other than a Permitted Encumbrance, in excess of $100,000 (other than letters of credit entered into or issued in the ordinary course of business), being imposed on any asset that may be a Purchased Asset;

        (h)     (i) make, change or rescind any election relating to Taxes, (ii) settle or compromise or agree to compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or consent to any extension or waiver of the statute of limitations thereof, (iii) except as may be required by Law, make any change to any of

its methods of reporting income or deductions for Tax purposes from those employed in the preparation of its most recently filed Tax Returns, (iv) change any annual Tax accounting period, (v) adopt or change any method of Tax accounting, (vi) amend any Tax Returns or (vii) obtain any Tax ruling or enter into any closing agreement, in each of clauses (i) – (vii), to the extent related to the Purchased Assets or the Business and that would reasonably be expected to affect Taxes of the Business for any taxable period ending after the Closing Date;

(i)      (i) except to the extent required by this Agreement or applicable Law, enter into, adopt, amend or terminate employment, severance, termination or similar type of Contract, collective bargaining agreement or Benefit Plan, except (A) for increases in base salaries in a manner and amount consistent with past practice, or (B) as may be required by any Benefit Plan in effect as of the date hereof or (ii) increase in any manner the compensation or benefits of any officer, employee or consultant of Seller or pay or otherwise grant any benefit not required by any Benefit Plan;

(j)      effectuate a plant closing or layoff regardless of whether such action triggers obligations under the WARN Act;

(k)      hire any new employees of the Business or reassign or transfer any current employee to or from the Business, except in the ordinary course of business;

(l)      (i) make or commit to any capital expenditures, other than (A) those provided in the forecast for the Business provided to Buyer prior to the date hereof and (B) such expenditures with an aggregate cost not exceeding $100,000 or (ii) fail to make or commit to any capital expenditures provided in the forecast for the Business provided to Buyer prior to the date hereof;

(m)      (i) enter into, amend or terminate any Contract of a type that, if in effect at the date of this Agreement, would be required to be disclosed pursuant to Section 3.16(a) or (ii) amend or modify or otherwise waive, release or assign any material rights, claims or benefits of any Material Contract;

(n)      pay, discharge or satisfy any Liabilities relating to the Business in excess of $100,000, except in the ordinary course of business;

(o)      settle or compromise any Action pending or threatened against Seller, the Business or the Purchased Assets in excess of $100,000;

(p)      enter into any transaction or any Contract with any Affiliate, current or former managers, directors, officers, employees, members or shareholders of Seller relating to the Business;

(q)      license or grant any right to, or transfer, any of the Business Intellectual Property, other than grants of non-exclusive licenses in the ordinary course of business; or

(r)      take, or agree or otherwise commit to take, any of the foregoing actions or any other action that if taken would cause any representation or warranty of Seller contained in this Agreement to be untrue or incorrect as of the date when made or as of any subsequent date (as

49

if made as of such date) or that could prevent the satisfaction of any condition set forth in Article VI.

Section 5.2.    Use of Name.  Seller agrees that from and after the Closing it will not use the names "Luxx" or "Luxx Lighting" in any form whatsoever, including in respect of advertising and promotional materials.

Section 5.3.    Tax Matters.

(a)    Buyer, at Buyer's expense, shall prepare and file or cause to be prepared and filed when due all periodic non-income Tax Returns (each, a "**Straddle Period Return**") with respect to the Purchased Assets for Tax periods which begin before the Closing Date and end after the Closing Date (each such period, a "**Straddle Period**") in a manner consistent with Seller's past practice, except as otherwise required by applicable Law, and in accordance with the provisions of this Agreement.  Seller shall pay to Buyer no later than three Business Days prior to the due date of the Taxes shown as due and owing on any such Tax Return, an amount of such Taxes equal to the amount of such Taxes for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the Tax period ending on and including the Closing Date and the denominator of which is the number of days in the entire taxable period, except to the extent such amount was taken into account as a liability in the calculation of Final Closing Date Net Working Capital.

(b)    Buyer shall bear all transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest thereon) incurred in connection with the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**"), subject to a limit of $100,000, above which Seller shall bear all Transfer Taxes.  The Parties shall cooperate as reasonably requested to minimize such Transfer Taxes, including with respect to any available exemption from such Transfer Taxes.  Seller will prepare and file or cause to be prepared and filed as Tax Returns with respect to such Transfer Taxes, except as otherwise required by applicable Law.

(c)    To the extent the allocation of the Purchase Price (and other applicable amounts for Tax purposes) among the Purchased Assets has not been agreed upon by Buyer and Seller prior to the Closing, within sixty (60) days after the Closing Date, Buyer will engage Citizens Banks, N.A. (the "**Valuation Expert**") to conduct a valuation analysis of the Purchased Assets (and other relevant amounts for Tax purposes).  The Valuation Expert will determine the valuation of the Purchased Assets (and other relevant amounts for Tax purposes) based on their independent, professional judgment.  Following the Valuation Expert's delivery of the final valuation report (and in any event within 120 days after the determination of the Final Closing Date Net Working Capital pursuant to Section 2.10(d)) Buyer shall deliver to Seller a statement (the "**Asset Allocation Statement**") of the allocation of the Purchase Price (and other applicable amounts for Tax purposes) among the Purchased Assets in accordance with the Valuation Expert's final valuation report and Section 1060 of the Code and the Treasury Regulations thereunder. Buyer and Seller and each of their respective Affiliates shall: (i) be bound by the Asset Allocation Statement for purposes of determining any Taxes; (ii) prepare and file, and cause their respective Affiliates to prepare and file, their Tax Returns (including IRS Form 8594) on a basis consistent with the Asset Allocation Statement; (iii) cooperate in the filing of any forms (including IRS Form

50

8594) required to be filed with regard to the Asset Allocation Statement, including any amendments to such forms required pursuant to any applicable Law or this Agreement; and (iv) take no position, and cause their Affiliates to take no position, inconsistent with the Asset Allocation Statement on any applicable Tax Return or in any proceeding before any Governmental Authority or otherwise.  If the Asset Allocation Statement is disputed by any Taxing Authority, the Party receiving notice of the dispute shall promptly notify the other Party, and the Parties agree (and shall cause their respective Affiliates) to use their reasonable best efforts to defend such Asset Allocation Statement in any audit or other Action and not to settle or otherwise dispose of such audit or other Action without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed).

(d)     On or prior to the Closing Date, Seller will notify all of the Government Authorities responsible for the administration of Taxes for the jurisdictions set forth on Section 5.3(d) of the Disclosure Schedule of the transactions contemplated by this Agreement in the form and manner required by such Governmental Authorities, if the failure to make any such notification or receive available Tax clearance certificate from the California Franchise Tax Board ( "**Tax Clearance Certificate**") could subject Buyer to any Taxes of Seller.  If, with respect to any application for a Tax Clearance Certificate made pursuant to this Section 5.3(d), any Governmental Authority asserts that Seller is liable for any Tax, Seller will promptly pay any and all such Taxes and will provide evidence to Buyer that such Taxes have been paid in full or the Liability for such Taxes has otherwise been resolved or satisfied.

(e)     The Parties shall cooperate (and cause their respective Affiliates to cooperate) fully, as and to the extent reasonably requested by the other parties, in connection with the preparation and filing of Tax Returns (or amendments thereto) pursuant to this Section 5.3 and any Tax audit, litigation or other proceeding with respect to Taxes and payments in respect thereof. Such cooperation shall include the retention and (upon the other Parties' request) the provision of records and information which are reasonably relevant to any such Tax audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Each of the Parties shall furnish the other Parties with copies of all relevant correspondence received from any Governmental Authority in connection with any Tax audit or information request with respect to any Taxes for which any other party may have an indemnification obligation under this Agreement.

(f)     All amounts paid in respect of indemnification under Article VIII shall be treated for all Tax purposes as adjustments to the Purchase Price, except as other required by applicable Law.

Section 5.4.    <u>Non-Competition; Non-Solicitation</u>.

(a)     As a material inducement to Buyer to enter into this Agreement, from the Closing and for five (5) years thereafter, Burkhart, Van Ortwick, and Seller will not, directly or indirectly through any Person anywhere in the world, (i) engage in, own any interest in, invest in, lend funds to, operate, control or provide any management, consulting, financial, administrative, supply, distribution or other services to any business that competes with the Business as conducted, or as presently proposed to be conducted, directly or indirectly in any manner, or (ii) solicit, sell or attempt to sell goods and services offered by the Business to any customer of the Business (or

51

any successor) or induce or seek to induce any such Person to cease to do business with the Business or otherwise vary the terms of its relationship with the Business; *provided*, *however*, that notwithstanding the foregoing, each of Burkhart, Van Ortwick, and Seller may (i) collectively own, directly or indirectly, solely as an investment, securities of any Person that are traded on any national securities exchange or the NASDAQ Stock Market if Burkhart, Van Ortwick, and Seller (alone or collectively) (A) are not a controlling Person of, or a member of a group that controls such Person and (B) do not, directly or indirectly, own 2% or more of any class of securities of such Person and (ii) dispose of items of Excluded Inventory in its possession as of the date hereof for a period of six (6) months after the Closing Date (the "**Sell Off Period**"), in each case, solely in the ordinary course, consistent with past practices; *provided*, that Burkhart, Van Ortwick, and Seller make clear in any such sales or dispositions that such items of Excluded Inventory are not associated with the Business, with Buyer or with the Luxx brand.  Upon the expiration of the Sell Off Period, Seller shall destroy all remaining Excluded Inventory.

(b)     From the Closing and for five (5) years thereafter, Burkhart, Van Ortwick and Seller will not, directly or indirectly through any Person, (i) cause, solicit, induce or encourage any Employees to leave such employment or (ii) cause, induce or encourage any material actual or prospective customer, supplier or licensor of Seller as of the Closing Date, or any other Person who has a material business relationship with Seller as of the Closing Date, to terminate or modify any such actual or prospective relationship.  The foregoing restrictions will not preclude (x) general solicitations in newspapers or similar mass media not targeted toward Employees or (y) the solicitation or hiring of any employee who for at least one year prior to the date on which such solicitation or hiring would take place has terminated such employee's employment with Seller (it being conclusively presumed so as to avoid any disputes under this Section 5.4(b) that any such solicitation or hiring within such one year period is in violation of clause (i) above).

(c)     Neither party will make any disparaging or defamatory public comments about any other party hereto  or its Affiliates or their respective directors, managers and officers, or to encourage or participate with anyone to make such statements or any such comments with respect to the Business, Buyer or its Affiliates or their products.  Buyer agrees and acknowledges that the terms of this Section 5.4(c) do not prohibit Seller from making truthful statements, if required to do so by Law or Action (including in connection with any Action relating to this Agreement and the transactions contemplated hereby); *provided*, *however*, that if any such Person is requested by Order to provide testimony which would otherwise violate the provisions of this Section 5.4(c), such Person will promptly notify Buyer of such request.

(d)     From and after the Closing, Seller will not and will cause its Affiliates and their respective Representatives not to, directly or indirectly, disclose, reveal, divulge or communicate to any Person, other than authorized officers, directors and employees of Buyer, or use or otherwise exploit for its own benefit or for the benefit of anyone other than Buyer, any Confidential Information.  Seller and its Affiliates and their respective Representatives will not have any obligation to keep confidential the Confidential Information if and to the extent disclosure thereof is (i) specifically required by Law, except that in the event disclosure is required by applicable Law, Seller will, to the extent reasonably permitted, provide Buyer with prompt written notice of such requirement prior to making any disclosure so that Buyer may seek an appropriate protective order; or (ii) the Confidential Information is publicly disclosed by someone

other than Seller, Van Ortwick or Burkhart, other than any such disclosure in violation of an obligation of confidentiality with respect to such Confidential Information.

(e)     The Parties recognize that the Laws and public policies of the various states of the United States may differ as to the validity and enforceability of covenants similar to those set forth in this Section 5.4.  It is the intention of the Parties that the provisions of this Section 5.4 be enforced to the fullest extent permissible under the Laws and policies of each jurisdiction in which enforcement may be sought, and that the unenforceability (or the modification to conform to such Laws or policies) of any provisions of this Section 5.4 will not render unenforceable, or impair, the remainder of the provisions of this Section 5.4.  Accordingly, if any provision of this Section 5.4 is determined to be invalid or unenforceable, such invalidity or unenforceability will be deemed to apply only with respect to the operation of such provision in the particular jurisdiction in which such determination is made and not with respect to any other provision or jurisdiction.  The Parties (i) have carefully read and understand all of the provisions of this Agreement and have had the opportunity for this Agreement to be reviewed by counsel and (ii) acknowledge that the duration, geographical scope and subject matter of this Section 5.4 are reasonable and necessary to protect the goodwill, customer relationships, legitimate business interests, trade secrets and confidential information of the Parties.

(f)     From the Closing and for five (5) years thereafter, Burkhart, Van Ortwick and Seller will not, directly or indirectly through any Person, take any action to encourage, initiate, solicit or engage in any discussions or negotiations with Nicholls that would cause Nicholls not to engage in an employment, consulting or other service provider relationship with Buyer or any of its Affiliates, and will not otherwise take any action to circumvent the interests, intentions, plans or proposed undertakings of the Buyer or any of its Affiliates in engaging Nicholls as an employee, consultant or other service provider of Buyer or any of its Affiliates.

(g)     The Parties to this Agreement acknowledge and agree that any remedy at Law for any breach of the provisions of this Section 5.4 may be inadequate, and Seller hereby agree that Buyer will have the right to seek equitable relief, including the issuance of a temporary or permanent injunction by a court of competent jurisdiction.

Section 5.5.    Non-Assignable Assets.

(a)     Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this Section 5.5, to the extent that the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset would result in a violation of applicable Law, or would require the consent, authorization, approval or waiver of a Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement (including any Governmental Authority), and such consent, authorization, approval or waiver shall not have been obtained prior to the Closing, this Agreement will not constitute a sale, assignment, transfer, conveyance or delivery, or an attempted sale, assignment, transfer, conveyance or delivery, thereof; *provided*, *however*, that, subject to the satisfaction or waiver of the conditions contained in Article VI, the Closing will occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof. Following the Closing, Seller and Buyer will use commercially reasonable efforts, and will cooperate with each other, to obtain any such required consent, authorization, approval or waiver;

53

*provided, however*, that neither Party will be required to make any payments, incur any Liability or offer or grant any accommodation (financial or otherwise) to any third party to obtain any such consent, authorization, approval or waiver, other than the incurrence of incidental expenses relating to obtaining any such consent, authorization, approval or waiver, except and only to the extent that Buyer agrees to reimburse and make whole Seller for any payment or other accommodation made by Seller at Buyer's request.  Once such consent, authorization, approval or waiver is obtained, Seller will sell, assign, transfer, convey and deliver to Buyer the relevant Purchased Asset to which such consent, authorization, approval or waiver relates for no additional consideration.  Applicable sales, transfer and other similar Taxes in connection with such sale, assignment, transfer, conveyance or license will be borne equally by Buyer, on the one hand, and Seller, on the other hand, in accordance with Section 5.3(b).

(b)    To the extent that any Purchased Asset cannot be transferred to Buyer following the Closing pursuant to this Section 5.5, Buyer and Seller will use commercially reasonable efforts to enter into such arrangements (such as subleasing, sublicensing or subcontracting) to provide to the Parties the economic and, to the extent permitted under applicable Law, operational equivalent of the transfer of such Purchased Asset to Buyer as of the Closing and the performance by Buyer of its obligations with respect thereto.  To the extent permitted under applicable Law, Seller will, at Buyer's expense, hold in trust for and pay to Buyer promptly upon receipt thereof, such Purchased Asset and all income, proceeds and other monies received by Seller to the extent related to such Purchased Asset in connection with the arrangements under this Section 5.5.

Section 5.6.    Employee Matters.

(a)    Offer of Employment.  Buyer or one of its Affiliates, in their sole discretion, shall make offers of employment to the employees of Seller set forth on Section 5.6(a) of the Disclosure Schedule.  Any such offers shall be made at least one week before the Closing.  Upon each such employee's acceptance of such offer of employment, such employee shall become an employee of Buyer or one of its Affiliates as of the Closing Date (and shall be referred to herein as a "**Transferring Employee**").    The date on which each such Transferring Employee commences employment with Buyer or one of its Affiliates shall be referred to herein as the "**Employment Commencement Date**."  Seller shall provide Buyer with an opportunity to review, revise and approve any formal written communications by Seller to the Employees regarding the transactions contemplated by this Agreement and such Employees' employment with Buyer or one of its Affiliates as described herein, and Seller shall accept Buyer's revisions to such communications.

(b)    Terms and Conditions of Employment.

(i)    For a period of six (6) months following the Closing Date (the "**Continuation Period**"), Buyer or its Affiliates shall employ each Transferring Employee on terms and conditions that are reasonably comparable to the terms and conditions for each employee provided by Seller to the Transferring Employee immediately prior to the Closing.  In addition, and without limiting the immediately preceding sentence, during the Continuation Period, Buyer shall offer, or shall cause its Affiliates to offer, each Transferring Employee participation in employee benefit plans, agreements, programs, policies and arrangements of Buyer or any of its

Affiliates (the "**Buyer Plans**") that shall be in the aggregate no less favorable than those offered by Buyer to its similarly situated employees.

(ii)     For purposes of eligibility, level of benefits, vesting and benefit accruals (other than benefit accruals under a defined benefit pension plan) under each Buyer Plan in which the Transferring Employees become eligible to participate before the end of the Continuation Period, Buyer or its Affiliates shall give each Transferring Employee full credit under each such Buyer Plan for all service with Seller, its Affiliates and any predecessor employer prior to the Closing to the same extent as such service was recognized for such purpose by Seller and/or its Affiliates prior to the Closing under comparable Benefit Plans; *provided*, *however*, that such service shall not be credited to the extent that it would result in a duplication of benefits.

(c)     General Employee Provisions.

(i)     Seller and Buyer shall cooperate in giving any notices required by applicable Laws or contracts and take whatever other actions with respect to the plans, programs and policies described in this Section 5.6(c)(i) as may be necessary to carry out the arrangements described in this Section 5.6(c)(i).

(ii)     Seller and Buyer shall provide each other with such plan documents and summary plan descriptions, employee data or other information as may be reasonably required to carry out the arrangements described in this Section 5.6(c)(ii).

(iii)     Buyer and Seller intend to use the "standard procedure" under IRS Revenue Procedure 2004 53, whereby each of Buyer and Seller report on Forms W-2 only those wages paid to the Transferring Employees for the portion of the calendar year that such Transferring Employees were employed by Buyer and Seller, respectively.

(iv)     After the Closing Date, Seller shall be responsible for providing continuation coverage under Section 4980B of the Code and Title I, Part 6 of ERISA to all former employees of Seller or any ERISA Affiliate of Seller who terminated employment on or before the Closing Date or in connection with the transactions contemplated by this Agreement who are considered "M&A qualified beneficiaries" as defined under Treas. Reg Section 54.4980B-9. If neither Seller nor any ERISA Affiliate of Seller maintains a group health plan, Buyer shall assume such responsibility as a successor employer, and notwithstanding any other provisions in this Agreement, Seller shall reimburse Buyer for all direct and indirect expenses in connection with providing such COBRA benefits.

(d)     No Third-Party Beneficiary Rights.  Nothing contained in this Agreement shall (i) impose an obligation on Buyer to continue the employment or service of any Transferring Employee or any contractor or consultant of Seller, (ii) limit the right of Buyer to terminate the employment or services of, or to reassign or otherwise alter the status of, any Transferring Employee or any contractor or consultant of Seller after the Closing Date, or to change in any manner the terms and conditions of his or her employment or other service to or engagement by Seller, or (iii) be construed as amending any Benefit Plan or any Buyer Plan.

(e)     WARN Act.  Seller shall be responsible for all WARN Act Liabilities relating to the periods prior to and on the Closing Date, including any such Liabilities that result

55

from Employees' separation of employment from Seller and/or Employees not becoming Transferred Employees.  Buyer shall be responsible for all WARN Act Liabilities exclusively with respect to the Transferred Employees that relate to the period following the Closing Date.

Section 5.7.    <u>Parties' Obligations</u>.

(a)    Each of Seller and Buyer will cause their respective Representatives to timely perform any of their respective obligations under this Agreement and the Transaction Documents.  Without limiting the foregoing, each of the Parties will use its reasonable best efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement as promptly as practicable.  Seller will use its reasonable best efforts to obtain all such waivers, consents or approvals from third parties, and to give all such notices to third parties, as are set forth on <u>Section 5.7 of the Disclosure Schedule</u>.

(b)    Subject to the terms and conditions of this Agreement, each Party will use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate the transactions contemplated by this Agreement.  The Parties hereto will furnish to each other and to each other's legal counsel all such information as may be reasonably requested in order to accomplish the foregoing actions.

(c)    Subject to the terms and conditions of this Agreement, each Party will use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable to consummate and make effective, the transactions contemplated by this Agreement, including (i) the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an Action or proceeding by, any Governmental Authority, (ii) the obtaining of all necessary consents or waivers from third parties, including Governmental Authorities, and (iii) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement and to fully carry out the purposes of this Agreement.  The Parties agree that they will consult and cooperate with each other in good faith with respect to the obtaining of all permits, consents, approvals and authorizations of all third parties and Governmental Authorities necessary or advisable to consummate the transactions contemplated by this Agreement and each party will keep the others apprised of the status of matters relating to consummation of the transactions contemplated by this Agreement.  Subject to applicable Laws and this Agreement, Seller, on the one hand, and Buyer, on the other hand, and their respective legal counsel will (x) have the right to review in advance, and, to the extent practicable, each will consult the other on, any filing made with, or written materials to be submitted to, any Governmental Authority in connection with the transactions contemplated by this Agreement, (y) promptly inform each other of any communication (or other correspondence or memoranda) received from, or given to, the U.S. Department of Justice, the U.S. Federal Trade Commission, or any other Governmental Authority with regulatory jurisdiction over enforcement of any applicable anti-trust, competition, or trade regulation Law (each such Governmental Authority, a "**Governmental Antitrust Entity**"), and (z) furnish each other with copies of all correspondence, filings and written communications

56

between them or their Subsidiaries or Affiliates, on the one hand, and any Governmental Authority or its respective staff, on the other hand, with respect to this Agreement or the transactions contemplated by this Agreement. Seller, on the one hand, and Buyer, on the other hand, will provide each other and their respective legal counsel with advance notice of, and the opportunity to participate in, any discussion, telephone call or meeting with any Governmental Authority in respect of any filing, investigation or other inquiry in connection with the transactions contemplated by this Agreement and to participate in the preparation for such discussion, telephone call or meeting. Buyer shall be entitled to direct the antitrust defense of this Agreement, or negotiations with, any Governmental Authority or other third party relating to this Agreement or regulatory filings under applicable competition Law, subject to the provisions of this Section 5.7. Seller shall use its commercially reasonable efforts to provide full and effective support of Buyer in all material respects in all such negotiations and other discussions or actions to the extent requested by Buyer.

(d)     Without limiting the generality of the undertakings pursuant to this Section 5.7, but subject to Section 5.7(e), (i) the Parties shall provide or cause to be provided (including by their "ultimate parent entities" as that term is defined in the HSR Act) as promptly as practicable to Governmental Antitrust Entities information and documents requested by any Governmental Antitrust Entity or necessary, proper or advisable to permit consummation of the transactions contemplated by this Agreement, including preparing and filing any notification and report form and related materials required under the HSR Act as promptly as practicable following the date of this Agreement, with respect to the required filing under the HSR Act, and thereafter to respond promptly to any request for additional information, data or documentary material that may be made under the HSR Act, (ii) the Parties shall use their commercially reasonable efforts to take such actions as are necessary or advisable to obtain from any Governmental Authority any consents, licenses, permits, waivers, approvals, authorizations, or orders to effect prompt consummation of the transactions contemplated by this Agreement, and (iii) the Parties will use their commercially reasonable efforts to resolve any objections and challenges, including by contest through litigation on the merits, negotiation or other Action, that may be asserted by any Governmental Antitrust Entity with respect to the transactions under the HSR Act. Fees associated with the filing under the HSR Act will be borne by Buyer.

(e)     In furtherance and not in limitation of this Section 5.7, Seller and Buyer will make any other filings required in connection with any approval or consent of or waiver by a Governmental Authority required to permit consummation of the transactions contemplated by this Agreement as promptly as practicable and in any event within five Business Days of the date hereof.

(f)     Notwithstanding anything in this Agreement to the contrary, it is expressly understood and agreed that: (i) neither Buyer nor any of its Affiliates shall have any obligation to litigate or contest any administrative or judicial action or proceeding or any decree, judgment, injunction or other order, whether temporary, preliminary or permanent; and (ii) neither Buyer nor any of its Affiliates shall be under any obligation to make proposals, execute or carry out agreements, enter into consent decrees or submit to orders providing for (A) the sale, divestiture, license or other disposition or holding separate (through the establishment of a trust or otherwise) of any assets or categories of assets of Buyer or any of its Affiliates or Seller or any of its Affiliates, (B) the imposition of any limitation or regulation on the ability of Buyer or any of its Affiliates to

freely conduct their business or own such assets, or (C) the holding separate of the Purchased Assets or any of Business's product lines, assets or operations or the Business or any limitation or regulation on the ability of Buyer or any of its Affiliates to exercise full rights of ownership of the Business or the Purchased Assets.

(g)     Seller, on the one hand, and Buyer, on the other hand, will promptly advise each other upon receiving any communication from any Governmental Authority whose consent or approval is required for consummation of the transactions contemplated by this Agreement that causes such party to believe that there is a reasonable likelihood that any such consent or approval will not be obtained or that the receipt of any such approval will be materially delayed.

(h)     Except as may be otherwise provided in the Transaction Documents or otherwise agreed to by the Parties in writing, all Tangible Properties that are Excluded Assets (if any) that are located at any of the Real Property shall be removed from such facilities prior to the Closing (or as promptly as reasonably practicable thereafter), at Seller's expense and in a manner so as not to unreasonably interfere with the operations of Buyer or any of its Affiliates (to the extent any such removal is following the Closing) and to not cause damage to such Real Property or any Purchased Asset (other than wear and tear that is reasonably expected in connection with the applicable removal, but in any event, not material to any Purchased Asset or the Real Property from which it is being removed), and Buyer or any of its Affiliates, as applicable, (to the extent any such removal is following the Closing) shall provide reasonable access to Seller as applicable to such Real Property to effectuate such movement.  Seller shall be solely responsible for all costs and expenses of removing such Excluded Assets and any subsequent moving and installation thereof.

Section 5.8.   <u>Bulk Sale Filings</u>.   To the extent necessary, Buyer hereby waives compliance for Seller and its Affiliates with the provisions of any bulk sales transfer Laws applicable to the transfers described in this Agreement.  Seller will indemnify and hold harmless Buyer from and against any and all Liabilities that may be asserted by third parties against Buyer as a result of such Seller noncompliance.

Section 5.9.   <u>Escrow</u>.

(a)     On the Closing Date, Seller, Buyer and East West Bank, a national banking association, as escrow agent (including its successors and permitted assigns in such capacity, the "**Escrow Agent**") will enter into an escrow agreement, substantially in the form of **Exhibit H** (the "**Escrow Agreement**").  Buyer will pay all fees and expenses of the Escrow Agent in connection with the Escrow Agreement.  Seller and Buyer agree that, for Tax reporting purposes, all interest or other income from investment of such escrowed funds will, as of the end of each calendar year and to the extent required by the IRS, be reported as having been earned by Seller, and, in accordance with the terms of the Escrow Agreement, the Escrow Agent will release to Seller from the accounts established by the Escrow Agent pursuant to the Escrow Agreement (the "**Escrow Accounts**") funds sufficient to pay such Tax Liability.

(b)     In accordance with the terms of the Escrow Agreement, to the extent that no unresolved claim for indemnification pursuant to Article VII hereof is outstanding on the one-year anniversary of the Closing Date, the Seller and Buyer shall submit joint written instructions

to the Escrow Agent instructing the Escrow Agent to release and pay to Seller fifty percent (50%) of the portion of the Escrow Amount remaining after the one-year anniversary of the Closing Date (the "**First Escrow Release Amount**"); *provided*, that in the event that any claim for indemnification has been asserted, but has not been fully and finally resolved on the one-year anniversary of the Closing Date, the Seller and Buyer shall submit joint written instructions to the Escrow Agent instructing the Escrow Agent to release and pay to Seller the First Escrow Release Amount, less an amount equal to the maximum aggregate amount of all such unresolved claims, and thereafter, any portion of the First Escrow Release Amount not required to pay such claims as soon as practicable following the full and final resolution of such claims; and

(c)      In accordance with the terms of the Escrow Agreement, to the extent that no unresolved claim for indemnification pursuant to Article VII hereof is outstanding on the date that is eighteen (18) months after the Closing Date, the Seller and Buyer shall submit joint written instructions to the Escrow Agent instructing the Escrow Agent to release and pay to Seller the portion of the Escrow Amount remaining after the date that is eighteen (18) months after the Closing Date; *provided*, that in the event that any claim for indemnification has been asserted, but has not been fully and finally resolved on the date that is eighteen (18) months after the Closing Date, the Seller and Buyer shall submit joint written instructions to the Escrow Agent instructing the Escrow Agent to release and pay to Seller the Escrow Amount remaining on such date, less an amount equal to the maximum aggregate amount of all such unresolved claims, and thereafter, any portion of the Escrow Amount not required to pay such claims as soon as practicable following the full and final resolution of such claims.

Section 5.10.   Further Assurances; Post-Closing Cooperation.

(a)      From time to time after the Closing, without additional consideration, each of the Parties will (or, if appropriate, will cause their Affiliates to) execute and deliver such further instruments and take such other action as may be necessary to make effective the transactions contemplated by this Agreement and the Transaction Documents.  If any Party will following the Closing have in its possession any asset, right or Liability that under this Agreement that should have been delivered to another Party, then such Party will promptly deliver such asset, right or Liability to the other Party.

(b)      Seller hereby constitutes and appoints, effective as of the Closing Date, Buyer and its successors and assigns as the true and lawful attorney of Seller with full power of substitution in the name of Buyer, or in the name of Seller, but for the benefit of Buyer, at Buyer's cost (i) to collect for the account of Buyer any items of Purchased Assets and (ii) to institute and prosecute all proceedings that Buyer may in its reasonable discretion deem proper to assert or enforce any right, title or interest in, to or under the Purchased Assets, and to defend or compromise any and all Actions in respect of the Purchased Assets. Buyer will be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest in respect thereof.

(c)      Following the Closing, Seller will afford Buyer and its Representatives (i) such access during normal business hours as Buyer may reasonably request to all books, records and other data and information, including any information from Employees, relating to the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities and the Excluded

Liabilities and (ii) the right to make copies and extracts therefrom. Further, each Party agrees for a period extending seven years after the Closing Date not to destroy or otherwise dispose of any such books, records and other data unless such Party will first offer in writing to surrender such books, records and other data to the other Party and such other Party will not agree in writing to take possession thereof during the ten calendar day period after such offer is made and to inform the senders that Buyer is the new rightful recipient.

(d)     Following the Closing, Buyer may receive and open all mail addressed to Seller and deal with the contents thereof in its discretion to the extent that such mail and the contents thereof relate to the Business. Buyer agrees to deliver or cause to be delivered to Seller all mail received by Buyer after the Closing addressed to Seller or any of its Affiliates that does not relate to the Business.

(e)     Seller will take, or cause to be taken, all actions and do, or cause to be done, at no cost to Seller, all things necessary, proper, or advisable to register, maintain, and prevent the diminution in value of the Business Intellectual Property, including filing any affidavits of use in commerce with the U.S. Patent and Trademark Office, responding to all office actions or other correspondence from the U.S. Patent and Trademark Office, U.S. Copyright Office, and all other corresponding governmental offices throughout the world, obtaining and recording all documents necessary to establish, maintain, transfer, or identify Buyer's rights in such Intellectual Property, including all necessary assignments of such Intellectual Property and fulfilling all of its duties and obligations and avoid any defaults under all Contracts regarding Intellectual Property, and assist Buyer after the Closing with respect to any legal or administrative action relating to the Intellectual Property, including before the U.S. Patent and Trademark Office, U.S. Copyright Office, and all other corresponding foreign and domestic Governmental Authorities.

(f)     To the extent that any moral rights or rights of *droit moral* are deemed to exist or apply in any jurisdiction to any of the Intellectual Property rights transferred hereunder, Seller agrees to, and hereby waives, or hereby agrees to seek a waiver in favor of Seller and Buyer of any and all such moral rights or rights of *droit moral*.

(g)     Seller will effect all renewals of all Intellectual Property that are scheduled to or may expire between the date hereof and the date that is thirty (30) days after the Closing Date. Subject to the immediately following sentence, Buyer will be responsible for all out-of-pocket third-party fees and expenses incurred by Seller in connection with all such renewals, and Buyer will reasonably assist Seller in connection therewith, including executing and delivering, or causing to be executed and delivered, all such documents and instruments as Seller may reasonably deem necessary to affect such renewals. Seller will be fully responsible for, including paying all costs associated with, filing releases of all security Encumbrances existing on the Closing Date on Business Intellectual Property with the United States Patent and Trademark Office and any applicable foreign Intellectual Property offices where Encumbrances have been recorded on or prior to the Closing Date.

Section 5.11.   <u>Access to Information</u>. From the date hereof to the Closing Date, Seller will (a) afford Buyer and its Representatives reasonable access to the Employees and reasonable access to and the right to inspect all of the Real Property, properties, assets, premises, books and records, contracts, agreements and other data related to the Business and (b) furnish Buyer and its

60

Representatives with such financial, operating and other data and information related to the Business as Buyer may reasonably request, except that any such investigation will be conducted during normal business hours, upon reasonable advance notice to Seller, under the supervision of Seller's personnel and in such manner as not to unreasonably interfere with the normal operations of the Business. Buyer will, and will cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 5.11.

Section 5.12.  Publicity.  The initial press release announcing this Agreement will be in substantially the form previously agreed by the Parties.  Thereafter and prior to the Closing, no Party will issue any press release concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other, which approval will not be unreasonably withheld, delayed or conditioned, unless and to the extent that the disclosing Party otherwise determines in good faith that such disclosure is required by Law (in which case it will, if practicable under the circumstances, endeavor in good faith to consult with the other Parties with respect to the filing and content thereof).  Other than in connection with the filings required pursuant to the HSR Act, the terms of this Agreement will not be disclosed or otherwise made available to any third party, except where such disclosure, availability or filing is required by Law and only to the extent required by Law.

Section 5.13.  Exclusivity.  Until the Closing or the termination of this Agreement, Seller will not, and will not permit its Affiliates or Representatives to, nor will they encourage or authorize any Person (including any Representative) to, initiate any contact with, solicit, encourage or enter into or continue any negotiations, understandings or agreements with any third party with respect to or in connection with, or furnish or disclose any non-public information regarding the Business to any third party in connection with, any share purchase, merger, consolidation, share exchange, recapitalization or other business combination transaction involving the Business, in each case other than the transactions contemplated by this Agreement.

Section 5.14.  Receivables.  From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Receivables, other than Excluded Receivables, or any other Purchased Asset, Seller or its Affiliate shall remit such funds to Buyer within five (5) Business Days after its receipt thereof. From and after the Closing, if Buyer or its Affiliate receives or collects any funds relating to any Excluded Asset, Buyer or its Affiliate shall remit any such funds to Seller within five (5) Business Days after its receipt thereof.

Section 5.15.  Notification of Certain Matters.  Seller will give prompt written notice to Buyer, and Buyer will give prompt written notice to Seller, (a) of any notice or other communication received by such Party or any of its Affiliates from any Governmental Authority in connection with the transactions contemplated by this Agreement or from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, (b) of any Action commenced or, to such Party's knowledge, threatened against, relating to or involving or otherwise affecting such Party or any of its Affiliates which relate to the transactions contemplated by this Agreement, (c) in the event such Party becomes aware of the occurrence or non-occurrence of any event which will result, or has a reasonable prospect of resulting, in the failure of any condition, covenant or agreement contained in this Agreement to be complied with or satisfied prior to or at the Closing.

## ARTICLE VI

## CONDITIONS TO CLOSING

Section 6.1.    Conditions to Each Party's Obligations.  The respective obligations of each Party to effect the Closing are subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)    All necessary consents and approvals of any Governmental Authority required for the consummation of the transactions contemplated by this Agreement shall have been obtained, and any waiting period applicable to the consummation of the transactions contemplated hereby under the HSR Act shall have expired or been terminated.

(b)    No Law shall have been enacted, entered, promulgated or enforced by a Governmental Authority that prohibits the consummation of the transactions contemplated by this Agreement or the Transaction Documents, and no Action shall be pending by a Governmental Authority having jurisdiction over the Business that seeks to prohibit or enjoin the consummation of the transactions contemplated by this Agreement or the Transaction Documents.

Section 6.2.    Conditions to Buyer's Obligations.  The obligations of Buyer to effect the Closing are further subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)    Each of the representations and warranties made by Seller in this Agreement that is qualified by reference to materiality, Business Material Adverse Effect or Seller Material Adverse Effect shall be true and correct in all respects, and each of the representations and warranties made by Seller in this Agreement that are not so qualified shall be true and correct in all material respects, in each case as of the date of this Agreement and at and as of the Closing Date as if made on that date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be true and correct as of such specified date or time).

(b)    Seller shall have performed and complied in all material respects with each covenant required by this Agreement to be so performed or complied with by Seller at or before the Closing (including delivering to Buyer the items set forth in Section 2.7).

(c)    All payoff letters, consents or approvals listed in Section 6.2(c) of the Disclosure Schedule shall have been obtained and Buyer shall have received copies of such consents in form and substance reasonably satisfactory to Buyer.

(d)    No event, circumstance or change shall have occurred, that individually or in the aggregate with one or more other events, circumstances or changes, has had or reasonably could be expected to have, a Seller Material Adverse Effect or a Business Material Adverse Effect.

(e)    Seller shall have amended its charter, bylaws and any other governing documents, as applicable, and taken all other actions necessary to change its name to one sufficiently dissimilar to its present name, in Buyer's reasonable judgment, to avoid confusion with the conduct of the Business post-Closing.

(f)     At least eighty percent (80%) of the employees set forth on <u>Section 5.6(a) of the Disclosure Schedule</u> shall have accepted Buyer's offer of employment, on mutually agreebale terms, and have completed Buyer's standard pre-employment processes for hiring and onboarding.

(g)     Seller shall have delivered to Buyer a certificate, dated the Closing Date and duly executed by the Chief Executive Officer of Seller, in form and substance reasonably satisfactory to Buyer, to the effect that the conditions set forth in clauses (a), (b) and (d) of this Section 6.2 have been satisfied.

(h)     Seller shall have delivered to Buyer a certificate of the corporate secretary of Seller attaching thereto a true, correct and complete copy of resolutions of the board of directors and stockholders of Seller authorizing the execution, delivery and performance of this Agreement, the Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

(i)     Seller shall have delivered to Buyer a certificate of good standing or similar document with respect to Seller issued by the applicable Governmental Authority as of a date within three Business Days of the Closing Date.

(j)     Seller and the Escrow Agent (or, if the Escrow Agent is unable or unwilling to serve in such capacity, an alternative escrow agent reasonably satisfactory to Buyer) shall have entered into and delivered the Escrow Agreement.

(k)     Pattison shall have executed and delivered to Buyer the Pattison Consulting Agreement.

Section 6.3.    <u>Conditions to Seller's Obligations</u>.  The obligations of Seller to effect the Closing are further subject to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)     Each of the representations and warranties made by Buyer in this Agreement that is qualified by reference to materiality or Buyer Material Adverse Effect shall be true and correct in all respects, and each of the other representations and warranties made by Buyer in this Agreement that are not so qualified shall be true and correct in all material respects, in each case as of the date of this Agreement and at and as of the Closing Date as if made on that date (except in any case that representations and warranties that expressly speak as of a specified date or time need only be true and correct as of such specified date or time).

(b)     Buyer shall have performed and complied with, in all material respects, each covenant required by this Agreement to be so performed or complied with by Buyer at or before the Closing (including delivering to Seller or the Escrow Agent, as applicable, the items set forth in Section 2.8).

(c)     No event, circumstance or change shall have occurred, that individually or in the aggregate with one or more other events, circumstances or changes, has had or reasonably could be expected to have, a Buyer Material Adverse Effect.

(d)      Buyer shall have delivered to Seller a certificate, dated the Closing Date and duly executed by an authorized officer of Buyer, in form and substance reasonably satisfactory to Seller, to the effect that the conditions set forth in clauses (a)-(c) above have been satisfied.

(e)      Buyer shall have delivered to Seller a certificate of an authorized officer of Buyer attaching thereto a true, correct and complete copy of resolutions of the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement, the Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

(f)      Buyer and the Escrow Agent (or, if the Escrow Agent is unable or unwilling to serve in such capacity, an alternative escrow agent reasonably satisfactory to Seller) shall have entered into and delivered the Escrow Agreement.

## ARTICLE VII

## **TERMINATION**

Section 7.1.      <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing by:

(a)      the mutual written consent of Buyer and Seller;

(b)      Buyer, upon a material breach of any representation, warranty, covenant or agreement set forth in this Agreement (a "**<u>Terminating Breach</u>**") by Seller such that the conditions specified in Section 6.2(a) or 6.2(b) would not be satisfied at the Closing and, in either such case, such breach cannot be cured by the Termination Date or, if capable of being cured, is not cured within 15 days following receipt by Seller from Buyer of written notice thereof, except that the right to terminate this Agreement pursuant to this Section 7.1(b) will not be available to Buyer if it is then in material breach of any of its representations, warranties or covenants under this Agreement; or

(c)      Seller, upon a Terminating Breach by Buyer such that the conditions specified in Section 6.3(a) or 6.3(b) would not be satisfied at the Closing and, in either such case, such breach cannot be cured by the Termination Date or, if capable of being cured, is not cured within 15 days following receipt by Buyer from Seller of written notice thereof, except that the right to terminate this Agreement pursuant to this Section 7.1(c) will not be available to Seller if it is then in material breach of any of its representations, warranties or covenants under this Agreement; or

(d)      Buyer or Seller, as the case may be, if:

(i)      there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(ii)      any Governmental Authority shall have issued an Order restraining or enjoining the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable; or

LEGAL_US_E # 158737765.16

(iii)      the Closing shall not have occurred by December 31, 2021 (the "**Termination Date**") (unless the failure to consummate the Closing by such date shall be due to or have resulted from any breach of the representations or warranties made by, or the failure to perform or comply with any of the agreements or covenants hereof to be performed or complied with prior to the Closing by, the Party seeking to terminate the Agreement pursuant to this Section 7.1(d)(iii)); *provided*, *however*, that if on such date at least one of the conditions set forth in Section 6.1(a) (as a result of an antitrust Law or an Order under an antitrust Law) shall not have been satisfied, then, Buyer, at its sole discretion, may elect to extend the Termination Date for one three-month period.

(e)      Seller if (i) all the conditions set forth in Sections 6.1 and 6.2 (provided such conditions are capable of being satisfied as of the date of Seller's notice terminating the Agreement pursuant to this Section 7.1(e)) have been satisfied, (ii) Seller has irrevocably confirmed by written notice to Buyer that it is ready and willing to consummate the transactions contemplated by this Agreement (subject to the satisfaction of all of the conditions set forth in Section 6.3 that by their nature to be satisfied by actions taken at the Closing) on a proposed Closing Date that is consistent with Section 2.6 and such notice is given not less than five (5) Business Days prior to such proposed Closing Date, and (iii) the Closing shall not have been consummated on such proposed Closing Date.

Section 7.2.    Effect of Termination.  In the event this Agreement is terminated by either Party as provided in Section 7.1, the provisions of this Agreement will immediately become void and of no further force and effect, and no Party or any of its Subsidiaries or Affiliates (or any of their respective directors or officers) will have any Liability whatsoever under this Agreement or in connection with the transactions contemplated hereby (other than this Section 7.2, Section 5.12 and Article IX which will survive the termination of this Agreement), except that (a) such termination will not relieve any Party hereto of any Liability for damages actually incurred or suffered by the other Party as a result of any willful breach of this Agreement and (b) the provisions of the Confidentiality Agreement will continue in full force and effect.  For purposes hereof, "willful breach" means a material breach by a Party of the applicable provision of this Agreement as a result of an action or failure to act by such Party that it knew would result in a breach of this Agreement. Upon the termination of this Agreement, Buyer shall destroy, and delete from its computer systems, mobile storage devices or cloud devices, all of Seller's information.

## ARTICLE VIII

## SURVIVAL; INDEMNIFICATION

Section 8.1.    Survival of Representations, Warranties, Covenants and Agreements.  The representations and warranties of the Parties provided for in this Agreement will survive the Closing for a period of 18 months, except that (a) the representations and warranties set forth in Section 3.19 (Intellectual Property) will survive the Closing for a period of 24 months, (b) the representations and warranties set forth in Sections 3.6 (Tax Matters), 3.7 (ERISA and Employee Benefits) and 3.21 (Environmental Matters) will survive the Closing until 60 days following the expiration of the applicable statute of limitations (as may be extended by any Governmental Authority), and (c) the representations and warranties set forth in (i) Sections 3.1 (Organization and Qualification; Capitalization), 3.2 (Authority; Non-Contravention; Approvals); 3.30 (Brokers)

65

and 3.31 (Affiliate Transactions) (collectively, the "**Seller Fundamental Representations**"), and (ii) Sections 4.1 (Organization and Qualification), 4.2 (Authority; Non-Contravention; Approvals), and 4.3 (Brokers) (collectively the "**Buyer Fundamental Representations**" and, together with the Seller Fundamental Representations, the "**Fundamental Representations**") will survive the Closing to the fullest extent permissible under applicable Law.  Each covenant contained in this Agreement will survive until fully performed or fulfilled, unless non-compliance with such covenants is waived in writing by the Party or Parties entitled to such performance.  No Claim for indemnification may be asserted after the expiration of the applicable survival period; *provided*, that a specific Claim for indemnification which was timely and properly made before expiration of the applicable survival period but not resolved prior to its expiration will extend the survival period with respect to the specific representation, warranty, covenant or agreement underlying such Claim through the date such Claim is conclusively resolved.  The Parties' respective representations, warranties, covenants and agreements contained in this Agreement will survive strictly in accordance with this Section 8.1.

Section 8.2.   Indemnification by Buyer.  Subject to the provisions of this Article VIII, Buyer agrees to indemnify, defend and hold harmless Seller and Seller's officers, directors, managers, members, employees, agents, Affiliates and Subsidiaries, including officers and directors of any Affiliate or Subsidiary of Seller (collectively, the "**Seller Parties**"), after the Closing, from and against any and all Losses incurred by Seller Parties to the extent such Losses are based upon, arise out of or are related to (a) a breach of any representation or warranty of Buyer set forth in this Agreement or any of the Transaction Documents, (b) any failure to perform or comply with any of the covenants of Buyer set forth in this Agreement or any of the Transaction Documents, (c) the Assumed Liabilities, or (d) any and all Taxes for which Buyer is responsible pursuant to this Agreement.

Section 8.3.   Indemnification by Seller.  Subject to the provisions of this Article VIII, Seller, Burkhart and Van Ortwick will severally indemnify, defend and hold harmless Buyer and Buyer's officers, directors, managers, members, employees, agents, Affiliates and Subsidiaries, including officers and directors of any Affiliate or Subsidiary of Buyer (collectively, the "**Buyer Parties**" and together with the Seller Parties, the "**Indemnitees**"), after the Closing, from and against any and all Losses incurred by Buyer Parties to the extent such Losses are based upon, arise out of or relate to (a) a breach of any representation or warranty of Seller set forth in this Agreement or in any of the Transaction Documents, (b) any failure to perform or comply with any of the covenants of Seller set forth in this Agreement or in any of the Transaction Documents, (c) Excluded Liabilities, (d) any and all Taxes for which Seller is responsible pursuant to this Agreement or for which Seller is otherwise responsible under any applicable Law, or (e) any matters set forth on Schedule 8.3.

Section 8.4.   Assertion of Claims.  The Indemnitee will promptly give notice to the Party from whom the indemnification is sought (the "**Indemnitor**") of any claim (a "**Claim**") describing such Claim with reasonable particularity and containing a reference to the provisions of this Agreement under which such Claim has arisen, except that the failure to give such prompt notice will not prevent any Indemnitee from being indemnified hereunder for any Losses, except to the extent that the Indemnitor is prejudiced as a result of such failure to so promptly notify the Indemnitee.

LEGAL_US_E # 158737765.16

Section 8.5.    <u>Notice of and Right to Defend Third Party Claims</u>.

(a)    If any lawsuit or enforcement Action is filed against any Party entitled to the benefit of indemnity hereunder which may give rise to a Claim (a "**Third-Party Claim**"), written notice thereof will be given by the Indemnitee to the Indemnitor as promptly as practicable. If the Indemnitor confirms in writing to the Indemnitee within 30 days after receipt of a Third-Party Claim the Indemnitor's responsibility to indemnify and hold harmless the Indemnitee therefor (subject to the limitations set forth in this Article VIII), the Indemnitor may elect to assume control over the compromise or defense of such Third-Party Claim at the expense of the Indemnitor and by counsel selected by the Indemnitor, which counsel will be reasonably satisfactory to the Indemnitee; *provided, however,* that (i) the Indemnitee may, if such Indemnitee so desires, employ counsel at such Indemnitee's own expense to assist in the handling (but not control the defense) of any Third-Party Claim, (ii) the Indemnitor will keep the Indemnitee advised of all material events with respect to any Third-Party Claim, (iii) the Indemnitor will obtain the prior written approval of the Indemnitor before ceasing to defend against any Third-Party Claim or entering into any settlement, adjustment or compromise of such Third-Party Claim involving injunctive or similar equitable relief being asserted against any Indemnitee or any of its Affiliates, and (iv) no Indemnitor will, without the prior written consent of the Indemnitee, settle or compromise or consent to the entry of any judgment in any pending or threatened Claim in respect of which indemnification may be sought hereunder (whether or not any such Indemnitee is a party to such action).  The other Party will cooperate with the Party assuming the defense, compromise or settlement of any such Claim in accordance with this Agreement in any manner that such Party that assumes the defense reasonably may request.  After notice from the Indemnitor to the Indemnitee of its election so to assume the defense, conduct or settlement thereof, the Indemnitor will not be liable to the Indemnitee for any costs or legal or other expenses subsequently incurred by the Indemnitee in connection with the defense, conduct or settlement thereof following such notice (including the cost of any settlement entered into by Indemnitee without Indemnitor's express written consent).  In connection with any defense of any Third-Party Claim (whether by the Indemnitors or the Indemnitees), all of the Parties will, and will cause their respective Affiliates and Representatives to, reasonably cooperate with each other in connection with such Third-Party Claim to make available to each other all Persons and all pertinent information under their respective control.

(b)    Notwithstanding anything contained herein to the contrary, the Indemnitor will not be entitled to have sole control over (and if it so desires, the Indemnitee will have sole control over) the defense, settlement, adjustment or compromise of (but the Indemnitor will nevertheless be required to pay all Losses incurred by the Indemnitee in connection with such defense, settlement or compromise to the extent the Indemnitor has assumed the defense or the Indemnitee is otherwise entitled to indemnification hereunder) (i) any Third Party Claim that seeks an order, injunction or other equitable relief against any Indemnitee or any of its Affiliates, (ii) any Third-Party Claim in which both the Indemnitor and the Indemnitee are named as parties and either the Indemnitor or the Indemnitee determines upon the advice of counsel that there may be one or more legal defenses available to it that are different from or additional to those available to the other party, and (iii) any Third-Party Claim relating to Taxes relating to the Business for periods after the Closing Date.

(c)     If the Indemnitor elects not to assume the defense, settlement, adjustment or compromise of an asserted Liability, fails to timely and properly notify the Indemnitee of its election as herein provided, or, at any time after assuming such defense, fails to diligently defend against such Third-Party Claim in good faith, fails to have sufficient financial resources to pay the full amount of such potential Liability in connection with such Third-Party Claim or if the Indemnitee is otherwise entitled pursuant to this Agreement to have control over the defense, settlement or compromise of any Claim, the Indemnitee may, at the Indemnitor's expense (but only to the extent the Indemnitee is entitled to indemnification hereunder), pay, defend, settle, adjust or compromise such asserted Liability (but the Indemnitor will nevertheless be required to pay all Losses incurred by the Indemnitee in connection with such payment, defense, settlement, adjustment or compromise).

Section 8.6.     Indemnification Procedures.

(a)     If an Indemnified Party seeks indemnification under this Article VIII, such Indemnified Party will deliver an Officer's Certificate to the Indemnifying Party (and with respect to indemnification pursuant to Section 8.3, the Escrow Agent, if the Escrow Agreement has not expired in accordance with its terms).  The Indemnifying Party may object to such claim by delivering written notice to the Indemnified Party (and with respect to indemnification pursuant to Section 8.3, the Escrow Agent, if the Escrow Agreement has not expired in accordance with its terms) specifying the basis for such objection within 30 calendar days following receipt by the Indemnifying Party of notice from the Indemnified Party regarding such claim.  If no such objection is made within such 30 calendar day period, the Indemnified Party may recover Losses without further consent or approval required of any of the Indemnifying Parties.  For the purposes hereof, "**Officer's Certificate**" will mean a certificate signed by any officer of the Indemnified Party (i) stating that the Indemnified Party has paid, sustained, incurred or properly accrued, or in good faith reasonably anticipates that it will pay, sustain, incur or accrue Losses, and (ii) specifying in reasonable detail the individual items of Losses included in the amount so stated, the date each such item was paid, sustained, incurred or properly accrued, or the basis for such anticipated Liability.

(b)     All Losses incurred by an Indemnified Party will be satisfied in accordance with the procedures set forth herein.

Section 8.7.     Limitations.

(a)     No amounts of indemnity will be payable as a result of any Claim arising under Section 8.3(a) relating to a breach or alleged breach of a representation or warranty unless and until Buyer Parties have suffered, incurred, sustained or become subject to Losses referred to in that clause in excess of $1,075,000 in the aggregate in respect of all Claims (the "**Basket Amount**"), in which case Buyer Parties may bring a Claim for all such Losses in excess of the Basket Amount, except that any Claims brought by any Buyer Parties related to any breach or alleged breach of a Seller Fundamental Representation, a representation or warranty under Section 3.6 (Tax Matters), or arising out of or related to fraud or willful misconduct of Seller, Burkhart or Van Ortwick, will not be subject to, or in any way limited by, the Basket Amount.  Except for indemnity based on any Seller Fundamental Representation a representation or warranty under Section 3.6 (Tax Matters), or arising out of or related to fraud or willful misconduct of Seller, the

68

maximum Liability of Seller, Burkhart and Van Ortwick under Section 8.3(a) will not exceed an aggregate of ($25,800,000) (the "**Maximum Indemnity Amount**").

(b)     No amounts of indemnity will be payable as a result of any Claim arising under Section 8.2 relating to a breach or alleged breach of a representation or warranty unless and until the Seller Parties have suffered, incurred, sustained or become subject to Losses referred to in that clause in excess of the Basket Amount, in which case the Seller Parties may bring a Claim for all such Losses in excess of the Basket Amount, except that Claims brought by any Seller Parties related to any breach or alleged breach of a Buyer Fundamental Representation or arising out of or related to fraud or willful misconduct of Buyer will not be subject to, or in any way limited by, the Basket Amount.  Notwithstanding anything herein to the contrary, the maximum aggregate Liability of Buyer under Section 8.2 will not exceed the Maximum Indemnity Amount.

(c)     The amount of any Claim pursuant to this Article VIII will be reduced by the amount of any insurance proceeds actually recovered (less the cost to collect the proceeds of such insurance and the amount, if any, of any retroactive or other premium adjustments reasonably attributable thereto) by the Indemnified Party in respect of such claim or the facts or events giving rise to such indemnity obligation.  If the Indemnified Party realizes such insurance proceeds after the date on which an indemnity payment has been made to the Indemnified Party, the Indemnified Party will promptly make payment to the Indemnifying Party in an amount equal to such insurance proceeds; *provided*, that such payment will not exceed the amount of the indemnity payment.

(d)     In no event will any of the Parties be liable under this Article VIII for punitive damages, except to the extent payable in connection with a Third-Party Claim.

(e)     The right to indemnification or other remedy based upon the representations, warranties and covenants will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution of this Agreement or the Closing Date, with respect to the inaccuracy of or compliance with any such representation, warranty or covenant.

Section 8.8.    Payment of Claims.  If any Buyer Party is entitled to indemnification pursuant to this Article VIII (subject to the limitations set forth in Section 8.7), then (a) Buyer and Seller will instruct the Escrow Agent to pay to such Buyer Party the applicable indemnity amount, up to and including the Maximum Indemnity Amount pursuant to the terms of, and subject to, the Escrow Agreement and (b) Seller, Burkhart and Van Ortwick, severally, will pay to such Buyer Party the applicable indemnity amount, to the extent in excess of the Maximum Indemnity Amount and payable pursuant to the terms of this Agreement.

Section 8.9.    Character of Indemnity Payments.  The Parties agree that any indemnification payments made with respect to this Agreement will be treated for all Tax purposes as an adjustment to the Purchase Price, unless otherwise required by Law (including by a determination of a Taxing Authority that, under applicable Law, is not subject to further review or appeal).

Section 8.10.    Exclusive Remedy.  From and after the Closing, except with respect to fraud or willful misconduct, the remedies provided for in this Article VIII are exclusive and will be in

lieu of all other remedies for any breach of any representation or warranty or the failure to perform or comply with any covenant, agreement or other provision of this Agreement.

## ARTICLE IX

## <u>MISCELLANEOUS</u>

Section 9.1.    <u>Notices</u>.  All notices, requests, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given upon receipt to the Parties at the following addresses or facsimiles (or at such other address or facsimile for a Party as will be specified by the notice):

If to Seller:

> c/o Burk Ortwick Holdings
> 3811 Wacker Dr.
> Mira Loma, CA 91752
> Attn: Brandon L. Burkhart
> Email: leeswholesale@gmail.com

With a copy (which will not constitute notice) to:

> Rimon PC
> 800 Oak Grove Ave., Suite 250
> Menlo Park, CA 94025
> Attention:     James C. Chapman
> Email:          james.chapman@rimonlaw.com

If to Buyer:

> Hawthorne Hydroponics LLC
> c/o The Hawthorne Gardening Company
> 14111 Scottslawn Road
> Marysville, Ohio 43041
> Attention:  Katy Wiles
> Email:  katy.wiles@scotts.com

With a copy (which will not constitute notice) to:

> Paul Hastings LLP
> 200 Park Avenue
> New York, New York 10166
> Attention:  Samuel Waxman
> Email:  samuelwaxman@paulhastings.com

Section 9.2.  <u>Entire Agreement</u>.  This Agreement, the exhibits and schedules hereto and the Transaction Documents supersede all prior and contemporaneous discussions and agreements, both written and oral, among the Parties with respect to the subject matter of this Agreement and the Transaction Documents, and constitute the sole and entire agreement among the Parties to this Agreement with respect to the subject matter of this Agreement.

Section 9.3.  <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement or any Transaction Document, each Party will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the Transaction Documents and the transactions contemplated by this Agreement and the Transaction Documents.  Buyer and Seller will share equally any requisite filing fee in respect of any notification submitted pursuant to antitrust Laws, other than as set forth in Section 5.7(d).

Section 9.4.  <u>Waiver</u>.  Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver will be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition.  No failure or delay by any party in exercising any right, power or privilege hereunder will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No waiver by any Party of any term or condition of this Agreement, in any one or more instances, will be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.  All remedies, either under this Agreement or by Law or otherwise afforded, will be cumulative and not alternative.

Section 9.5.  <u>Amendment</u>.  This Agreement may only be amended, supplemented or modified by a written instrument duly executed by or on behalf of each Party to this Agreement.

Section 9.6.  <u>No Third-Party Beneficiary</u>.  The terms and provisions of this Agreement are intended solely for the benefit of each Party hereto and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third party beneficiary rights upon any other Person other than any Person entitled to indemnity under Article VIII.

Section 9.7.  <u>Assignment; Binding Effect</u>.  Neither this Agreement nor any right, interest or obligation under this Agreement may be assigned or delegated by any Party by operation of Law or otherwise without the prior written consent of the other Parties and any attempt to do so will be void, except that Buyer may assign or delegate any or all of its rights, interests and obligations under this Agreement (a) before or after the Closing, to any Affiliate, and (b) after the Closing, to any Person; *provided*, that any such Affiliate or Person referred to in clause (a) or (b), as applicable, agrees in writing to be bound by the terms, conditions and provisions contained in this Agreement, but no such assignment will relieve Buyer of its obligations under this Agreement if such assignee does not perform such obligations.  Without limiting the generality of the foregoing, if requested by Buyer, Seller agrees to cause the Business and the Purchased Assets or any portion thereof at the Closing to be transferred to any Person that Buyer may direct.  Subject to the foregoing, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and assigns.

71

Section 9.8.   <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without regard for the conflict of laws principles thereof.

Section 9.9.   <u>Consent to Jurisdiction; Service of Process; Waiver of Jury Trial</u>.

(a)   EACH PARTY HEREBY IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY (AND IF JURISDICTION IN THE DELAWARE COURT OF CHANCERY SHALL BE UNAVAILABLE, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA SITTING IN THE STATE OF DELAWARE) IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTION DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, AND EACH PARTY AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING WILL BE BROUGHT ONLY IN SUCH COURT (AND WAIVES ANY OBJECTION BASED ON *FORUM NON CONVENIENS* OR ANY OTHER OBJECTION TO VENUE THEREIN); *PROVIDED*, *HOWEVER*, THAT SUCH CONSENT TO JURISDICTION IS SOLELY FOR THE PURPOSE REFERRED TO IN THIS SECTION 9.9 AND WILL NOT BE DEEMED TO BE A GENERAL SUBMISSION TO THE JURISDICTION OF SAID COURTS OR IN THE STATE OF DELAWARE OTHER THAN FOR SUCH PURPOSE.  Any and all process may be served in any action, suit or proceeding arising in connection with this Agreement or the Transaction Documents by complying with the provisions of Section 9.1.  Such service of process will have the same effect as if the Party being served were a resident in the State of Delaware and had been lawfully served with such process in such jurisdiction.  The Parties hereby waive all claims of error by reason of such service.  Nothing herein will affect the right of any Party to service process in any other manner permitted by Law or to commence legal proceedings or otherwise proceed against the other in any other jurisdiction to enforce judgments or rulings of the aforementioned courts.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY TRANSACTION DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 9.9 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(b)   In the event of any breach of the provisions of this Agreement or the Transaction Documents, the non-breaching party will be entitled to seek equitable relief, including in the form of injunctions and orders for specific performance, where the applicable legal standards for such relief in such courts are met, in addition to all other remedies available to the non-breaching party with respect thereto at law or in equity.

LEGAL_US_E # 158737765.16

Section 9.10.   <u>Invalid Provisions</u>.  If any provision of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be illegal, invalid or unenforceable under any present or future Law, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 9.11.   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, all of which will be deemed originals and constitute one and the same instrument. This Agreement, and any amendment hereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, will be treated in all manner and respects as an original agreement and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

Section 9.12.   <u>Interpretation</u>.  The Parties have participated jointly in the negotiating and drafting of this Agreement.  If an ambiguity or a question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

*[The remainder of this page has been intentionally left blank.]*

73

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first written above.

LUXX LIGHTING, INC.

By: _____

Name: Brandon L. Burkhart
Title:   Chief Executive Officer

_____

**Brandon L. Burkhart**

_____

**Ivan Van Ortwick**

**Hawthorne Hydroponics LLC**

By: _____

Name:
Title:

[Signature Page to Purchase Agreement]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first written above.

**LUXX LIGHTING, INC.**

By: _____
       Name: Brandon L. Burkhart
       Title:   Chief Executive Officer


_____
**Brandon L. Burkhart**


_____
**Ivan Van Ortwick**


**Hawthorne Hydroponics LLC**

By: _____
Name: Mark J. Scheiwer
Title:  Vice President and Treasurer

[Signature Page to Purchase Agreement]

## Schedule 8.3

## Specific Indemnities

1. Any Action, demand, or allegation brought against any of the Buyer Parties or their manufacturers, distributors, customers, or end users, directly or indirectly by or on behalf of Signify N.V., Philips Lighting Holding B.V., or any Affiliates thereof with respect to or related to the Business, the Business Intellectual Property, or the products or services of the Business, including with respect to the drafting, negotiation, or execution of any license, settlement or other agreement with any of the foregoing and any upfront payments, license fees, maintenance fees, milestone payments, royalty payments, product price increases, and other fees and amounts payable thereunder or with respect thereto arising out of facts or circumstances that took place prior to the Closing.

2. Any Liabilities arising out of facts or circumstances that took place prior to the Closing related to breach, alleged breach, non-compliance, fees, tariffs, duties, penalties, or other similar payments in respect of International Trade Laws or Customs and Import Laws, including but not limited to with respect to misclassification of goods and duties associated therewith.

3. Any Liabilities arising out of or related to deficient and/or inaccurate safety markings or manuals with respect to products of the Business prior to the Closing.

4. Any Liabilities arising out of or related to Burkhart, Van Ortwick or Seller's sale of Excluded Inventory pursuant to Section 5.4(a).

5. Any Liabilities arising out of or related to the Classification.